1  SCHIFF HARDIN LLP
   Bruce A. Wagman, Esq. (CSB #159987)
2  bwagman@schiffhardin.com
   One Market, Spear Street Tower
3  Thirty-Second Floor
   San Francisco, CA 94105
4  Telephone:    (415) 901-8700
   Facsimile:    (415) 901-8701
5
   Attorneys for Plaintiffs

                                            FILED
                                            JUL 02 2013
                                        RICHARD W. WIEKING
                                    CLERK, U.S. DISTRICT COURT
                                   NORTHERN DISTRICT OF CALIFORNIA

7

8                  UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA  YGR

10                    SAN FRANCISCO DIVISION

11
                                          CV 13   3034
12  FRONT RANGE EQUINE RESCUE, THE            Case No.
    HUMANE SOCIETY OF THE UNITED
13  STATES, MARIN HUMANE SOCIETY,
    HORSES FOR LIFE FOUNDATION,
14  RETURN TO FREEDOM, RAMONA
    CORDOVA, KRYSTLE SMITH, CASSIE
15  GROSS, DEBORAH TRAHAN, and
    BARBARA SINK,
16
              Plaintiffs,                   **COMPLAINT FOR DECLARATORY
17                                          AND INJUNCTIVE RELIEF**
    v.
18
    TOM VILSACK, Secretary U.S. Department
19  of Agriculture; ELIZABETH A. HAGEN,
    Under Secretary for Food Safety, U.S.     **(Administrative Procedure Act Case)**
20  Department of Agriculture; and ALFRED A.
    ALMANZA, Administrator, Food Safety and
21  Inspection Service, U.S. Department of
    Agriculture,
22
              Defendants.
23

24  **I.    INTRODUCTION**

25        1.      Front Range Equine Rescue, The Humane Society of the United States, The Marin

26  Humane Society, Horses for Life Foundation, Return to Freedom, Ramona Cordova, Cassie

27  Gross, Deborah Trahan, Krystle Smith and Barbara Sink (collectively "Plaintiffs"), bring this

28  complaint for declaratory and injunctive relief ("Complaint") against Defendants Tom Vilsack,

SCHIFF HARDIN LLP                           - 1 -                              CASE NO. _____
ATTORNEYS AT LAW
SAN FRANCISCO           COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Secretary of Agriculture, United States Department of Agriculture ("USDA"), Elizabeth A.

2   Hagen, USDA Under Secretary for Food Safety, and Alfred V. Almanza, USDA Administrator

3   for Food Safety and Inspection Service ("FSIS"), collectively "Defendants," for violation of the

4   National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") and the Administrative

5   Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

6   2.   Defendants are embarking on a nationwide program of horse slaughter that

7   presents clear threats to the environment without complying with Congressionally-mandated

8   requirements intended to protect the public and our natural resources.

9   3.   The slaughter of American horses for human consumption presents unique and

10  extensive dangers that have never been adequately considered by Defendants, despite their

11  obligations under NEPA.

12  4.   In 2007, Congress ended horse slaughter for human consumption in America, and

13  there has been no program or policy for inspection of horse slaughter facilities in place since that

14  time. In 2011, Congress appropriated funding for inspection of horse slaughter facilities, which

15  necessitated a new set of plans, policies, and procedures for inspection of horse slaughter

16  facilities by FSIS.

17  5.   For six years, from 2007 until the filing of this complaint, there has been no plan

18  or policy for inspection of horses going to slaughter. For that entire time, horses were notably

19  absent from any consideration of testing or inspection programs. Defendants have been

20  modifying and supposedly improving their testing programs for slaughtered animals over the

21  course of that time. But horses have been consistently excluded. Even USDA's 2013 National

22  Residue Program for testing animals subject to slaughter, when the agency knew that horse

23  slaughter was authorized, excluded horses from consideration.

24  6.   Plaintiffs are filing this action because Defendants are proceeding with the

25  inspection of horses under the Federal Meat Inspection Act without compliance with their

26  federally mandated environmental review obligations. The issue of Defendants' failure to comply

27  with NEPA with respect to their horse slaughter inspection activities was previously addressed in

28

1   *Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 36 (D.D.C. 2007), and resulted in a final

2   order finding defendants in violation of NEPA.

3   7.   At least six applications for horse slaughter inspections in five states have already

4   been submitted to USDA since Congress appropriated funding for inspections. These

5   applications include: Valley Meat Co. LLC ("Valley Meat") located in Roswell, New Mexico;

6   Responsible Transportation of Sigourney, Iowa; Rains Natural Meats of Gallatin, Missouri;

7   American Beef Company/Unified Equine, LLC ("Unified Equine") of Rockville, Missouri; Trail

8   South Meat Processing Co. ("Trail South") of Woodbury, Tennessee; and Oklahoma Meat

9   Company of Washington, Oklahoma. In light of these applications, Defendants have been

10   developing new plans and programs, and a new set of policies with respect to the inspection of

11   horse slaughter facilities.

12   8.   As set forth in this Complaint, Defendants have violated NEPA by failing to

13   prepare an environmental impact statement or an environmental assessment prior to granting

14   inspection to horse slaughter plants located throughout the United States. Defendants' challenged

15   actions authorize the resumption of slaughter of American horses for human consumption after

16   six years without domestic horse slaughter. Defendants have taken this action notwithstanding

17   USDA's obligations to comply with NEPA, and USDA's actual knowledge that horse slaughter

18   causes significant environmental harms related specifically to the means and methods of horse

19   slaughter, the potentially toxic nature of the waste generated by this industry, and the fact that

20   horse meat endangers consumers.

21   9.   Additionally, Defendants have violated NEPA by failing to prepare an

22   environmental impact statement or an environmental assessment prior to adopting and

23   implementing a new residue testing plan applicable to all horse slaughter plants throughout the

24   nation that may be authorized to operate by Defendants.

25   10.   Defendants' failure to conduct any consideration or review of the environmental

26   effects of their grant of inspection and their new residue testing plan violates NEPA and its

27   implementing regulations. Defendants should be enjoined from: carrying out inspections at any

28   horse slaughter facility that has received a grant of inspection; implementing their new residue

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 3 -                                                          CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  testing plan for any horse slaughter facility; and granting inspection to any horse slaughter

2  facility, unless and until Defendants conduct a detailed review of the environmental effects of

3  their actions in full compliance with NEPA and its implementing regulations.

4  **II.    JURISDICTION AND VENUE**

5      11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Venue

6  is proper pursuant to 28 U.S.C. § 1391(e).

7  **III.   PARTIES**

8      12.    Front Range Equine Rescue (FRER) is a Colorado-based nonprofit group

9  incorporated under Section 501(c)(3) of the Internal Revenue Code.  FRER has over 95,000

10  supporters nationwide, with its largest percentage in California, and is dedicated to stopping

11  cruelty and abuse of horses through rescue and education. FRER is actively involved in the

12  rescue, rehabilitation and adoption to good homes of domestic and wild horses found at auctions

13  and horses destined for slaughter; and in educational efforts regarding responsible horse

14  ownership, the cruelty of horse slaughter and wild horse roundups. FRER has assisted thousands

15  of horses through its rescue and educational programs. While some of FRER's horses are

16  surrendered by their owners or rescued when abandoned, many are rescued from livestock

17  auctions; others are purchased at feed lots before they are sent to slaughter.

18      13.    FRER has been actively advocating against horse slaughter operations in the

19  United States for years.  In March 2012, FRER, in conjunction with The Humane Society of the

20  United States, submitted a Petition for Rulemaking to the Federal Food and Drug Administration

21  ("FDA") requesting that the FDA promulgate rules that horse meat is adulterated according to

22  federal law and regulations and cannot be sold legally.[1]  In April 2012, FRER, in conjunction

23  with The Humane Society of the United States ("The HSUS"), submitted another Petition for

24  Rulemaking to the USDA, asking that the USDA promulgate rules that horse meat is adulterated

25  according to federal law and regulations and cannot be sold legally.[2]  FRER has also petitioned

26

27  [1] Available at http://www.frontrangeequinerescue.org/documents/petition.fda.slaughter.pdf.

28  [2] Available at http://www.fsis.usda.gov/PDF/Petition_SchiffHardin_040612.pdf.

Schiff Hardin LLP
Attorneys At Law
San Francisco

CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1     the Federal Bureau of Land Management (BLM) to stop the sale of wild horses gathered from the

2     range to individuals who then sell them to slaughter facilities.[3]

3     14.     In addition to its petitions to the FDA and USDA for rulemaking regarding

4     adulterated horse meat and to the BLM regarding wild horses sold for slaughter, FRER has been

5     instrumental in bringing to light Valley Meat's numerous, blatant violations of New Mexico

6     environmental law caused by the plant's now-abandoned cattle slaughter operations. Valley

7     Meat's environmental law violations persisted for many years before FRER advocated that state

8     officials take action against Valley Meat. FRER wrote multiple letters to the Solid Waste Bureau

9     of the New Mexico Environmental Department, requesting appropriate sanctions for the

10     violations perpetrated by Valley Meat. The result of FRER's advocacy was a finding by the Solid

11     Waste Bureau of the New Mexico Environmental Department in August 2012 that Valley Meat

12     was in grave violation of the solid waste laws, and that it should be fined $86,400.

13     15.     FRER's primary mission is to stop the abuse and neglect of horses through rescue

14     and education. It provides support and rehabilitation of horses who are sold at auctions,

15     purchased from kill buyers, or owner surrendered. The majority of FRER's rescue horses would

16     have been sent to slaughter but for FRER's rescue of them. Since 2011, however, FRER has been

17     forced to expend a large portion of its annual budget in an effort to prevent the slaughter of

18     American horses. The actions of the USDA in delaying consideration of FRER's rulemaking

19     petition increased the financial outlay FRER had to make in order to identify the nature and

20     likelihood of success of the current applications for horse slaughter. When USDA announced that

21     it was going to begin reviewing applications of potential slaughter facilities, FRER was again

22     required to increase its outlay of funds to investigate and identify the problems with horse

23     slaughter in particular states, nationally, and even internationally. FRER will need to continue to

24     divert resources from its other programs in order to address the issues surrounding horse slaughter

25     unless Defendants' actions are stopped.

26

27     _____

28     [3] Available at http://www.frontrangeequinerescue.org/documents/wild.horse.filing.dec2012.pdf.

- 5 -           CASE NO. _____

16. Defendants' actions as set forth below impede FRER's actions and frustrate FRER's ability to pursue its goals for several reasons. First, Defendants' actions will authorize the slaughter of tens if not hundreds of thousands of healthy American horses. Second, FRER will continue to be forced to divert its limited resources to investigation of the potential for new horse slaughterhouses, and the trade in horses in the slaughter pipeline. Defendants' actions will force FRER to divert its limited organizational and programmatic resources to continue these investigations and care for animals saved from the slaughterhouse. These resources would otherwise be spent on programmatic and advocacy activities to prevent cruelty to horses, in furtherance of FRER's larger goals, including its programs which provide alternatives to horse slaughter.

17. If horse slaughter for human consumption begins in America, FRER and its supporters will be directly and irreparably harmed. They have a particularized interest in preventing horse slaughter and have invested significant energy and resources, including a large portion of FRER's annual budget, into preventing the initiation of the slaughter of American horses for human food. If this practice begins again, the impact to the organization will be major.

18. The interests of FRER and its supporters in observing and enjoying horses, and otherwise protecting these animals from slaughter, are injured by Defendants' decision to grant inspection to a horse slaughter plant, because the grant of inspection allows the applicant to begin slaughtering wild and companion horses. Moreover, FRER has thousands of supporters nationwide, including in New Mexico, Missouri, Iowa and California. Thousands of FRER's supporters will be adversely affected by the health, environmental, aesthetic, and economic impacts of horse slaughter operations.

19. These injuries are caused by the USDA's grant of inspection to domestic horse slaughter plants and adoption of a new residue testing plan for horse slaughter, because if the grant of inspection had not been given and the new testing program had not been adopted, horses would not and legally could not be slaughtered for human consumption in America.

20. These injuries will be redressed if the Plaintiffs prevail in this action, because if the grant of inspection is set aside, then any horse slaughter plants that have received grants for

1    inspection will be prohibited from operating, the current status quo of no horse slaughter in the

2    United States will continue, and there will be no detrimental health, environmental, aesthetic, or

3    economic impacts felt by the supporters of FRER living in New Mexico, Missouri, and Iowa, or

4    anywhere else horse slaughter may begin.

5          21.     The Humane Society of the United States is a non-profit organization that

6    promotes the protection of all animals. The HSUS maintains its headquarters in Washington, DC

7    and is the largest animal protection organization in the United States, with millions of members

8    nationwide and many thousands of members in New Mexico, Missouri, Iowa and California. The

9    HSUS has actively advocated against practices that injure or abuse horses and opposes the

10   slaughter of horses for human consumption for more than fifty years. The HSUS investigates

11   horse cruelty complaints and assists individuals with guidance and advice as to how to best care

12   for their horses, including how to prevent horses from being lost, stolen, or sold to "killer buyers"

13   at auction – middlemen hired by the slaughterhouses to purchase horses for human food. The

14   HSUS actively collaborates with federal agencies to develop wild horse immunocontraception

15   field studies and trials, in order to reduce the sale and slaughter of wild horses. The HSUS has

16   also been active in strengthening provisions of the Horse Protection Act through strong advocacy

17   in support of the American Horse Slaughter Prevention Act (H.R. 503 and S. 1915) since its

18   original introduction in 2002, and the Wild Horse Act that was introduced this Congress (H.R.

19   297 and S. 576). The HSUS has assisted in the passage of state laws that ban horse slaughter or

20   govern the treatment and transportation of horses sold for slaughter within their borders. The

21   HSUS also advocated for the Commercial Transportation of Equines for Slaughter Act, passed by

22   Congress in 1996. The HSUS worked with bipartisan leaders in Congress to pass an Amendment

23   to the FY2006 Agriculture Appropriations Act to de-fund federal ante-mortem inspection of

24   horses for slaughter. More recently, The HSUS has worked with FRER to submit rulemaking

25   petitions to FDA and USDA with the purpose of preventing horse slaughter from resuming again

26   in the United States.

27         22.     Members of The HSUS enjoy observing, photographing, studying and otherwise

28   appreciating wild horses. Members of The HSUS also enjoy observing, photographing, and

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                          - 7 -                              CASE NO. _____

1    otherwise appreciating companion horses. The interests of The HSUS and its members in

2    observing, studying, and enjoying horses, and otherwise protecting these animals from slaughter,

3    are injured by Defendants' decision to grant inspection to any horse slaughter plant, because the

4    grant of inspection allows the applicant to begin slaughtering wild and companion horses.

5    Moreover, members of The HSUS who reside in or near any horse slaughter plants approved by

6    Defendants will be adversely affected by the health, environmental, aesthetic, and economic

7    impacts of horse slaughter operations.

8    23.    HSUS member Lawrence Seper became a member of The HSUS so that it would

9    represent his interests on animal protection issues, including the slaughtering of horses for human

10    consumption. Mr. Seper has lived in Gallatin, Missouri for nearly four years, and lives in close

11    proximity to the Rains Natural Meats plant. He recreates in the Gallatin area, and would be

12    injured if Rains Natural Meats begins horse slaughter operations.

13    24.    HSUS member Margaret Walker became a member of The HSUS so that it would

14    represent her interests on animal protection issues, including the slaughtering of horses for human

15    consumption. Ms. Walker has lived in Gallatin, Missouri for over eight years. Ms. Walker has

16    an ardent interest in the protection and welfare of horses as companion animals, and would face

17    an immediate and severe impact to her ability to enjoy her life in Gallatin if Rains Natural Meats

18    begins slaughtering horses for human consumption.

19    25.    HSUS member Barbara Mohror became a member of The HSUS so that it would

20    represent her interests on animal protection issues, including the slaughtering of horses for human

21    consumption. Ms. Mohror has lived in Keota, Iowa for more than eighteen years. Ms. Mohror

22    recreates with her family in the Sigourney area, and will be injured if Responsible Transportation

23    begins horse slaughter operations.

24    26.    These injuries are caused by the USDA's grant of inspection to horse slaughter

25    facilities and adoption of a new residue testing plan for horse slaughter, because if the grant of

26    inspection had not been given and a new testing program had not been adopted, horses would not

27    and legally could not be slaughtered for human consumption in America.

28

1    27.    These injuries will be redressed if the Plaintiffs prevail in this action, because if
2    the grant of inspection is set aside, then the horse slaughter plants will be prohibited from
3    operating, the current status quo of no horse slaughter in the United States will continue, and
4    there will be no detrimental health, environmental, aesthetic, or economic impacts felt by
5    members of The HSUS in New Mexico, Missouri, and Iowa, or anywhere else horse slaughter
6    may begin.

7    28.    Additionally, the ability of The HSUS and its members to engage in educational,
8    legislative, and advocacy activities with respect to horse protection is injured by Defendants'
9    failure to comply with NEPA. Without the required environmental analysis, and response to
10   public comments, Defendants have prevented The HSUS from learning what, if any,
11   environmental effects information USDA considered prior to USDA undertaking that action,
12   thereby inhibiting The HSUS's efforts to communicate with its members, so that its members
13   may in turn contact USDA, other agencies, and their elected representatives to advocate for the
14   humane treatment of horses and other animals and the protection of the environment from horse
15   slaughter contamination. These injuries will be redressed if the Plaintiffs prevail in this action,
16   because when the grant of inspection is set aside, then horse slaughter cannot occur until proper
17   NEPA review, including public participation and comment, is undertaken.

18   29.    Plaintiff Marin Humane Society (MHS) is a nonprofit organization located in
19   Novato, California. MHS was founded over 100 years ago to protect and advocate for animals.
20   MHS offers refuge, rehabilitation, and support services to more than 10,000 animals each year,
21   including domestic, wild, and rescued farm animals. MHS engages in a number of community
22   services and has actively been involved in the provision of sanctuary and then adoption for
23   hundreds of animals used in agricultural production or destined for slaughter.

24   30.    MHS also has an active anticruelty and advocacy program and routinely supports
25   legislation directed at reducing cruelty to all animals. MHS has supported and continues to
26   support the passage of laws banning horse slaughter, based on MHS policy against that practice.

27   31.    MHS monitors and weighs in on national issues and has a special focus on Marin
28   County and its residents. MHS investigates horse cruelty complaints and assists individuals with

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 9 -                                          CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    guidance and advice as to how to best care for their horses, including how to prevent horses from
2    being lost, stolen, or sold to "killer buyers" at auction – middlemen hired by the slaughterhouses
3    to purchase horses for human food.

4         32.    MHS has actively supported the passage of state laws that ban horse slaughter or
5    govern the treatment and transportation of horses sold for slaughter. MHS promotes and supports
6    a mission of anticruelty for all animals, and for that reason is opposed to the slaughter of horses.

7         33.    MHS has been actively involved in surveillance and investigations of local
8    livestock auctions where horses were being sold to killer-buyers for slaughter. MHS has also
9    rescued horses destined for slaughter, and has counseled the public in order to prevent the sale of
10   horses to slaughter, and has worked with other equine rescue groups in order to prevent horses
11   from going to slaughter.

12        34.    MHS has been involved in training animal control officers, animal services
13   officers, and humane officers and other students in the application of state statutes addressing
14   horse slaughter issues.

15        35.    MHS supporters enjoy observing, photographing, studying and otherwise
16   appreciating companion horses. The interests of MHS and its supporters in observing, studying,
17   and enjoying horses, and otherwise protecting these animals from slaughter, are injured by
18   Defendants' decision to grant inspection to any horse slaughter plant, because the grant of
19   inspection allows the applicant to begin slaughtering horses.

20        36.    These injuries are caused by the USDA's grant of inspection to horse slaughter
21   facilities and adoption of a new residue testing plan for horse slaughter, because if the grant of
22   inspection had not been given and a new testing program had not been adopted, horses would not
23   and legally could not be slaughtered for human consumption in America.

24        37.    These injuries will be redressed if the Plaintiffs prevail in this action, because if
25   the grant of inspection is set aside, then the horse slaughter plants will be prohibited from
26   operating, the current status quo of no horse slaughter in the United States will continue, and
27   there will be no injuries felt by MHS and its supporters.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 10 -                                CASE NO. _____

38.     Additionally, the ability of MHS to engage in educational, legislative, and advocacy activities with respect to horse protection is injured by Defendants' failure to comply with NEPA. Without the required environmental analysis, and response to public comments, Defendants have prevented MHS from learning what, if any, environmental effects information USDA considered prior to USDA undertaking that action, thereby inhibiting MHS' efforts to communicate with its supporters, so that they may in turn contact USDA, other agencies, and their elected representatives to advocate for the humane treatment of horses and other animals and the protection of the environment from horse slaughter contamination. These injuries will be redressed if the Plaintiffs prevail in this action, because when the grant of inspection is set aside, then horse slaughter cannot occur until proper NEPA review, including public participation and comment, is undertaken.

39.     Plaintiff Horses for Life Foundation is a Bay Area organization dedicated to protecting horses who would otherwise go to slaughter or be captured, and preserving the wild ones that live on the American open range. Horses for Life advocates for an end to horse slaughter, and a ban on the export of American horses across international borders to slaughter.

40.     Plaintiff Return to Freedom is a nonprofit organization with over 25,000 supporters, headquartered in Lompoc, California, dedicated to the rescue of horses destined for slaughter, and wild horses. In 2007, Return to Freedom saved the lives of four horses who were about to be slaughtered at the Cavel slaughterhouse in DeKalb, Illinois. Return to Freedom brought these "miracle horses" to the Lompoc sanctuary, which became their permanent home. Return to Freedom and its supporters are devoted to these and other horses who have been obtained while en route to slaughter.

41.     Return to Freedom's permanent equine residents include domestic and former wild horses who were on their way to slaughter but for the group's rescue of the horses, who now live permanently at the Return to Freedom ranch.

42.     Return to Freedom supports the enactment of legislation that would end the slaughter of American horses for food, and the transport of horses for slaughter.

1    43.    Return to Freedom has met with tribal Lakota elders, in an effort to prevent horse

2    slaughter operations on tribal lands. After discussions, Return to Freedom obtained letters from

3    the tribal elders stating their belief that horses should not be slaughtered for human food.

4    44.    RTF has been a consultant as part of a feasibility study, for the State of New

5    Mexico to provide rescue and sanctuary and save the wild horses on tribal and state lands from

6    slaughter. Return to Freedom and its supporters remain heavily invested in ensuring that wild

7    horses not be sent to slaughter.

8    45.    Plaintiff Barbara Sink has lived in Gallatin, Missouri for nearly thirteen years. Her

9    residence is located approximately three miles from the Rains Natural Meats facility. Ms. Sink

10   was an engineer for the civil bioenvironmental engineering division of the United States Air

11   Force for two years, a position that required her to survey and evaluate water quality in the

12   workplace and surrounding environment, and recommend controls to keep environmental and

13   occupational exposures within acceptable limits. She often spends time gardening and regularly

14   fishes in the Grand River, which flows downstream from Rains Natural Meats, approximately one

15   mile away. The stream adjacent to Rains Natural Meats flows directly into the Grand River.

16   Ms. Sink often takes her children and grandchildren to the lakes, rivers, and streams that are local

17   to Gallatin, Missouri to swim, hike, play, and fish.

18   46.    Because of her knowledge of the potential contamination from horse slaughter

19   operations, and the adulterated nature of horse meat, Ms. Sink will stop fishing in the Grand

20   River, will stop eating fish that are locally caught, and will stop recreating at other local parks

21   with her family if horse slaughter operations begin in Gallatin for fear of contamination from the

22   Rains Natural Meat facility's runoff. This will cause her injury and distress.

23   47.    Ms. Sink drives through Gallatin often, including past the Rains Natural Meat

24   facility, to get to the Amish markets in Jamesport. If horse slaughter begins at Rains Natural

25   Meat, she will see trucks with horses being carried to slaughter, which will cause her great

26   distress, based on her understanding of the inherently cruel nature of horse slaughter.

27   48.    If horse slaughter begins at Rains Natural Meats, Ms. Sink will also witness

28   vehicles that are trucking away the remains and parts of horses which are being carried to

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 12 -                              CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    landfills, and the horse flesh being sold by Rains Natural Meats. Viewing these trucks will cause

2    Ms. Sink injury and distress.

3        49.    A livestock auction is located approximately three blocks from Ms. Sink's home,

4    and if Rains Natural Meats begins slaughter operations, horses that are going to be slaughtered

5    there will very likely pass through this livestock auction. Ms. Sink will see horses on their way to

6    the auction, and then to slaughter at the Rains Natural Meats plant. This will cause her injury and

7    distress.

8        50.    Ms. Sink is aware that horse slaughterhouses that previously operated in the

9    United States emitted a noxious odor. If Rains Natural Meats begins slaughtering horses, Ms.

10   Sink will likely smell this stench when she is in town, which will detrimentally impact her ability

11   to enjoy her life and her community.

12       51.    Ms. Sink is extremely worried that if Rains Natural Meats begins slaughter

13   operations, toxic runoff from the plant will pollute the surrounding area, including the rivers and

14   streams near her home.

15       52.    Plaintiff Krystle Smith has lived in Roswell, New Mexico for her entire life, and

16   her mother and grandmother have lived in Roswell and southern New Mexico for all of their

17   lives. Ms. Smith has been an employee of the Roswell Humane Society for seven years, and lives

18   within six miles of the Valley Meat facility. She regularly spends time fishing and camping at

19   Lake Van, which is downstream from Valley Meat, and which is connected to the waterways in

20   proximity of Valley Meat by a series of underground channels that extend all the way to Carlsbad.

21   She has been fishing and camping on Lake Van for years, and plans on continuing to do so, as

22   long as the water and environment are not contaminated. However, the Pecos River, which is

23   close to Valley Meat, runs through Roswell and surrounding towns including Hagerman, Artesia,

24   and Carlsbad. A series of natural underground streams connect many of the waterways in the

25   area downstream and in the vicinity of Valley Meat.

26       53.    Based on Valley Meat's violations of New Mexico's and federal requirements

27   regarding the protection of the environment and waterways, Ms. Smith is reasonably worried that

28   any horse slaughter taking place at Valley Meat will affect the quality of the water in which

1    engages in regular recreation. This is compounded by Ms. Smith's reasonable belief that all

2    horses who will be slaughtered at the Valley Meat facility have been given multiple drugs and

3    other substances that render their meat adulterated and dangerous, so that the byproducts of

4    Valley Meat's horse slaughter will pollute the surrounding area, including the rivers and streams.

5        54.    If horse slaughter commences at Valley Meat, Ms. Smith will stop fishing and

6    camping in the area she calls home, though she will desire to continue those activities. This will

7    cause her injury and distress.

8        55.    If Valley Meat begins a horse slaughter operation, Ms. Smith will be extremely

9    worried about the discharges the horse slaughter facility is allowing to enter the local waterways,

10   and she will be certain that the water in which she fishes is unsafe. She will not be able to eat fish

11   from the river if Valley Meat is slaughtering horses.

12       56.    Ms. Smith is aware that horse slaughter cannot be accomplished in a humane

13   manner, and that horses suffer terribly in the slaughter process. As part of her job with the

14   Roswell Humane Society, she travels to a nearby veterinary hospital no less than five times, and

15   usually more times, each week. In order to get to that shelter she must drive right by where the

16   Roswell Livestock Auction Barn is located. Any horses purchased by Valley Meat from the

17   auction would be in plain view of the road she travels. If Valley Meat is slaughtering horses, she

18   will be directly confronted with a view of the horses in holding pens and transport trucks waiting

19   to be transported to Valley Meat for slaughter. These images will cause her intense aesthetic

20   injury. Her aesthetic appreciation of the area will be harmed, she will be frightened to go past the

21   facility, and she will have to be sure that her family does not go past the facility. If she sees

22   horses being taken to Valley Meat, or trucks returning from there with carcasses, she will have an

23   immediate and long-lasting injury from viewing those trucks and animals.

24       57.    If livestock trucks carrying horses begin to drive past the Roswell Humane

25   Society, Ms. Smith will be deeply affected because she will know that those horses are going to

26   an inhumane death in the slaughterhouse, and because the offal and remains of those horses will

27   pollute the ground around the facility and wherever else they are dropped, which could affect the

28   entire community.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 14 -                    CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    58.    If Valley Meat begins slaughtering horses, the stench will carry into Roswell on a

2  regular basis, especially with Roswell's intense summer heat and winds, and will seriously affect

3  Ms. Smith's ability to enjoy her work, her life, and the surrounding parks and rivers and streams,

4  which will all likely be affected by the contamination by Valley Meat from horse slaughter.

5    59.    Plaintiff Ramona Cordova works in the Human Resources Department of Eastern

6  New Mexico University's Roswell campus. She was born and raised in Roswell, and has lived

7  there for almost all of her life. Her parents and much of her family, including her brother, aunts,

8  uncles and cousins, all live in Roswell, and they are all proud of Roswell's reputation and

9  community.

10    60.    Ms. Cordova and her family are integrally connected to Roswell and its

11  surrounding areas. A vital part of their sense of community and family structure comes from their

12  love of the surrounding parks and lakes and natural structures in proximity to Roswell, and their

13  ability to appreciate the town and the natural environment.

14    61.    Ms. Cordova lives less than seven miles from the Valley Meat facility. She is

15  active in gardening, walking around the Roswell community, and some hiking. She and her

16  family go to the parks in proximity to the Valley Meat facility, including Bottomless Lakes State

17  Park and others. Her family also engages in recreation and fishing on the Pecos River, which

18  runs close to Valley Meat. They have been doing these activities for years and will continue to do

19  them. A tributary of the Pecos River, the Spring River Canal, runs very close to Valley Meat and

20  Ms. Cordova believes that runoff from Valley Meat drains into the Spring River Canal.

21    62.    Ms. Cordova is aware that all horses who will be slaughtered at the Valley Meat

22  facility have all been given multiple drugs and other substances that render their meat adulterated

23  and dangerous, so that the byproducts of Valley Meat's horse slaughter will pollute the

24  surrounding area, including the rivers and streams. Because of her patronage of these natural

25  wonders, she will be injured and distressed by this damage.

26    63.    Ms. Cordova understands that any method of horse slaughter will cause extreme

27  and unnecessary pain and suffering for the horses involved. She regularly sees the trucks

28  carrying cows and other animals to the local livestock auction. If she see horses on their way to

1    the auction and then to slaughter at Valley Meat, her appreciation of her community and the

2    proud nature of being a Roswell citizen will be immediately and permanently altered. If she sees

3    horses being taken to Valley Meat, or trucks returning from there with their carcasses, she will

4    have an immediate and long-lasting injury from viewing those trucks and animals.

5         64.     Plaintiff Deborah Trahan has been a resident of Roswell, New Mexico for ten

6    years, and lives within six miles of the Valley Meat slaughterhouse. She is disabled, and suffers

7    from rheumatoid arthritis, osteoporosis and degenerative bone disease. Her autoimmune diseases

8    are exacerbated by increases in stress and even subtle changes in diet.

9         65.     Fish is an important part of Ms. Trahan's diet, and she believes the incorporation

10   of fresh fish into her diet is important as a dietary treatment for all of three of her diseases. If

11   Valley Meat begins slaughtering horses and discarding the byproducts of that process, she will no

12   longer be able to eat the fish from local waterways, for fear of triggering an exacerbation of her

13   diseases.

14        66.     The natural beauty and healthy waterways in the area of Valley Meat are a vital

15   part of Ms. Trahan's appreciation of the area. She is aware that Valley Meat has repeatedly

16   violated New Mexico's and federal requirements regarding the protection of the environment and

17   waterways, and reasonably believes Valley Meat will continue to do so once it begins

18   slaughtering horses.

19        67.     Ms. Trahan believes that all horses who will be slaughtered at the Valley Meat

20   facility have been given multiple drugs and other substances that render their meat adulterated

21   and dangerous, so that the byproducts of Valley Meat's horse slaughter will pollute the

22   surrounding area, including the rivers and streams. A series of natural underground streams

23   connect many of the waterways in the area downstream and in the vicinity of Valley Meat. If

24   Valley Meat begins horse slaughter, she will be extremely worried about the discharges it is

25   allowing to enter the local waterways.

26        68.     Ms. Trahan's family does a significant amount of camping in the areas near Valley

27   Meat. If Valley Meat begins slaughtering horses, she will stop camping in the area, even though

28

1     she would want to continue, because she will be able to smell the Valley Meat facility and will be

2     concerned that the water in the area was contaminated form the Valley Meat runoff.

3         69.     Ms. Trahan believes that horse slaughter is inherently inhumane and that any

4     method of horse slaughter will cause extreme and unnecessary pain and suffering for the horses

5     involved. If she sees horses being taken to Valley Meat, or trucks returning from there with

6     carcasses, she will have an immediate and long-lasting injury from viewing those trucks and

7     animals.

8         70.     Plaintiff Cassie Gross has been a resident of Roswell, New Mexico for thirty years.

9     She has been employed by the Roswell Humane Society for twenty years, and lives within seven

10     miles of Valley Meat.

11         71.     Roswell has an international fame based on the reported sighting of UFOs in

12     Roswell in 1947. It is home to the International UFO Museum and Research Center, and an

13     annual Roswell UFO Festival that brings substantial income to the city. If people learn that

14     Roswell is home to a horse slaughterhouse, she believes that tourism will be severely affected.

15     Because of the negative sentiment about horse slaughter of a large majority of New Mexican

16     citizens and all Americans, tourism will significantly drop this year and in future years, impacting

17     many programs dependent on Roswell public funding.

18         72.     If Valley Meat opens its slaughterhouse, tourism will significantly drop, and

19     funding for the public schools where Ms. Gross' sons go, as well as other municipal privileges

20     and benefits, will be reduced, injuring Ms. Gross and her family in a variety of ways.

21         73.     If horse slaughter comes to Roswell, merchants will also lose significant income

22     which comes in from tourists visiting Roswell all year long and especially for the Roswell UFO

23     Festival, and will need to raise prices. This will cause Ms. Gross and the other plaintiffs

24     economic harm based on the increased prices merchants will need to charge.

25         74.     Ms. Gross is an organic gardener, and she fishes and camps with friends and

26     family at Lake Van and on the Pecos River, which are close to Valley Meat. The natural beauty

27     and healthy waterways in the area of Valley Meat are a vital part of her appreciation of the area,

28     and she enjoys eating the fish she catches.

1    75.    Because all horses who will be slaughtered at the Valley Meat facility have been

2    given multiple drugs and other substances that render their meat adulterated and dangerous, the

3    byproducts of Valley Meat's horse slaughter will pollute the surrounding area, including the

4    rivers and streams, as well as the air quality in Roswell.  This will cause aesthetic and recreational

5    injury to Ms. Gross.

6    76.    A series of natural underground streams connect many of the waterways in the

7    area downstream and in the vicinity of Valley Meat.  If Valley Meat begins horse slaughter, Ms.

8    Gross will be extremely worried about the discharges it is allowing to enter the local waterways,

9    and she will be certain that the water in which she fishes is unsafe.  She will be further injured

10   because she will not be able to eat fish from the river if Valley Meat is slaughtering horses, and

11   she will stop camping in the area with her family.

12   77.    Ms. Gross knows that horse slaughter is inherently inhumane and that any method

13   of horse slaughter will cause extreme and unnecessary pain and suffering for the horses involved.

14   As part of her job with the Roswell Humane Society, Ms. Gross travels to a nearby veterinary

15   hospital no less than three times, and usually more times, each week.  In order to get to that clinic,

16   she must drive right by the Roswell Livestock Auction Barn, where any horses sold to Valley

17   Meat will be trucked and temporarily kept.  If Valley Meat is slaughtering horses, she will be

18   directly confronted with the horror of the horses in holding pens waiting to be sent to Valley Meat

19   to be slaughtered.  She will be forced to see trucks loaded with horses, on their way to their death.

20   These images will cause her intense and long-term aesthetic injury.  She will be frightened to go

21   past the facility, and will have to be sure that her children do not go past the facility.

22   78.    If Valley Meat begins slaughtering horses, the stench from the plant will come

23   over Ms. Gross's home on a daily basis, as winds from the South come into town consistently.

24   The intense heat in the area will make the odors much worse and will seriously affect her ability

25   to enjoy her work and her activities of daily life, and it will also ruin her ability to enjoy the

26   surrounding parks and rivers and streams, which will all likely be affected by the contamination

27   by Valley Meat from horse slaughter.

28

1    79.    The interests of the individual Plaintiffs, of living in a clean community that does

2    not depend on a water, air, or soil supply contaminated by horse slaughter's byproducts, are

3    injured by Defendants' decision to grant inspection to a horse slaughter plant. The grant of

4    inspection allows the horse slaughter plant to commence operations without any consideration of

5    the environmental effects of the plant and without any information provided to or input received

6    from the public and the local community regarding the significant environmental effects of horse

7    slaughter. The individual plaintiffs' injuries are particularized because of their connection to the

8    Roswell community and their physical proximity to the horse slaughter plant, and their viewing of

9    the trucks carrying horses and their carcasses. NEPA is intended in part to protect persons who

10   might be injured by major federal actions taken without proper regard for the possible

11   environmental effects of such actions. The individual Plaintiffs are just the type of people whom

12   NEPA procedural requirements are intended to assist.

13   80.    These injuries are caused by the USDA's grant of inspection to horse

14   slaughterhouses in the United States and adoption of the new residue testing plan for horse

15   slaughter, because if the grant of inspection had not been given and a new testing program had

16   not been adopted, horses would not and legally could not be slaughtered for human consumption

17   in America.

18   81.    Plaintiffs' injuries will be redressed if the Plaintiffs prevail in this action, because

19   when the grant of inspection is set aside, the horse slaughter plant will be prohibited from

20   operating and causing harmful environmental effects in local communities unless proper

21   precautions have been taken. Furthermore, Plaintiffs will have the opportunity to present their

22   concerns about the immediate harmful environmental effects of horse slaughter plants to the

23   USDA at the time that USDA engages in the required NEPA review.

24   82.    Defendant Tom Vilsack is the Secretary of Agriculture, and has ultimate

25   responsibility for ensuring that agencies within USDA comply with requirements of the APA and

26   NEPA and with its own regulations.

27   83.    Defendant Elizabeth A. Hagen is the USDA Under Secretary for Food Safety, and

28   is responsible for overseeing FSIS, the public agency in USDA responsible for ensuring the

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 19 -                           CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  nation's meat is safe. Defendant Hagen has ultimate responsibility for ensuring that FSIS

2  complies with requirements of the APA and NEPA and with its own regulations.

3      84.    Defendant Alfred V. Almanza is the Administrator of FSIS, an agency within

4  USDA, and is responsible for authorizing the grant of inspection to horse slaughter facilities

5  challenged in this case. Defendant Almanza has ultimate responsibility for ensuring that FSIS

6  complies with the requirements of the APA and NEPA and with its own regulations.

7  **IV.    STATUTORY FRAMEWORK UNDERLYING THE COMPLAINT**

8          **A.    Administrative Procedure Act.**

9      85.    The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), provides that

10  "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by

11  agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5

12  U.S.C. § 702.

13     86.    "[F]inal agency action for which there is no other adequate remedy in a court" is

14  subject to judicial review. 5 U.S.C. § 704.

15     87.    Under the APA, a reviewing court shall "hold unlawful and set aside agency

16  action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

17  otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or

18  limitations, or short of statutory right; [or] without observance of procedure required by law." 5

19  U.S.C. §§ 706(2)(A), (C), and (D).

20          **B.    National Environmental Policy Act.**

21     88.    The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA), and the

22  Council for Environmental Quality (CEQ) Regulations, 40 C.F.R. parts 1500-1508, require

23  federal agencies to conduct environmental impact analyses for regulatory actions.

24     89.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R.

25  § 1500.1(a). NEPA's purpose encompasses "[promoting] efforts which will prevent or eliminate

26  damage to the environment and biosphere and stimulate the health and welfare of man" and

27  "[establishing] a Council on Environmental Quality." 42 U.S.C. § 4321.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 20 -                                    CASE NO. _____

1    90.    In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity

2    on the interrelations of all components of the natural environment, particularly the profound

3    influences of population growth, high-density urbanization, industrial expansion, resource

4    exploitation, and new and expanding technological advances[.]" 42 U.S.C. § 4331.

5    91.    The goals of NEPA reflect "the continuing policy of the Federal Government . . .

6    and other concerned public and private organizations, to use all practicable means and

7    measures . . . in a manner calculated to foster and promote the general welfare, to create and

8    maintain conditions under which man and nature can exist in productive harmony, and fulfill the

9    social, economic, and other requirements of present and future generations of Americans." *Id.*

10   92.    The Council on Environmental Quality ("CEQ") established by NEPA is charged

11   with "formulat[ing] and recommend[ing] national policies to promote the improvement of the

12   quality of the environment." 42 U.S.C. § 4342.

13   93.    The USDA has expressly "incorporate[d] and adopt[ed]" all of the CEQ

14   regulations. 7 C.F.R. § 1b.1(a).

15   94.    The CEQ regulations implementing NEPA mandate that "[f]ederal agencies shall

16   to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable

17   alternatives to proposed actions that will avoid or minimize adverse effects . . . upon the quality

18   of the human environment," and "[u]se all practicable means . . . to restore and enhance the

19   quality of the human environment and avoid or minimize any possible adverse effects of their

20   actions upon the quality of the human environment." 40 C.F.R. §§ 1500.2(a), (f).

21   95.    CEQ regulations instruct the USDA to "integrate the NEPA process with other

22   planning at the earliest possible time to insure that planning and decisions reflect environmental

23   values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R.

24   § 1501.2.

25   96.    Where an agency is invoking a new inspection mechanism, NEPA review is

26   required before that mechanism can be invoked. "NEPA procedures must insure that

27   environmental information is available to public officials and citizens before decisions are made

28   and before actions are taken." 40 C.F.R. § 1500.1(b).

| 1 | 97. The United States District Court for the District of Columbia has previously |

97.   The United States District Court for the District of Columbia has previously decided that a change in the "legal or regulatory status quo" triggers NEPA review. *Johanns*, 520 F. Supp. 2d at 29.NEPA requires that a federal agency prepare one of three levels of documentation based on the significance of its project's possible impact on the environment. *See* 40 C.F.R. § 1507.3(b).

98.   NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This statement is referred to as the Environmental Impact Statement ("EIS").

99.   CEQ has issued regulations defining the term "major federal action." In particular, 40 C.F.R. § 1508.18 provides that:

> 'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility . . . (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals. . . .

40 C.F.R. § 1508.18.

100.   One common category of federal action is "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(4).

101.   CEQ regulations explain that evaluation of the term "significantly" in 42 U.S.C. § 4332(C) requires considerations of both "context" and "intensity". 40 C.F.R. § 1508.27. For context, the agency must consider the effects on society as a whole, the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a). For intensity, meaning the severity of the environmental impact, the agency must take into account multiple considerations, among them: the degree to which the proposed action affects public health or safety; the degree to which the effects on the environment are likely to be highly controversial; the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; the degree to which the action may establish a precedent for future actions with significant

CASE NO. _____

1   effects; and "[w]hether the action threatens a violation of Federal, State, or local law or

2   requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

3       102.    An EIS must describe:

4       (i) the environmental impact of the proposed action, (ii) any adverse
        environmental effects which cannot be avoided should the proposal be
5       implemented, (iii) alternatives to the proposed action, (iv) the relationship
        between local short-term uses of man's environment and the maintenance and
6       enhancement of long-term productivity, and (v) any irreversible and irretrievable
        commitments of resources which would be involved in the proposed action
7       should it be implemented.

8   42 U.S.C. § 4332(C).

9       103.    "Effect" is defined in CEQ regulations to encompass both direct and indirect

10  effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic,

11  social, or health effects, whether direct, indirect, or cumulative. 40 C.F.R. § 1508.8.

12      104.    Projects that "do not individually or cumulatively have a significant environmental

13  effect" may proceed under a "categorical exclusion" from NEPA review, in which case neither an

14  EIS nor an environmental assessment ("EA") is required. However, the agency's procedures for

15  determining categorical exclusions must provide for extraordinary circumstances in which a

16  normally excluded action has or may have a significant environmental effect. *See* 40 C.F.R.

17  §§ 1508.4, 1507.3(b)(2)(ii).

18      105.    USDA regulations implementing NEPA state that FSIS is excluded from the

19  requirements of preparing procedures to implement NEPA and is "categorically excluded from

20  the preparation of an EA or EIS unless the agency head determines that an action may have a

21  significant environmental effect." 7 C.F.R. §§ 1b.4(a) and 1b.4(b)(6).

22      106.    Thus, if the agency finds that its proposed action could potentially be covered by a

23  categorical exclusion, the agency must determine whether there are any "[e]xtraordinary

24  circumstances" that nevertheless require the agency to perform an environmental evaluation

25  because the action "may have a significant environmental effect." 40 C.F.R. § 1508.4.

26      107.    The United States District Court for the District of Columbia has found that USDA

27  violated CEQ regulations when it failed even to consider whether a normally excluded action,

28

1    such as an FSIS action, may have a significant environmental impact. *Johanns*, 520 F. Supp. 2d
2    at 34.

3          108.    Furthermore, according to USDA's own regulations, any agency of the USDA,
4    including FSIS, is required to "continue to scrutinize [its] activities to determine continued
5    eligibility for categorical exclusion." 7 C.F.R. §§ 1b.3(a), (c), and 1b.4.

6          109.    If the agency has not determined that its action "[n]ormally requires an
7    environmental impact statement," or normally is covered by a categorical exclusion, then the
8    agency must prepare an EA to determine whether the agency must prepare a full EIS or issue a
9    finding of "no significant impact" on the environment (FONSI). 40 C.F.R. §§ 1501.4, 1508.9,
10    1508.13.

11          **C.      Federal Meat Inspection Act ("FMIA").**

12          110.    The Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq.* ("FMIA"), is a
13    comprehensive statutory meat inspection scheme, and slaughter facilities cannot operate without
14    federal oversight, inspection, and approval by FSIS. A new horse slaughter facility requires the
15    grant of inspection and continued inspection and oversight by USDA. *See* 21 U.S.C. § 603(a).

16          111.    Federal inspection is required at any facility slaughtering horses or other animals
17    intended for use as human food. 9 C.F.R. §§ 302.1, 304.1.

18          112.    In order to be eligible for federal inspection pursuant to the FMIA, a horse
19    slaughter facility must apply to FSIS for inspection, and review of any application for inspection
20    necessarily involves FSIS assessing detailed paperwork regarding the premises, standard
21    operating procedures, and management of waste-streams, including sewage and water. 9 C.F.R.
22    § 416.2.

23    **V.      FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF**

24          **A.      Horse Slaughter in America**

25          113.    Americans have a long relationship with horses. We keep horses as companions.
26    They have stood by, loyal as dogs, during every war from the American Revolution up to the
27    present day. They shoulder the burdens to work for farmers and ranchers. We admire their
28    wildness and herd cultures where they are left alone in nature on the open range. There are

1   approximately nine million horses and two million horse owners in the U.S., and in addition there

2   are tens of thousands of wild horses in this country. In New Mexico, the location of Valley

3   Meat's horse slaughter plant, there are 147,000 horses, over 60 percent of which are involved in

4   showing and recreation.

5       114.    Americans do not intend their horses to end up as meat, and American captive and

6   wild horses are not treated by their original owners as food animals. Because they are not raised

7   in regulated industries conscious of public health and safety concerns, but rather in private homes,

8   on racetracks, and as working animals, serious environmental issues arise if they are slaughtered

9   for human food. Almost all American horses are given a wide variety of drugs and other

10  substances that render their blood and tissue contaminated and dangerous to consume. The

11  discard of the byproducts of horse slaughter thus poses serious public health risks when such

12  adulterated tissue and blood, and the wastewater from slaughter, seep into the ground and water

13  supply.

14      115.    According to a recent objective survey, approximately eighty percent of

15  Americans surveyed are opposed to horse slaughter for human consumption. Polls in New

16  Mexico, Iowa and Missouri have established that seventy percent of the voters in each of those

17  states are similarly opposed to the practice. Nevertheless, every year more than 140,000

18  American horses are sold to slaughter.

19      116.    Horses are sent to slaughterhouses in deplorable, inhumane, and cruel conditions,

20  because long-distance transport in cramped trucks is especially difficult for horses.

21      117.    The treatment of horses at slaughterhouses in America (in the past) and abroad has

22  been roundly criticized. Defendants FSIS and USDA have documented appalling cruelty at U.S.

23  horse slaughter plants, including gruesome descriptions and photographs of the mistreatment

24  inherent in horse slaughter.[4]

25      [4] *See, e.g.*, USDA, Food Safety & Inspection Service, Noncompliance Record No. 0019-2005-

26  8243 (Apr. 13, 2005); *see also, e.g.*, Noncompliance Record Nos. 00 18-2005-8243 (Apr. 4,
    2005) ("Nine horses were overcrowded in the alleyway causing undue excitement which was

27  further exacerbated when two more employees from the kill floor began yelling and hitting these
    horses causing the one in the end of the line to slip and fall."); 0013-2006-8243 (Oct. 9, 2006)

28  ("horse was down" . . . "in the upper middle compartment of a pot bellied trailer" and "[o]ther

*(Footnote continued on next page)*

CASE NO. _____

1    118.   Horse slaughter is particularly detrimental to the human environment. The last

2    three American horse slaughterhouses, located in DeKalb, Illinois (Cavel), Kaufman, Texas

3    (Dallas Crown), and Fort Worth, Texas (Beltex), were shut down in 2007. Every one of these

4    operations wreaked environmental havoc by dumping blood, entrails, urine, feces, heads, and

5    hooves into local water systems, overwhelming local waste water infrastructures and causing

6    numerous environmental violations.

7    119.   According to the former mayor of Kaufman, Texas, where the Dallas Crown plant

8    was located, the problems were epidemic, including significant environmental contamination.

9    Dallas Crown also left a 600-gallon container filled with blood and horse parts outside its facility,

10   which generated a stench, attracted flies and vermin, and eventually spilled outside the plant,

11   emptying horse blood into the ground.

12   120.   The environmental contamination caused by that horse slaughter plant was in no

13   way confined to contamination at the facility itself. In fact, on multiple occasions, Kaufman

14   residents' faucets delivered blood and horse tissue instead of water. Dallas Crown's

15   environmental contamination and repeated local wastewater code violations imposed

16   environmental, aesthetic, public health, and economic harms on its host community.

17   121.   As exemplified by the operations of the horse slaughter plants closed down in the

18   U.S. six years ago, horse slaughter produces environmental effects on a magnitude not seen with

19   other slaughter facilities, and causes potentially serious environmental harms for any local

20   community hosting a horse slaughter facility. Individuals living near any horse slaughter plant

21   will suffer degradation in the quality of their air, water, and ground resources. This is because

22

23

---

24   *(Footnote continued from previous page)*
     horses within the compartment were trampling the downed horse"); 0006-2007-8243 (Jan. 24,
25   2007)) ("two downed horses being trampled upon by the other horses as well as the front horse
     being kicked with the hind feet from another horse"); Press Release, Animals' Angels (Nov.
26   2008), *available at* http://www.kaufmanzoning.net/nov24/pressrelease.pdf; *see also* Mary Nash's
     Horse Meat Website, *available at* http://www.kaufmanzoning.net/foia.htm (making available for
27   download USDA documents describing and depicting regulatory violations, mistreatment, and
     cruelty).

28

1    horses are different, as previously stated, in the way they are raised and the dangerous drugs and
2    medications with which they are treated.

3    122.    The disposal of horse blood and offal presents a particular environmental threat
4    because of the drugs and substances horses are given throughout their lives. The byproducts of
5    horse slaughter – especially blood, sludge, and waste water –may contaminate groundwater and
6    even enter the food chain when sludge is distributed on crops. For that reason, horse slaughter
7    involves effects on the environment that are "highly uncertain or involve unique or unknown
8    risks" because it is unknown how those drug residues, once in the local water or ground supply,
9    will affect the health and safety of nearby residents.

10   123.    Because USDA is approving a horse slaughter facility for the first time since the
11   last horse slaughterhouses were shut down in 2007, the manner in which USDA approves a grant
12   of inspection for a domestic horse slaughter plant, including whether it undertakes NEPA review,
13   will likely establish a precedent for how the agency handles future slaughter inspection
14   applications.

15   124.    Horse slaughter's impacts on local, national and even international human
16   environments is highly controversial, as evidenced by the large percentage of Americans opposed
17   to horse slaughter, the introduction and support of federal legislation that would prohibit horse
18   slaughter for human consumption, and the recent scandal regarding the incorporation of horse
19   meat into beef products throughout Europe.

20   125.    Approval of horse slaughter inspections threatens a violation of Federal, State, and
21   local environmental laws, because past horse slaughter facilities repeatedly and brazenly violated
22   local laws pertaining to waste management and air and water quality, costing host communities
23   large sums of money to seek compliance and remedy environmental harms, and because of the
24   special dangers inherent in horse meat.

25   126.    By reestablishing horse slaughter in New Mexico – or anywhere else – USDA's
26   new program of inspection will have known and unknown effects on the ecology of local
27   communities, and on the aesthetic, economic, social and health interests of people and their
28   environment.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 27 -                                        CASE NO. _____

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1     127.    All of the environmental effects caused by horse slaughter only occur if USDA's

2  grant of an application for inspection to a horse slaughter plant is allowed to move forward.

3     128.    Defendants have never refuted that "horse slaughter operations have 'significantly'

4  impacted the environment within the meaning of NEPA as set forth in 40 C.F.R. § 1508.27."

5  *Johanns*, 520 F. Supp. 2d at 19.

6     129.    USDA has publicly stated that it believes no NEPA review is required before

7  granting inspection of domestic horse slaughter facilities.

8     130.    In determining whether NEPA review was necessary before allowing a new horse

9  slaughter plan and set of policies, USDA was confronted with compelling evidence that all of the

10  last three horse slaughterhouses operating in this country wreaked environmental havoc on their

11  local communities. USDA has allowed domestic horse slaughter for human consumption to

12  resume in this country, presumably without any FSIS consideration or scrutiny to determine

13  whether the issuance of these grants of inspection were eligible for a categorical exclusion from

14  NEPA requirements.

15     **B.**    **The Federal Regulation of Horse Slaughter**

16     131.    Until 2006, FSIS carried out inspections of horse slaughter plants. In an

17  amendment to the 2006 Agricultural Appropriations Act, on November 10, 2005, Congress

18  withdrew funding for the inspection of horses transported for slaughter, and the inspection of

19  horse slaughterhouses. Pub. L. 109-97, § 794, 119 Stat. 2120, 2164 (A.R. 51). The funding

20  prohibition was reinstated annually through 2011, confirming its intended effect of prohibiting

21  nationwide the slaughter of horses for meat. *See* Remarks of Senator John Ensign (R-NV), 151

22  CONG. REC. S 10,218 (Sep. 20, 2005) ("The goal of our amendment is simple: to end the

23  slaughter of America's horses for human consumption overseas.").

24     132.    After the President signed the 2006 appropriations amendment into law, the three

25  horse slaughter plants operating in the U.S. filed a petition with the USDA for emergency

26  rulemaking to create a fee-for-service inspection regime, whereby the slaughterhouses would pay

27  for FSIS inspectors to oversee their continued operations. USDA granted that petition without

28

1   any public notice or comment and against the express intent of Congress. *See Johanns*, 520 F.
2   Supp. 2d at 12-13.

3        133.    The HSUS and other parties filed a complaint with the United States District Court
4   of the District of Columbia claiming that USDA's implementation of this rule, which would have
5   allowed horse slaughter to continue without performing a NEPA analysis, was a violation of
6   NEPA.  On the parties' cross-motions for summary judgment, the court ruled that the USDA's
7   interpretation of 7 C.F.R. § 1b.4 as permitting FSIS to ignore whether its actions have
8   environmental impacts was arbitrary and capricious, and thus a violation of the APA. *Johanns*,
9   520 F. Supp. 2d 8, 36.  The Court stated that "any notion that USDA may avoid NEPA review
10  simply by *failing* even to consider whether a normally excluded action may have a significant
11  environmental impact flies in the face of the CEQ regulations." *Id.* at 34 (internal quotation
12  omitted).

13       134.    In November 2011, Congress failed to renew the ban on funding federal FSIS
14  inspectors at horse slaughter plants in the United States.  Presently, FSIS has appropriations to
15  conduct horse slaughter plant inspections.

16       135.    In response to the appropriations by Congress for horse slaughter inspections, and
17  because of the great threat to human health associated with the consumption of meat from
18  American horses, Plaintiffs FRER and HSUS filed two petitions for rulemaking, requesting the
19  USDA and the Food and Drug Administration to recognize the potential dangers of horsemeat
20  and to issue rules in connection with those dangers. *See* footnotes 1, 2, *supra*.

21       136.    During the time that FSIS considered and approved the applications for inspection
22  to slaughter horses throughout the United States, USDA had for its consideration Plaintiffs' April
23  2012 rulemaking petition that underscored for USDA the serious health risks and environmental
24  harms inherent in permitting horse slaughter plants to operate in the United States.  USDA has not
25  acted on the rulemaking petition Plaintiffs filed, but it has stated that in order to begin horse
26  slaughter again, the agency would need to develop new protocols, policies and procedures in
27  order to comply with the FMIA and provide inspections of horse slaughter plants.

28

1       137.    Plaintiffs have provided USDA with undisputed evidence that virtually every

2  American horse who goes to slaughter has received medications that federal law specifically

3  states are not to be used on animals intended to be eaten. Thus, USDA must come up with a new

4  plan or policy that addresses the fact that every American horse is potentially excluded from the

5  food supply as a matter of law.

6       138.    The rulemaking petition also provided USDA with ample evidence demonstrating

7  the inevitable environmental effects of the agency's action if the agency were to proceed by

8  granting an inspection to a horse slaughter facility.

9       139.    On June 28, 2013, USDA denied FRER's and HSUS' rulemaking petition, and

10  issued a grant of inspection for Valley Meat, announced that it would be granting inspection to

11  horse slaughter facilities in Iowa and Missouri, so that the companies could begin slaughtering

12  horses for human consumption.

13       140.    Defendants are aware of Valley Meat's past noncompliance with environmental

14  regulations. When Valley Meat was in the business of slaughtering cattle, FSIS documented

15  maggot-infested piles of decaying animals as high as fifteen feet on its property.[5] FSIS itself first

16  noted Valley Meat's gross violations of waste removal requirements for its cattle slaughter

17  operations. USDA has taken the final agency action of granting inspection to Valley Meat,

18  conditionally authorizing it to slaughter horses, despite Valley Meat's past problems processing

19  cattle, and despite the obvious environmental and health effects associated with horse slaughter.

20       141.    Given its history of environmental violations, Valley Meat's operations, as well as

21  other horse slaughter plant's operations, should be subjected to heightened environmental

22  scrutiny. However, USDA has granted and says it will grant permits of inspection to engage in

23  horse slaughter without engaging in such scrutiny.

24       142.    USDA possessed information that was directly relevant to the grant of inspection

25  to domestic horse slaughter plants. While Defendants have not made their decision documents

26

27      [5] January 22, 2010 Letter from Dr. Ron Nelson, Denver District Manager, FSIS to the Roswell
       Health Office of the New Mexico Health Department.

28

1  available at this time, this information presumably was not a part of the agency's decision of
2  whether a grant of inspection to a horse slaughter facility was subject to NEPA's review
3  requirements.

4      143.    USDA has stated that it needed to develop new drug residue testing plans, plans
5  and policies in connection with the renewal of horse slaughter in America. USDA will need to
6  provide new training to its inspectors in order to begin horse slaughter operations again.

7      144.    Defendants have now adopted a fatally flawed new residue testing plan,
8  specifically for horse slaughter, that will govern all horse slaughter operations in the country.
9  Defendants presumably did not conduct any environmental review prior to adopting and
10  implementing this new testing program.

11      145.    Because of the grant of inspection to domestic horse slaughter plants and the
12  adoption of a new drug residue testing plan for regulating horse slaughter nationwide, the status
13  quo of no domestic horse slaughter has ended, and the slaughter of American horses for human
14  consumption is now resuming for the first time in this country since 2007.

15      146.    By granting inspection to a horse slaughter plant and by adopting a new residue
16  testing plan to apply to horse slaughter nationwide, USDA has substantively changed its
17  operations by allocating its finite resources to authorize and oversee horse slaughter. This is a
18  major change in policy and practice that has direct, indirect, and cumulative impacts on the
19  environment.

20      147.    The grant of inspection to a horse slaughter facility creates a significant change in
21  the status quo because without it, horse slaughterhouses could not legally operate.

22      148.    In addition to the domestic change in status quo from a practical prohibition on
23  horse slaughter since 2006 to now USDA issuing a grant of inspection to domestic horse
24  slaughterhouses, relevant international regulations of horse meat have also changed. The
25  European Union (EU) adopted in 2009 new regulations that will require any imported horse meat
26  to satisfy additional and higher export safety and inspection requirements.

27      149.    USDA has not incorporated any change in policy or inspection requirements to
28  address the adopted EU regulations. Horses slaughtered in the U.S. are exported to EU markets,

1    and U.S. horse meat will have to satisfy these new EU regulations. Because there has been no

2    horse slaughter in the U.S. since these regulations were adopted, USDA did not have to worry

3    about whether its inspections complied with EU regulations. If American horse slaughter starts

4    up again pursuant to FSIS's grant of inspection, there is a new regulatory framework in place, and

5    USDA needs to revise its inspection procedures to comply with it. This is an additional change in

6    the status quo triggering the requirements of NEPA.

7           150.    In response to the prospect of resuming horse slaughter operations in the United

8    States and in response to public opposition to American horse slaughter, Congress is considering

9    a bipartisan bill, the Safeguard American Food Exports (SAFE) Act, that would prohibit U.S.

10   horse slaughter facilities and also ban the exporting of horses for slaughter. S. 541/H.R. 1094.

11          151.    In response to the Obama Administration eliminating funding for USDA

12   inspection of horse slaughter facilities in its proposed budget for FY2014, both the House and

13   Senate Appropriations committees unanimously amended the FY2014 Agriculture Appropriations

14   bill to eliminate funding for the inspection of horse slaughter facilities.

15          152.    Recent events overseas have also emphasized the dangers of horse slaughter.

16   Horse meat has been found in many samples of beef in several European countries. Recalls

17   because of the horse meat problem were reported on a regular basis for weeks in 2013. For

18   example, furniture (and meat) company IKEA removed 1670 pounds of meatballs from fourteen

19   countries across the European continent. Horse meat in beef products in Ireland and England

20   raised great concerns as well. The potential for contamination of beef products with the drugs

21   and other substances associated with horse slaughter, as well as the effects on the human

22   environment, are a reality overseas.

23          153.    USDA officials have stated that Americans did not have to worry about toxic horse

24   meat in their beef, for the specific reason that there was no horsemeat being produced in America.

25   This is a virtual admission by USDA that, if production of horse meat begins in America, there

26   will be a significant effect on the human environment, and a potential contamination of the

27   American meat supply.

28

**C.    The Effect of Horse Slaughter on Endangered Species**

154.    The horse slaughtering process produces by-products and waste products that are a threat to the environment and to wildlife in the vicinity of the slaughter facility. Horse slaughtering produces the following: (1) manure, contents of rumen and intestines; (2) edible products, including offal and blood; (3) inedible products such as bones, and hair; (4) fat; and (5) large volumes of wastewater.

155.    Most slaughterhouse processes require the use of water, and the pollutants contained in wastewater can impact the environment when the wastewater runoff enters into groundwater, streams, and rivers. Horse slaughtering also requires large amounts of hot water and steam for sterilizing and cleaning. Generating the energy for heating water emits gasses, which contribute to air pollution.

156.    Horse slaughter facilities, with their combination of contaminated by-products and excessive steam generation and the need to discharge massive amounts of wastewater, represent a threat to the environment as well as threatened and endangered species in the area. For example, Valley Meat is located near South Spring River, Pecos River, Bitter Lake Wildlife Refuge, and Bottomless Lakes State Park. Threatened and endangered species are found within the vicinity of Valley Meat, and their continued existence may be jeopardized by the horse slaughtering activities. Valley Meat's operations may also adversely affect or destroy the habitats of the threatened and endangered species. Affected species may include, but are not limited to, the Pecos bluntnose shiner, the Least tern, the Pecos Assiminea snail, Koster's springsnail, Roswell springsnail (collectively "snails"), and Noel's Amphipod.

157.    The Least tern is a bird listed as endangered by FWS. The tern's breeding area is in the Bitter Lake refuge and some breeding may occur at the Bottomless Lakes. The tern and its habitat, both Bitter Lake and the Bottomless Lakes, could be impacted by air emissions and wastewater from the slaughterhouse.

158.    The Pecos bluntnose shiner is a fish listed as threatened by FWS. In 2006, the FWS New Mexico Ecological Services Field Office issued a 5-year review of the shiner stating that the shiner's habitat is in the Pecos River—from the Fort Sumner Irrigation District Diversion

1    Dam to Brantley Reservoir—and has been found near Valley Meat's location. FWS has issued a

2    final rule designating as a critical habitat for the shiner large portions of the Pecos River, located

3    both upstream and downstream from Valley Meat's location. The shiner and its critical habitat

4    may be adversely affected by the introduction of wastewater from the slaughterhouse into the

5    waterways.

6         159.    Additionally, the snails and Noel's Amphipod may be affected by Valley Meat's

7    activities. FWS issued a final rule designating critical habitat for the snails and Noel's

8    Amphipod. The designated critical habitats are in close proximity to Valley Meat and are within

9    Bitter Lake refuge and part of the Pecos River. The snails and Noel's Amphipod, and their

10    critical habitats, may be adversely affected by any wastewater or air emissions.

11         160.    Similar threats to threatened and endangered species likely exist in the proximity

12    of other potential domestic horse slaughter facilities. Given the complexity of the environmental

13    impacts of wastewater discharge, USDA should have completed a comprehensive consultation

14    under Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), before granting any

15    application for inspection at a domestic horse slaughter facility, and any operation has a potential

16    significant impact on the human environment.

17    **VI.**    **CLAIMS FOR RELIEF**

18        **A.**    **Claim One:  Violation of the National Environmental Policy Act, 42 U.S.C.**
              **§ 4332(C).**

19

20         161.    Plaintiffs hereby restate and incorporate by reference the allegations contained in

21    this Complaint.

22         162.    By granting inspection to a horse slaughter facility without first conducting an

23    environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C), USDA

24    has violated NEPA and CEQ's implementing regulations, and has acted arbitrarily and

25    capriciously, and without observance of procedure required by law, in violation of the

26    Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq*.

27         163.    Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in

28    this Complaint.

**B.** **Claim Two:  Violation of the National Environmental Policy Act, 42 U.S.C. § 4332(C).**

164.     Plaintiffs hereby restate and incorporate by reference the allegations contained in this Complaint.

165.     By establishing, issuing and authorizing a drug residue testing plan for horse slaughter to be used at horse slaughter facilities without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C), USDA has violated NEPA and CEQ's implementing regulations, and has acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq*.

166.     Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in this Complaint.

**C.** **Claim Three:  Violation of The Administrative Procedure Act, 5 U.S.C. § 706**

167.     Plaintiffs hereby restate and incorporate by reference the allegations contained in this Complaint.

168.     By providing a grant of inspection to domestic horse slaughter plants, USDA has abused its discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

169.     Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in this Complaint.

WHEREFORE, Plaintiffs request that the Court issue an Order:

1.     Declaring that USDA's grant of inspection to a horse slaughter facility without the required NEPA review is arbitrary and capricious, and without observance of procedure required by law, and not in accordance with the Administrative Procedure Act or the National Environmental Policy Act;

2.     Declaring that USDA's establishment of a drug residue testing plan for horse slaughter without NEPA review is arbitrary and capricious, and without observance of procedure

1  required by law, and not in accordance with the Administrative Procedure Act or the National

2  Environmental Policy Act;

3      3.      Setting aside any grants of inspection given to horse slaughter plants throughout

4  the United States;

5      4.      Preliminarily and permanently enjoining USDA or FSIS from granting or

6  conditionally granting any applications for inspection of horse slaughter facilities, and from

7  otherwise carrying out any inspections of horse slaughter facilities, without the performance of

8  adequate NEPA review;

9      5.      Preliminarily and permanently enjoining USDA or FSIS from implementing the

10  new drug residue testing plan for horse slaughterhouses nationwide, without the performance of

11  adequate NEPA review;

12      6.      Awarding Plaintiffs costs and reasonable attorneys' fees' and

13      7.      Awarding Plaintiffs any other relief that the Court may deem just and proper.

14

15  Date: July 1, 2013                              SCHIFF HARDIN LLP

16

17                                          By:
                                                 Bruce A. Wagman, Esq.
18                                               *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 36 -                                    CASE NO. ___

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF