UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| FRONT RANGE EQUINE RESCUE, THE HUMANE SOCIETY OF THE UNITED STATES, MARIN HUMANE SOCIETY, HORSES FOR LIFE FOUNDATION, RETURN TO FREEDOM, FOUNDATION TO PROTECT NEW MEXICO WILDLIFE, RAMONA CORDOVA, KRYSTLE SMITH, CASSIE GROSS, DEBORAH TRAHAN, BARBARA SINK, SANDY SCHAEFER, TANYA LITTLEWOLF, CHIEF DAVID BALD EAGLE, CHIEF ARVOL LOOKING HORSE and ROXANNE TALLTREE-DOUGLAS,<br><br>            Plaintiffs,<br><br>v.<br><br>TOM VILSACK, Secretary U.S. Department of Agriculture; ELIZABETH A. HAGEN, Under Secretary for Food Safety, U.S. Department of Agriculture; and ALFRED A. ALMANZA, Administrator, Food Safety and Inspection Service, U.S. Department of Agriculture,<br><br>            Defendants. | Civil No. 1:13-CV-00639-MCA-RHS |

**FIRST AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I.    INTRODUCTION

1.    Front Range Equine Rescue, The Humane Society of the United States, Marin

Humane Society, Horses for Life Foundation, Return to Freedom, Foundation to Protect New

Mexico Wildlife, Ramona Cordova, Krystle Smith, Cassie Gross, Deborah Trahan, Barbara Sink,

Sandy Schaefer, Tanya Littlewolf, Chief David Bald Eagle, Chief Arvol Looking Horse, and

Roxanne Talltree-Douglas (collectively "Plaintiffs"), bring this complaint for declaratory and

injunctive relief ("Complaint") against Defendants Tom Vilsack, Secretary of Agriculture, United States Department of Agriculture ("USDA"), Elizabeth A. Hagen, USDA Under Secretary for Food Safety, and Alfred V. Almanza, USDA Administrator for Food Safety and Inspection Service ("FSIS"), collectively "Defendants," for violation of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA") and the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

2.     Defendants are embarking on a nationwide program of horse slaughter that presents clear threats to the environment without complying with Congressionally-mandated requirements intended to protect the public and our natural resources.

3.     The slaughter of American horses for human consumption presents unique and extensive dangers that have never been adequately considered by Defendants, despite their obligations under NEPA.

4.     In 2007, Congress ended horse slaughter for human consumption in America, and there has been no program or policy for inspection of horse slaughter facilities in place since that time.  In 2011, Congress appropriated funding for inspection of horse slaughter facilities, which necessitated a new set of plans, policies, and procedures for inspection of horse slaughter facilities by FSIS.

5.     For six years, from 2007 until the filing of this complaint, there has been no plan or policy for inspection of horses going to slaughter.  For that entire time, horses were notably absent from any consideration of testing or inspection programs.  Defendants have been modifying and supposedly improving their testing programs for slaughtered animals over the course of that time.  But horses have been consistently excluded.  Even USDA's 2013 National Residue Program for testing animals subject to slaughter, when the agency knew that horse slaughter was authorized, excluded horses from consideration.

6.     Plaintiffs are filing this action because Defendants are proceeding with the inspection of horses under the Federal Meat Inspection Act without compliance with their federally mandated environmental review obligations.  The issue of Defendants' failure to

comply with NEPA with respect to their horse slaughter inspection activities was previously addressed in *Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 36 (D.D.C. 2007), and resulted in a final order finding defendants in violation of NEPA.

7. At least six applications for horse slaughter inspections in five states have already been submitted to USDA since Congress appropriated funding for inspections. These applications include: Valley Meat Co. LLC ("Valley Meat") located in Roswell, New Mexico; Responsible Transportation of Sigourney, Iowa; Rains Natural Meats of Gallatin, Missouri; American Beef Company/Unified Equine, LLC ("Unified Equine") of Rockville, Missouri; Trail South Meat Processing Co. ("Trail South") of Woodbury, Tennessee; and Oklahoma Meat Company of Washington, Oklahoma. In light of these applications, Defendants have been developing new plans and programs, and a new set of policies with respect to the inspection of horse slaughter facilities.

8. As set forth in this Complaint, Defendants have violated NEPA by failing to prepare an environmental impact statement or an environmental assessment prior to granting inspection to horse slaughter plants located throughout the United States. Defendants' challenged actions authorize the resumption of slaughter of American horses for human consumption after six years without domestic horse slaughter. Defendants have taken this action notwithstanding USDA's obligations to comply with NEPA, and USDA's actual knowledge that horse slaughter causes significant environmental harms related specifically to the means and methods of horse slaughter, the potentially toxic nature of the waste generated by this industry, and the fact that horse meat endangers consumers.

9. Additionally, Defendants have violated NEPA by failing to prepare an environmental impact statement or an environmental assessment prior to adopting and implementing a new residue testing plan applicable to all horse slaughter plants throughout the nation that may be authorized to operate by Defendants.

10. Defendants' failure to conduct any consideration or review of the environmental effects of their grant of inspection and their new residue testing plan violates NEPA and its

implementing regulations.  Defendants should be enjoined from: carrying out inspections at any horse slaughter facility that has received a grant of inspection; implementing their new residue testing plan for any horse slaughter facility; and granting inspection to any horse slaughter facility, unless and until Defendants conduct a detailed review of the environmental effects of their actions in full compliance with NEPA and its implementing regulations.

## II.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391(e).

## III.    PARTIES

12.    Front Range Equine Rescue (FRER) is a Colorado-based nonprofit group incorporated under Section 501(c)(3) of the Internal Revenue Code.  FRER has over 95,000 supporters nationwide, with its largest percentage in California, and is dedicated to stopping cruelty and abuse of horses through rescue and education. FRER is actively involved in the rescue, rehabilitation and adoption to good homes of domestic and wild horses found at auctions and horses destined for slaughter; and in educational efforts regarding responsible horse ownership, the cruelty of horse slaughter, and wild horse roundups. FRER has assisted thousands of horses through its rescue and educational programs. While some of FRER's horses are surrendered by their owners or rescued when abandoned, many are rescued from livestock auctions; others are purchased at feed lots before they are sent to slaughter.

13.    FRER has been actively advocating against horse slaughter operations in the United States for years.  In March 2012, FRER, in conjunction with The Humane Society of the United States ("The HSUS"), submitted a Petition for Rulemaking to the Federal Food and Drug Administration ("FDA") requesting that the FDA promulgate rules that horse meat is adulterated according to federal law and regulations and cannot be sold legally.[1]  In April 2012, FRER, in conjunction with The HSUS, submitted another Petition for Rulemaking to the USDA, asking

---

[1] Available at http://www.frontrangeequinerescue.org/documents/petition.fda.slaughter.pdf.

that the USDA promulgate rules that horse meat is adulterated according to federal law and regulations and cannot be sold legally.[2]  FRER has also petitioned the Federal Bureau of Land Management (BLM) to stop the sale of wild horses gathered from the range to individuals who then sell them to slaughter facilities.[3]

14.     In addition to its petitions to the FDA and USDA for rulemaking regarding adulterated horse meat and to the BLM regarding wild horses sold for slaughter, FRER has been instrumental in bringing to light Valley Meat's numerous, blatant violations of New Mexico environmental law caused by the plant's now-abandoned cattle slaughter operations.  Valley Meat's environmental law violations persisted for many years before FRER advocated that state officials take action against Valley Meat.  FRER wrote multiple letters to the Solid Waste Bureau of the New Mexico Environment Department, requesting appropriate sanctions for the violations perpetrated by Valley Meat.  The result of FRER's advocacy was a finding by the Solid Waste Bureau of the New Mexico Environment Department in August 2012 that Valley Meat was in grave violation of the solid waste laws, and that it should be fined $86,400.

15.     FRER's primary mission is to stop the abuse and neglect of horses through rescue and education.  It provides support and rehabilitation of horses who are sold at auctions, purchased from kill buyers, or owner surrendered.  The majority of FRER's rescue horses would have been sent to slaughter but for FRER's rescue of them.  Since 2011, however, FRER has been forced to expend a large portion of its annual budget in an effort to prevent the slaughter of American horses.  The actions of the USDA in delaying consideration of FRER's rulemaking petition increased the financial outlay FRER had to make in order to identify the nature and likelihood of success of the current applications for horse slaughter.  When USDA announced that it was going to begin reviewing applications of potential slaughter facilities, FRER was again required to increase its outlay of funds to investigate and identify the problems with horse

---

[2] Available at http://www.fsis.usda.gov/PDF/Petition_SchiffHardin_040612.pdf.

[3] Available at http://www.frontrangeequinerescue.org/documents/wild.horse.filing.dec2012.pdf.

slaughter in particular states, nationally, and even internationally.  FRER will need to continue to divert resources from its other programs in order to address the issues surrounding horse slaughter unless Defendants' actions are stopped.

16.     Defendants' actions as set forth below impede FRER's actions and frustrate FRER's ability to pursue its goals for several reasons.  First, Defendants' actions will authorize the slaughter of tens if not hundreds of thousands of healthy American horses.  Second, FRER will continue to be forced to divert its limited resources to investigation of the potential for new horse slaughterhouses, and the trade in horses in the slaughter pipeline.  Defendants' actions will force FRER to divert  its limited organizational and programmatic resources to continue these investigations and care for animals saved from the slaughterhouse.  These resources would otherwise  be spent on programmatic and advocacy activities to prevent cruelty to horses, in furtherance of FRER's larger goals, including its programs which provide alternatives to horse slaughter.

17.     If horse slaughter for human consumption begins in America, FRER and its supporters will be directly and irreparably harmed.  They have a particularized interest in preventing horse slaughter and have invested significant energy and resources, including a large portion of FRER's annual budget, into preventing the initiation of the slaughter of American horses for human food.  If this practice begins again, the impact to the organization will be major.

18.      The interests of FRER and its supporters in observing and enjoying horses, and otherwise protecting these animals from slaughter, are injured by Defendants' decision to grant inspection to a horse slaughter plant, because the grant of inspection allows the applicant to begin slaughtering wild and companion horses.  Moreover, FRER has thousands of supporters nationwide, including in New Mexico, Missouri, Iowa, and California.  Thousands of FRER's supporters will be adversely affected by the health, environmental, aesthetic, and economic impacts of horse slaughter operations.

19.     These injuries are caused by the USDA's grant of inspection to domestic horse slaughter plants and adoption of a new residue testing plan for horse slaughter, because if the grant of inspection had not been given and the new testing program had not been adopted, horses would not and legally could not be slaughtered for human consumption in America.

20.     These injuries will be redressed if the Plaintiffs prevail in this action, because if the grant of inspection is set aside, then any horse slaughter plants that have received grants for inspection will be prohibited from operating, the current status quo of no horse slaughter in the United States will continue, and there will be no detrimental health, environmental, aesthetic, or economic impacts felt by the supporters of FRER living in New Mexico, Missouri, and Iowa, or anywhere else horse slaughter may begin.

21.     The Humane Society of the United States is a non-profit organization that promotes the protection of all animals. The HSUS maintains its headquarters in Washington, DC and is the largest animal protection organization in the United States, with millions of members nationwide and many thousands of members in New Mexico, Missouri, Iowa, and California. The HSUS has actively advocated against practices that injure or abuse horses and has opposed the slaughter of horses for human consumption for more than fifty years.  The HSUS investigates horse cruelty complaints and assists individuals with guidance and advice as to how to best care for their horses, including how to prevent horses from being lost, stolen, or sold to "killer buyers" at auction – middlemen hired by the slaughterhouses to purchase horses for human food. The HSUS actively collaborates with federal agencies to develop wild horse immunocontraception field studies and trials, in order to reduce the sale and slaughter of wild horses.  The HSUS has also been active in strengthening provisions of the Horse Protection Act through strong advocacy in support of the American Horse Slaughter Prevention Act (H.R. 503 and S. 1915) since its original introduction in 2002, and the Wild Horse Act that was introduced this Congress (H.R. 297 and S. 576).  The HSUS has assisted in the passage of state laws that ban horse slaughter or govern the treatment and transportation of horses sold for slaughter within their borders.  The HSUS also advocated for the Commercial Transportation of Equines for

Slaughter Act, passed by Congress in 1996.  The HSUS worked with bipartisan leaders in Congress to pass an Amendment to the FY2006 Agriculture Appropriations Act to de-fund federal ante-mortem inspection of horses for slaughter.  More recently, The HSUS has worked with FRER to submit rulemaking petitions to FDA and USDA with the purpose of preventing horse slaughter from resuming again in the United States.

22.     Members of The HSUS enjoy observing, photographing, studying. and otherwise appreciating wild horses.  Members of The HSUS also enjoy observing, photographing, and otherwise appreciating companion horses.  The interests of The HSUS and its members in observing, studying, and enjoying horses, and otherwise protecting these animals from slaughter, are injured by Defendants' decision to grant inspection to any horse slaughter plant, because the grant of inspection allows the applicant to begin slaughtering wild and companion horses. Moreover, members of The HSUS who reside in or near any horse slaughter plants approved by Defendants will be adversely affected by the health, environmental, aesthetic, and economic impacts of horse slaughter operations.

23.     HSUS member Lawrence Seper became a member of The HSUS so that it would represent his interests on animal protection issues, including the slaughtering of horses for human consumption.  Mr. Seper has lived in Gallatin, Missouri for nearly four years, and lives in close proximity to the Rains Natural Meats plant.  He recreates in the Gallatin area, and would be injured if Rains Natural Meats begins horse slaughter operations.

24.     HSUS member Margaret Walker became a member of The HSUS so that it would represent her interests on animal protection issues, including the slaughtering of horses for human consumption.  Ms. Walker has lived in Gallatin, Missouri for over eight years. Ms. Walker has an ardent interest in the protection and welfare of horses as companion animals, and would face an immediate and severe impact to her ability to enjoy her life in Gallatin if Rains Natural Meats begins slaughtering horses for human consumption.

25.     HSUS member Barbara Mohror became a member of The HSUS so that it would represent her interests on animal protection issues, including the slaughtering of horses for

human consumption.  Ms. Mohror has lived in Keota, Iowa for more than eighteen years. Ms. Mohror recreates with her family in the Sigourney area, and will be injured if Responsible Transportation begins horse slaughter operations.

26.     These injuries are caused by the USDA's grant of inspection to horse slaughter facilities and adoption of a new residue testing plan for horse slaughter, because if the grant of inspection had not been given and a new testing program had not been adopted, horses would not and legally could not be slaughtered for human consumption in America.

27.     These injuries will be redressed if the Plaintiffs prevail in this action, because if the grant of inspection is set aside, then the horse slaughter plants will be prohibited from operating, the current status quo of no horse slaughter in the United States will continue, and there will be no detrimental health, environmental, aesthetic, or economic impacts felt by members of The HSUS in New Mexico, Missouri, and Iowa, or anywhere else horse slaughter may begin.

28.     Additionally, the ability of The HSUS and its members to engage in educational, legislative, and advocacy activities with respect to horse protection is injured by Defendants' failure to comply with NEPA.  Without the required environmental analysis, and response to public comments, Defendants have prevented The HSUS from learning what, if any, environmental effects information USDA considered prior to USDA undertaking that action, thereby inhibiting The HSUS's efforts to communicate with its members, so that its members may in turn contact USDA, other agencies, and their elected representatives to advocate for the humane treatment of horses and other animals and the protection of the environment from horse slaughter contamination.  These injuries will be redressed if the Plaintiffs prevail in this action, because when the grant of inspection is set aside, then horse slaughter cannot occur until proper NEPA review, including public participation and comment, is undertaken.

29.     Plaintiff Marin Humane Society (MHS) is a nonprofit organization located in Novato, California.  MHS was founded over 100 years ago to protect and advocate for animals. MHS offers refuge, rehabilitation, and support services to more than 10,000 animals each year,

including domestic, wild, and rescued farm animals.  MHS engages in a number of community services and has actively been involved in the provision of sanctuary and then adoption for hundreds of animals used in agricultural production or destined for slaughter.

30.    MHS also has an active anticruelty and advocacy program and routinely supports legislation directed at reducing cruelty to all animals.  MHS has supported and continues to support the passage of laws banning horse slaughter, based on MHS policy against that practice.

31.    MHS monitors and weighs in on national issues and has a special focus on Marin County and its residents.  MHS investigates horse cruelty complaints and assists individuals with guidance and advice as to how to best care for their horses, including how to prevent horses from being lost, stolen, or sold to "killer buyers" at auction.

32.    MHS has actively supported the passage of state laws that ban horse slaughter or govern the treatment and transportation of horses sold for slaughter.  MHS promotes and supports a mission of anticruelty for all animals, and for that reason is opposed to the slaughter of horses.

33.    MHS has been actively involved in surveillance and investigations of local livestock auctions where horses were being sold to killer-buyers for slaughter.  MHS has also rescued horses destined for slaughter, and has counseled the public in order to prevent the sale of horses to slaughter, and has worked with other equine rescue groups in order to prevent horses from going to slaughter.

34.    MHS has been involved in training animal control officers, animal services officers, and humane officers and other students in the application of state statutes addressing horse slaughter issues.

35.    MHS supporters enjoy observing, photographing, studying, and otherwise appreciating companion horses.  The interests of MHS and its supporters in observing, studying, and enjoying horses, and otherwise protecting these animals from slaughter, are injured by Defendants' decision to grant inspection to any horse slaughter plant, because the grant of inspection allows the applicant to begin slaughtering horses.

36.     These injuries are caused by the USDA's grant of inspection to horse slaughter facilities and adoption of a new residue testing plan for horse slaughter, because if the grant of inspection had not been given and a new testing program had not been adopted, horses would not and legally could not be slaughtered for human consumption in America.

37.     These injuries will be redressed if the Plaintiffs prevail in this action, because if the grant of inspection is set aside, then the horse slaughter plants will be prohibited from operating, the current status quo of no horse slaughter in the United States will continue, and there will be no injuries felt by MHS and its supporters.

38.     Additionally, the ability of MHS to engage in educational, legislative, and advocacy activities with respect to horse protection is injured by Defendants' failure to comply with NEPA.  Without the required environmental analysis, and response to public comments, Defendants have prevented MHS from learning what, if any, environmental effects information USDA considered prior to USDA undertaking that action, thereby inhibiting MHS's efforts to communicate with its supporters, so that they may in turn contact USDA, other agencies, and their elected representatives to advocate for the humane treatment of horses and other animals and the protection of the environment from horse slaughter contamination.  These injuries will be redressed if the Plaintiffs prevail in this action, because when the grant of inspection is set aside, then horse slaughter cannot occur until proper NEPA review, including public participation and comment, is undertaken.

39.     Plaintiff Horses for Life Foundation is a Bay Area organization dedicated to protecting horses who would otherwise go to slaughter or be captured, and preserving the wild ones that live on the American open range.  Horses for Life advocates for an end to horse slaughter, and a ban on the export of American horses across international borders to slaughter.

40.     Plaintiff Return to Freedom is a nonprofit organization with over 25,000 supporters, headquartered in Lompoc, California, dedicated to the rescue of horses destined for slaughter, and wild horses.  In 2007, Return to Freedom saved the lives of four horses who were about to be slaughtered at the Cavel slaughterhouse in DeKalb, Illinois.  Return to Freedom

brought these "miracle horses" to the Lompoc sanctuary, which became their permanent home. Return to Freedom and its supporters are devoted to these and other horses who have been obtained while en route to slaughter.

41.     Return to Freedom's permanent equine residents include domestic and former wild horses who were on their way to slaughter but for the group's rescue of the horses, who now live permanently at the Return to Freedom ranch.

42.     Return to Freedom supports the enactment of legislation that would end the slaughter of American horses for food, and the transport of horses for slaughter.

43.     Return to Freedom has met with tribal Lakota elders, in an effort to prevent horse slaughter operations on tribal lands.  After discussions, Return to Freedom obtained letters from the tribal elders stating their belief that horses should not be slaughtered for human food.

44.     Return to Freedom has been a consultant as part of a feasibility study, for the State of New Mexico to provide rescue and sanctuary and save the wild horses on tribal and state lands from slaughter.  Return to Freedom and its supporters remain heavily invested in ensuring that wild horses not be sent to slaughter.

45.     The Foundation to Protect New Mexico Wildlife is a New Mexico non-profit corporation with a mission to act in defense of New Mexico's rich wildlife heritage and maintain the health of the habitat in which its wildlife lives, to prevent unnecessary cruelty to animals in New Mexico, including protecting New Mexico's wild horses and to ensure that they do not end up slaughtered for food.  The Foundation undertakes a broad range of activities designed to protect the critical role wildlife plays in New Mexico's diverse ecosystem and cultural economy, to support the preservation and improvement of wildlife habitat, and to encourage and support the connection between New Mexico's citizens and their native wildlife.

46.     Plaintiff Barbara Sink has lived in Gallatin, Missouri for nearly thirteen years. Her residence is located approximately three miles from the Rains Natural Meats facility. Ms. Sink was an engineer for the civil bioenvironmental engineering division of the United States Air Force for two years, a position that required her to survey and evaluate water quality

in the workplace and surrounding environment, and recommend controls to keep environmental and occupational exposures within acceptable limits.  She often spends time gardening and regularly fishes in the Grand River, which flows downstream from Rains Natural Meats, approximately one mile away.  The stream adjacent to Rains Natural Meats flows directly into the Grand River.  Ms. Sink often takes her children and grandchildren to the lakes, rivers, and streams that are local to Gallatin, Missouri to swim, hike, play, and fish.

47.     Because of her knowledge of the potential contamination from horse slaughter operations, and the adulterated nature of horse meat, Ms. Sink will stop fishing in the Grand River, will stop eating fish that are locally caught, and will stop recreating at other local parks with her family if horse slaughter operations begin in Gallatin for fear of contamination from the Rains Natural Meat facility's runoff.  This will cause her injury and distress.

48.     Ms. Sink drives through Gallatin often, including past the Rains Natural Meat facility, to get to the Amish markets in Jamesport.  If horse slaughter begins at Rains Natural Meat, she will see trucks with horses being carried to slaughter, which will cause her great distress, based on her understanding of the inherently cruel nature of horse slaughter.

49.     If horse slaughter begins at Rains Natural Meats, Ms. Sink will also witness vehicles that are trucking away the remains and parts of horses which are being carried to landfills, and the horse flesh being sold by Rains Natural Meats.  Viewing these trucks will cause Ms. Sink injury and distress.

50.     A livestock auction is located approximately three blocks from Ms. Sink's home, and if Rains Natural Meats begins slaughter operations, horses that are going to be slaughtered there will very likely pass through this livestock auction.  Ms. Sink will see horses on their way to the auction, and then to slaughter at the Rains Natural Meats plant.  This will cause her injury and distress.

51.     Ms. Sink is aware that horse slaughterhouses that previously operated in the United States emitted a noxious odor.  If Rains Natural Meats begins slaughtering horses,

Ms. Sink will likely smell this stench when she is in town, which will detrimentally impact her ability to enjoy her life and her community.

52.     Ms. Sink is extremely worried that if Rains Natural Meats begins slaughter operations, toxic runoff from the plant will pollute the surrounding area, including the rivers and streams near her home.

53.     Plaintiff Sandy Schaefer is a member of the Sioux tribe.  She lives in Roswell, New Mexico with her son, Matthew Wells Mato Little Elk, who speaks Lakota.  Ms. Schaefer deeply believes that horse slaughter for human consumption is inhumane, abhorrent, and unfit for the Native American culture.  Horses play a special, particular role in society and in Native American culture, and are not raised as food.  Ms. Schaefer understands that there are many respectful ways to treat and manage our horses without condemning them to the horrors of commercial slaughter.  Ms. Schaefer believes that to slaughter horses is greedy, disrespectful, and contrary to the Native Americans' relationship with its brother nation, the horse nation.  It is not an answer for any tribe and will only bring devastation to the Native American culture and people.  If horse slaughter begins in her hometown, Ms. Schaefer will see horses being sent to slaughter—stuck in trucks, fighting for their lives, injured, and ill.  She will feel helpless and her life, heart, and soul will be directly harmed by the cruelty and disrespect to her brother nation.

54.     Ms. Schaefer is aware that slaughtering American horses will produce toxic meat that can harm consumers, because horses are not raised or treated as food animals and are given medicines and other substances that are unfit for human consumption.  She is concerned that toxic substances in the bodies of our horse brothers will poison our own environment as byproducts of horse slaughter facilities.  Roswell will also suffer the harm that other communities with horse slaughter in the past suffered – there will be horse blood, parts, and carcasses in her community, in her town's precious waterway, in their water treatment facility, and in her environment.  Ms. Schaefer does not want her hometown to be poisoned or known as the center of horse slaughter, and does not want it to deliver destruction to the horse nation or to any people who consume horsemeat.

- 14 -

55.     Plaintiff Krystle Smith has lived in Roswell, New Mexico for her entire life, and her mother and grandmother have lived in Roswell and southern New Mexico for all of their lives.  Ms. Smith has been an employee of the Roswell Humane Society for seven years, and lives within six miles of the Valley Meat facility.  She regularly spends time fishing and camping at Lake Van, which is downstream from Valley Meat, and which is connected to the waterways in proximity of Valley Meat by a series of underground channels that extend all the way to Carlsbad.  She has been fishing and camping on Lake Van for years, and plans on continuing to do so, as long as the water and environment are not contaminated.  However, the Pecos River, which is close to Valley Meat, runs through Roswell and surrounding towns including Hagerman, Artesia, and Carlsbad.  A series of natural underground streams connect many of the waterways in the area downstream and in the vicinity of Valley Meat.

56.     Based on Valley Meat's violations of New Mexico's and federal requirements regarding the protection of the environment and waterways, Ms. Smith is reasonably worried that any horse slaughter taking place at Valley Meat will affect the quality of the water in which she engages in regular recreation.  This is compounded by Ms. Smith's reasonable belief that all horses who will be slaughtered at the Valley Meat facility have been given multiple drugs and other substances that render their meat adulterated and dangerous, so that the byproducts of Valley Meat's horse slaughter will pollute the surrounding area, including the rivers and streams.

57.     If horse slaughter commences at Valley Meat, Ms. Smith will stop fishing and camping in the area she calls home, though she will desire to continue those activities.  This will cause her injury and distress.

58.     If Valley Meat begins a horse slaughter operation, Ms. Smith will be extremely worried about the discharges the horse slaughter facility is allowing to enter the local waterways, and she will be certain that the water in which she fishes is unsafe.  She will not be able to eat fish from the river if Valley Meat is slaughtering horses.

59.     Ms. Smith is aware that horse slaughter cannot be accomplished in a humane manner, and that horses suffer terribly in the slaughter process.  As part of her job with the

Roswell Humane Society, she travels to a nearby veterinary hospital no less than five times, and usually more times, each week.  In order to get to that shelter she must drive right by where the Roswell Livestock Auction Barn is located.  Any horses purchased by Valley Meat from the auction would be in plain view of the road she travels.  If Valley Meat is slaughtering horses, she will be directly confronted with a view of the horses in holding pens and transport trucks waiting to be transported to Valley Meat for slaughter.  These images will cause her intense aesthetic injury.  Her aesthetic appreciation of the area will be harmed, she will be frightened to go past the facility, and she will have to be sure that her family does not go past the facility.  If she sees horses being taken to Valley Meat, or trucks returning from there with carcasses, she will have an immediate and long-lasting injury from viewing those trucks and animals.

60.     If livestock trucks carrying horses begin to drive past the Roswell Humane Society, Ms. Smith will be deeply affected because she will know that those horses are going to an inhumane death in the slaughterhouse, and because the offal and remains of those horses will pollute the ground around the facility and wherever else they are dropped, which could affect the entire community.

61.     If Valley Meat begins slaughtering horses, the stench will carry into Roswell on a regular basis, especially with Roswell's intense summer heat and winds, and will seriously affect Ms. Smith's ability to enjoy her work, her life, and the surrounding parks and rivers and streams, which will all likely be affected by the contamination by Valley Meat from horse slaughter.

62.     Plaintiff Ramona Cordova works in the Human Resources Department of Eastern New Mexico University's Roswell campus.  She was born and raised in Roswell, and has lived there for almost all of her life.  Her parents and much of her family, including her brother, aunts, uncles and cousins, all live in Roswell, and they are all proud of Roswell's reputation and community.

63.     Ms. Cordova and her family are integrally connected to Roswell and its surrounding areas.  A vital part of their sense of community and family structure comes from

their love of the surrounding parks and lakes and natural structures in proximity to Roswell, and their ability to appreciate the town and the natural environment.

64.     Ms. Cordova lives less than seven miles from the Valley Meat facility.  She is active in gardening, walking around the Roswell community, and some hiking.  She and her family go to the parks in proximity to the Valley Meat facility, including Bottomless Lakes State Park and others.  Her family also engages in recreation and fishing on the Pecos River, which runs close to Valley Meat.  They have been doing these activities for years and will continue to do them.  A tributary of the Pecos River, the Spring River Canal, runs very close to Valley Meat and Ms. Cordova believes that runoff from Valley Meat drains into the Spring River Canal.

65.     Ms. Cordova is aware that all horses who will be slaughtered at the Valley Meat facility have all been given multiple drugs and other substances that render their meat adulterated and dangerous, so that the byproducts of Valley Meat's horse slaughter will pollute the surrounding area, including the rivers and streams.  Because of her patronage of these natural wonders, she will be injured and distressed by this damage.

66.     Ms. Cordova understands that any method of horse slaughter will cause extreme and unnecessary pain and suffering for the horses involved.  She regularly sees the trucks carrying cows and other animals to the local livestock auction.  If she see horses on their way to the auction and then to slaughter at Valley Meat, her appreciation of her community and the proud nature of being a Roswell citizen will be immediately and permanently altered.  If she sees horses being taken to Valley Meat, or trucks returning from there with their carcasses, she will have an immediate and long-lasting injury from viewing those trucks and animals.

67.     Plaintiff Deborah Trahan has been a resident of Roswell, New Mexico for ten years, and lives within six miles of the Valley Meat slaughterhouse.  She is disabled, and suffers from rheumatoid arthritis, osteoporosis, and degenerative bone disease.  Her autoimmune diseases are exacerbated by increases in stress and even subtle changes in diet.

68.     Fish is an important part of Ms. Trahan's diet, and she believes the incorporation of fresh fish into her diet is important as a dietary treatment for all of three of her diseases.  If

- 17 -

Valley Meat begins slaughtering horses and discarding the byproducts of that process, she will no longer be able to eat the fish from local waterways, for fear of triggering an exacerbation of her diseases.

69.    The natural beauty and healthy waterways in the area of Valley Meat are a vital part of Ms. Trahan's appreciation of the area.  She is aware that Valley Meat has repeatedly violated New Mexico's and federal requirements regarding the protection of the environment and waterways, and reasonably believes Valley Meat will continue to do so once it begins slaughtering horses.

70.    Ms. Trahan believes that all horses who will be slaughtered at the Valley Meat facility have been given multiple drugs and other substances that render their meat adulterated and dangerous, so that the byproducts of Valley Meat's horse slaughter will pollute the surrounding area, including the rivers and streams.  A series of natural underground streams connect many of the waterways in the area downstream and in the vicinity of Valley Meat.  If Valley Meat begins horse slaughter, she will be extremely worried about the discharges it is allowing to enter the local waterways.

71.    Ms. Trahan's family does a significant amount of camping in the areas near Valley Meat.  If Valley Meat begins slaughtering horses, she will stop camping in the area, even though she would want to continue, because she will be able to smell the Valley Meat facility and will be concerned that the water in the area was contaminated form the Valley Meat runoff.

72.    Ms. Trahan believes that horse slaughter is inherently inhumane and that any method of horse slaughter will cause extreme and unnecessary pain and suffering for the horses involved.  If she sees horses being taken to Valley Meat, or trucks returning from there with carcasses, she will have an immediate and long-lasting injury from viewing those trucks and animals.

73.    Plaintiff Cassie Gross has been a resident of Roswell, New Mexico for thirty years.  She has been employed by the Roswell Humane Society for twenty years, and lives within seven miles of Valley Meat.

74.    Roswell has an international fame based on the reported sighting of UFOs in Roswell in 1947.  It is home to the International UFO Museum and Research Center, and an annual Roswell UFO Festival that brings substantial income to the city.  If people learn that Roswell is home to a horse slaughterhouse, she believes that tourism will be severely affected.  Because of the negative sentiment about horse slaughter felt by a large majority of New Mexican citizens and all Americans, tourism will significantly drop this year and in future years, impacting many programs dependent on Roswell public funding.

75.    If Valley Meat opens its slaughterhouse, tourism will significantly drop, and funding for the public schools where Ms. Gross's sons go, as well as other municipal privileges and benefits, will be reduced, injuring Ms. Gross and her family in a variety of ways.

76.    If horse slaughter comes to Roswell, merchants will also lose significant income which comes from tourists visiting Roswell all year long and especially for the Roswell UFO Festival, and will need to raise prices.  This will cause Ms. Gross and the other plaintiffs economic harm based on the increased prices merchants will need to charge.

77.    Ms. Gross is an organic gardener, and she fishes and camps with friends and family at Lake Van and on the Pecos River, which are close to Valley Meat.  The natural beauty and healthy waterways in the area of Valley Meat are a vital part of her appreciation of the area, and she enjoys eating the fish she catches.

78.    Because all horses who will be slaughtered at the Valley Meat facility have been given multiple drugs and other substances that render their meat adulterated and dangerous, the byproducts of Valley Meat's horse slaughter will pollute the surrounding area, including the rivers and streams, as well as the air quality in Roswell.  This will cause aesthetic and recreational injury to Ms. Gross.

79.    A series of natural underground streams connect many of the waterways in the area downstream and in the vicinity of Valley Meat.  If Valley Meat begins horse slaughter, Ms. Gross will be extremely worried about the discharges it is allowing to enter the local waterways, and she will be certain that the water in which she fishes is unsafe.  She will be

further injured because she will not be able to eat fish from the river if Valley Meat is slaughtering horses, and she will stop camping in the area with her family.

80.     Ms. Gross knows that horse slaughter is inherently inhumane and that any method of horse slaughter will cause extreme and unnecessary pain and suffering for the horses involved. As part of her job with the Roswell Humane Society, Ms. Gross travels to a nearby veterinary hospital no less than three times, and usually more times, each week.  In order to get to that clinic, she must drive right by the Roswell Livestock Auction Barn, where any horses sold to Valley Meat will be trucked and temporarily kept.  If Valley Meat is slaughtering horses, she will be directly confronted with the horror of the horses in holding pens waiting to be sent to Valley Meat to be slaughtered.  She will be forced to see trucks loaded with horses, on their way to their death.  These images will cause her intense and long-term aesthetic injury.  She will be frightened to go past the facility, and will have to be sure that her children do not go past the facility.

81.     If Valley Meat begins slaughtering horses, the stench from the plant will come over Ms. Gross's home on a daily basis, as winds from the South come into town consistently. The intense heat in the area will make the odors much worse and will seriously affect her ability to enjoy her work and her activities of daily life, and it will also ruin her ability to enjoy the surrounding parks and rivers and streams, which will all likely be affected by the contamination by Valley Meat from horse slaughter.

82.     Plaintiff Tanya Littlewolf belongs to the Apache Mescalero tribe and was born on the Mescalero reservation in south central New Mexico.  She currently runs Wolf Mountain Sanctuary in Lucerne Valley, California and is an avid supporter of animal protection.  Horses are a special animal to Tanya Littlewolf and her people, who have a longstanding loyalty to the animal.  Tanya Littlewolf and her tribe believe that horses should never be subject to a cruel, brutal, and violent death by slaughter.  If domestic horse slaughter commences, she deeply believes that all American horses will become vulnerable.  Tanya Littlewolf believes that slaughtering horses is never the right thing to do, and it is always a violation of the Native

American culture.  Tanya Littlewolf is aware of many humane and respectful options for horse management other than death or slaughter that are in harmony with the Native American values, such as gelding and population control.  According to Tanya Littlewolf's beliefs, to slaughter horses will bring harm, betrayal, and destruction to all Native Americans, especially their children who must learn to respect and never exploit the Creator's family and all life on Earth.

83.     Plaintiff Chief David Bald Eagle holds the title of Chief of the Minikoju Band of the Cheyenne River Tribe Lakota Indians and First Chief of the United Indigenous Nations of the Americas.  The Lakota call themselves "The Horse People" and have a longstanding, sacred relationship with horses.  The tribe refers to horses as "Sunka Wakan," or "sacred dog."  Chief David Bald Eagle and the Lakota Tribe believe in the importance of living in harmony with nature, including wildlife and the environment, and believe they must be loyal to horses, just as horses have been loyal to them.  The Lakota also believe that horses are unfairly blamed for destruction of wild lands and unfairly pushed off of those lands, when other causes are to blame.  The Lakota and Chief David Bald Eagle believe that abusing a horse, including slaughtering a horse for human consumption, will bring misfortune or death to the abuser.  The Lakota and Chief David Bald Eagle also believe that allowing the slaughter of horses on Native American land will not benefit the tribal nations, but instead will be an opportunity for more control by the non-native government and outside special interests.  For these reasons Chief David Bald Eagle strongly opposes horse slaughter.

84.     Plaintiff Chief Arvol Looking Horse of the Lakota, Dakota, Nakota Nation is known as "Sung Wakan" – Horse Man.  He is the 19th Generation Keeper of the Sacred White Buffalo Calf Bundle and the spiritual leader of his people.  He has devoted his life to honoring and protecting Mother Earth and all of her inhabitants, and he opposes the slaughter of horses, which degrades their gifts and poisons Mother Earth.  Chief Arvol Looking Horse and his Nation know that throughout history, horses have assisted, nurtured, and sacrificed themselves for his people.  For these reasons, Chief Arvol Looking Horse views horses as sacred, and believes that

they have earned their right to live in peace, free of the suffering and trauma that they would be forced to endure in a slaughterhouse.

85.     Plaintiff Roxanne Talltree-Douglas is a Blackfoot Horsewoman.  She learned the precious gift of horse medicine from her grandmother, Jean-Marie Talltree-Batiste, who rode on horseback from Blackfoot lands in southern Canada to Louisiana with her father and two brothers when she was 6 years old.  Roxanne Talltree-Douglas and her Native American tribe deeply respect the horse nation.  She follows the Blackfoot belief that horses are spirit beings that were put on Mother Earth to teach us how to live, love, and exist, and that hitting or hurting a horse is the same as spitting in the face of the Creator.  According to Roxanne Talltree-Douglas's beliefs, if you care for your horse, your horse will be placed at the western gate at your passing, which will take you to the other worlds.  Roxanne Talltree-Douglas and her people revere horses and believe that if horses choose, as a nation to leave this earth, we will know it and honor this decision, but it is not up to the people to make that decision for them.  It is the steadfast tradition of Roxanne Talltree-Douglas and her people to ensure that the horse nation lives long and well on Mother Earth.

86.     The interests of the individual Plaintiffs, of living in a clean community that does not depend on a water, air, or soil supply contaminated by horse slaughter's byproducts, are injured by Defendants' decision to grant inspection to a horse slaughter plant.  The grant of inspection allows the horse slaughter plant to commence operations without any consideration of the environmental effects of the plant and without any information provided to or input received from the public and the local community regarding the significant environmental effects of horse slaughter.  The individual Plaintiffs' injuries are particularized because of their connection to the Roswell community and their physical proximity to the horse slaughter plant, and their viewing of the trucks carrying horses and their carcasses.  NEPA is intended in part to protect persons who might be injured by major federal actions taken without proper regard for the possible environmental effects of such actions.  The individual Plaintiffs are just the type of people whom NEPA procedural requirements are intended to assist.

87.     These injuries are caused by the USDA's grant of inspection to horse slaughterhouses in the United States and the adoption of the new residue testing plan for horse slaughter, because if the grant of inspection had not been given and a new testing program had not been adopted, horses would not and legally could not be slaughtered for human consumption in America.

88.     Plaintiffs' injuries will be redressed if the Plaintiffs prevail in this action, because when the grant of inspection is set aside, the horse slaughter plant will be prohibited from operating and causing harmful environmental effects in local communities unless proper precautions have been taken.  Furthermore, Plaintiffs will have the opportunity to present their concerns about the immediate harmful environmental effects of horse slaughter plants to the USDA at the time that USDA engages in the required NEPA review.

89.     Defendant Tom Vilsack is the Secretary of Agriculture, and has ultimate responsibility for ensuring that agencies within USDA comply with requirements of the APA and NEPA and with its own regulations.

90.     Defendant Elizabeth A. Hagen is the USDA Under Secretary for Food Safety, and is responsible for overseeing FSIS, the public agency in USDA responsible for ensuring the nation's meat is safe.  Defendant Hagen has ultimate responsibility for ensuring that FSIS complies with requirements of the APA and NEPA and with its own regulations.

91.     Defendant Alfred V. Almanza is the Administrator of FSIS, an agency within USDA, and is responsible for authorizing the grant of inspection to horse slaughter facilities challenged in this case.  Defendant Almanza has ultimate responsibility for ensuring that FSIS complies with the requirements of the APA and NEPA and with its own regulations.

## IV.     STATUTORY FRAMEWORK UNDERLYING THE COMPLAINT

### A.     Administrative Procedure Act.

92.     The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved

by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

93.     "[F]inal agency action for which there is no other adequate remedy in a court" is subject to judicial review.  5 U.S.C. § 704.

94.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (C), and (D).

**B.     National Environmental Policy Act.**

95.     The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA)*,* and the Council for Environmental Quality (CEQ) Regulations, 40 C.F.R. parts 1500-1508, require federal agencies to conduct environmental impact analyses for regulatory actions.

96.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  NEPA's purpose encompasses "[promoting] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" and "[establishing] a Council on Environmental Quality."  42 U.S.C. § 4321.

97.     In enacting NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances[.]"  42 U.S.C. § 4331.

98.     The goals of NEPA reflect "the continuing policy of the Federal Government . . . and other concerned public and private organizations, to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  *Id.*

99.     The Council on Environmental Quality ("CEQ") established by NEPA is charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment."  42 U.S.C. § 4342.

100.     The USDA has expressly "incorporate[d] and adopt[ed]" all of the CEQ regulations.  7 C.F.R. § 1b.1(a).

101.     The CEQ regulations implementing NEPA mandate that "[f]ederal agencies shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects . . . upon the quality of the human environment," and "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."  40 C.F.R. §§ 1500.2(a), (f).

102.     CEQ regulations instruct the USDA to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. § 1501.2.

103.     Where an agency is invoking a new inspection mechanism, NEPA review is required before that mechanism can be invoked.  "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

104.     The United States District Court for the District of Columbia has previously decided that a change in the "legal or regulatory status quo" triggers NEPA review.  *Johanns*, 520 F. Supp. 2d at 29.  NEPA requires that a federal agency prepare one of three levels of documentation based on the significance of its project's possible impact on the environment.  *See* 40 C.F.R. § 1507.3(b).

105.     NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is referred to as the Environmental Impact Statement ("EIS").

106.    CEQ has issued regulations defining the term "major federal action." In particular, 40 C.F.R. § 1508.18 provides that:

> 'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility . . . (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals. . . .

40 C.F.R. § 1508.18.

107.    One common category of federal action is "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(4).

108.    CEQ regulations explain that evaluation of the term "significantly" in 42 U.S.C. § 4332(C) requires considerations of both "context" and "intensity". 40 C.F.R. § 1508.27. For context, the agency must consider the effects on society as a whole, the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a). For intensity, meaning the severity of the environmental impact, the agency must take into account multiple considerations, among them: the degree to which the proposed action affects public health or safety; the degree to which the effects on the environment are likely to be highly controversial; the "degree to which possible effects on the human environment are highly uncertain or involve unique or unknown risks"; the degree to which the action may establish a precedent for future actions with significant effects; and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

109.    An EIS must describe:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

110.    "Effect" is defined in CEQ regulations to encompass both direct and indirect effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative.  40 C.F.R. § 1508.8.

111.    Projects that "do not individually or cumulatively have a significant environmental effect" may proceed under a "categorical exclusion" from NEPA review, in which case neither an EIS nor an environmental assessment ("EA") is required.  However, the agency's procedures for determining categorical exclusions must provide for extraordinary circumstances in which a normally excluded action has or may have a significant environmental effect.  *See* 40 C.F.R. §§ 1508.4, 1507.3(b)(2)(ii).

112.    USDA regulations implementing NEPA state that FSIS is excluded from the requirements of preparing procedures to implement NEPA and is "categorically excluded from the preparation of an EA or EIS unless the agency head determines that an action may have a significant environmental effect."  7 C.F.R. §§ 1b.4(a) and 1b.4(b)(6).

113.    Thus, if the agency finds that its proposed action could potentially be covered by a categorical exclusion, the agency must determine whether there are any "[e]xtraordinary circumstances" that nevertheless require the agency to perform an environmental evaluation because the action "may have a significant environmental effect."  40 C.F.R. § 1508.4.

114.    The United States District Court for the District of Columbia has found that USDA violated CEQ regulations when it failed even to consider whether a normally excluded action, such as an FSIS action, may have a significant environmental impact.  *Johanns*, 520 F. Supp. 2d at 34.

115.    Furthermore, according to USDA's own regulations, any agency of the USDA, including FSIS, is required to "continue to scrutinize [its] activities to determine continued eligibility for categorical exclusion."  7 C.F.R. §§ 1b.3(a), (c), and 1b.4.

116.    If the agency has not determined that its action "[n]ormally requires an environmental impact statement," or normally is covered by a categorical exclusion, then the

agency must prepare an EA to determine whether the agency must prepare a full EIS or issue a finding of "no significant impact" on the environment (FONSI).  40 C.F.R. §§ 1501.4, 1508.9, 1508.13.

> ### C.      Federal Meat Inspection Act ("FMIA").

117.    The Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq*. ("FMIA"), is a comprehensive statutory meat inspection scheme, and slaughter facilities cannot operate without federal oversight, inspection, and approval by FSIS.  A new horse slaughter facility requires the grant of inspection and continued inspection and oversight by USDA.  *See* 21 U.S.C. § 603(a).

118.    Federal inspection is required at any facility slaughtering horses or other animals intended for use as human food.  9 C.F.R. §§ 302.1, 304.1.

119.    In order to be eligible for federal inspection pursuant to the FMIA, a horse slaughter facility must apply to FSIS for inspection, and review of any application for inspection necessarily involves FSIS assessing detailed paperwork regarding the premises, standard operating procedures, and management of waste-streams, including sewage and water.  9 C.F.R. § 416.2.

## V.      FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

> ### A.      Horse Slaughter in America.

120.    Americans have a long relationship with horses.  We keep horses as companions. They have stood by, loyal as dogs, during every war from the American Revolution up to the present day.  They shoulder the burdens to work for farmers and ranchers.  We admire their wildness and herd cultures where they are left alone in nature on the open range.  There are approximately nine million horses and two million horse owners in the U.S., and in addition there are tens of thousands of wild horses in this country.  In New Mexico, the location of Valley Meat's horse slaughter plant, there are 147,000 horses, over 60 percent of which are involved in showing and recreation.

121.    Americans do not intend their horses to end up as meat, and American captive and wild horses are not treated by their original owners as food animals.  Because they are not raised

in regulated industries conscious of public health and safety concerns, but rather in private homes, on racetracks, and as working animals, serious environmental issues arise if they are slaughtered for human food.  Almost all American horses are given a wide variety of drugs and other substances that render their blood and tissue contaminated and dangerous to consume.  The discard of the byproducts of horse slaughter thus poses serious public health risks when such adulterated tissue and blood, and the wastewater from slaughter, seep into the ground and water supply.

122.    According to a recent objective survey, approximately eighty percent of Americans surveyed are opposed to horse slaughter for human consumption.  Polls in New Mexico, Iowa and Missouri have established that seventy percent of the voters in each of those states are similarly opposed to the practice.  Nevertheless, every year more than 140,000 American horses are sold to slaughter.

123.    Horses are sent to slaughterhouses in deplorable, inhumane, and cruel conditions, because long-distance transport in cramped trucks is especially difficult for horses.

124.    The treatment of horses at slaughterhouses in America (in the past) and abroad has been roundly criticized.  Defendants FSIS and USDA have documented appalling cruelty at U.S. horse slaughter plants, including gruesome descriptions and photographs of the mistreatment inherent in horse slaughter.[4]

---

[4] *See*, *e.g.*, USDA, Food Safety & Inspection Service, Noncompliance Record No. 0019-2005-8243 (Apr. 13, 2005); *see also, e.g.*, Noncompliance Record Nos. 00 18-2005-8243 (Apr. 4, 2005) ("Nine horses were overcrowded in the alleyway causing undue excitement which was further exacerbated when two more employees from the kill floor began yelling and hitting these horses causing the one in the end of the line to slip and fall."); 0013-2006-8243 (Oct. 9, 2006) ("horse was down" . . . "in the upper middle compartment of a pot bellied trailer" and "[o]ther horses within the compartment were trampling the downed horse"); 0006-2007-8243 (Jan. 24, 2007)) ("two downed horses being trampled upon by the other horses as well as the front horse being kicked with the hind feet from another horse"); Press Release, Animals' Angels (Nov. 2008), *available at* http://www.kaufmanzoning.net/nov24/pressrelease.pdf; *see also* Mary Nash's Horse Meat Website, *available at* http://www.kaufmanzoning.net/foia.htm (making available for download USDA documents describing and depicting regulatory violations, mistreatment, and cruelty).

125.   Horse slaughter is particularly detrimental to the human environment.  The last three American horse slaughterhouses, located in DeKalb, Illinois (Cavel), Kaufman, Texas (Dallas Crown), and Fort Worth, Texas (Beltex), were shut down in 2007.  Every one of these operations wreaked environmental havoc by dumping blood, entrails, urine, feces, heads, and hooves into local water systems, overwhelming local waste water infrastructures and causing numerous environmental violations.

126.   According to the former mayor of Kaufman, Texas, where the Dallas Crown plant was located, the problems were epidemic, including significant environmental contamination.  Dallas Crown also left a 600-gallon container filled with blood and horse parts outside its facility, which generated a stench, attracted flies and vermin, and eventually spilled outside the plant, emptying horse blood into the ground.

127.   The environmental contamination caused by that horse slaughter plant was in no way confined to contamination at the facility itself.  In fact, on multiple occasions, Kaufman residents' faucets delivered blood and horse tissue instead of water.  Dallas Crown's environmental contamination and repeated local wastewater code violations imposed environmental, aesthetic, public health, and economic harms on its host community.

128.   As exemplified by the operations of the horse slaughter plants closed down in the U.S. six years ago, horse slaughter produces environmental effects on a magnitude not seen with other slaughter facilities, and causes potentially serious environmental harms for any local community hosting a horse slaughter facility.  Individuals living near any horse slaughter plant will suffer degradation in the quality of their air, water, and ground resources.  This is because horses are different, as previously stated, in the way they are raised and the dangerous drugs and medications with which they are treated.

129.   The disposal of horse blood and offal presents a particular environmental threat because of the drugs and substances horses are given throughout their lives.  The byproducts of horse slaughter – especially blood, sludge, and waste water – may contaminate groundwater and even enter the food chain when sludge is distributed on crops.  For that reason, horse slaughter

involves effects on the environment that are "highly uncertain or involve unique or unknown risks" because it is unknown how those drug residues, once in the local water or ground supply, will affect the health and safety of nearby residents.

130.    Because USDA is approving a horse slaughter facility for the first time since the last horse slaughterhouses were shut down in 2007, the manner in which USDA approves a grant of inspection for a domestic horse slaughter plant, including whether it undertakes NEPA review, will likely establish a precedent for how the agency handles future slaughter  inspection applications.

131.    Horse slaughter's impacts on local, national and even international human environments is highly controversial, as evidenced by the large percentage of Americans opposed to horse slaughter, the introduction and support of federal legislation that would prohibit horse slaughter for human consumption, and the recent scandal regarding the incorporation of horse meat into beef products throughout Europe.

132.    Approval of horse slaughter inspections threatens a violation of Federal, State, and local environmental laws, because past horse slaughter facilities repeatedly and brazenly violated local laws pertaining to waste management and air and water quality, costing host communities large sums of money to seek compliance and remedy environmental harms, and because of the special dangers inherent in horse meat.

133.    By reestablishing horse slaughter in New Mexico – or anywhere else – USDA's new program of inspection will have known and unknown effects on the ecology of local communities, and on the aesthetic, economic, social and health interests of people and their environment.

134.    All of the environmental effects caused by horse slaughter only occur if USDA's grant of an application for inspection to a horse slaughter plant is allowed to move forward.

135.    Defendants have never refuted that "horse slaughter operations have 'significantly' impacted the environment within the meaning of NEPA as set forth in 40 C.F.R. § 1508.27." *Johanns*, 520 F. Supp. 2d at 19.

136.    USDA has publicly stated that it believes no NEPA review is required before granting inspection of domestic horse slaughter facilities.

137.    In determining whether NEPA review was necessary before allowing a new horse slaughter plan and set of policies, USDA was confronted with compelling evidence that all of the last three horse slaughterhouses operating in this country wreaked environmental havoc on their local communities.  USDA has allowed domestic horse slaughter for human consumption to resume in this country, presumably without any FSIS consideration or scrutiny to determine whether the issuance of these grants of inspection were eligible for a categorical exclusion from NEPA requirements.

### B.     The Federal Regulation of Horse Slaughter.

138.    Until 2006, FSIS carried out inspections of horse slaughter plants.  In an amendment to the 2006 Agricultural Appropriations Act, on November 10, 2005, Congress withdrew funding for the inspection of horses transported for slaughter, and the inspection of horse slaughterhouses.  Pub. L. 109-97, § 794, 119 Stat. 2120, 2164 (A.R. 51).  The funding prohibition was reinstated annually through 2011, confirming its intended effect of prohibiting nationwide the slaughter of horses for meat.  *See* Remarks of Senator John Ensign (R-NV), 151 CONG. REC. S 10,218 (Sep. 20, 2005) ("The goal of our amendment is simple: to end the slaughter of America's horses for human consumption overseas.").

139.    After the President signed the 2006 appropriations amendment into law, the three horse slaughter plants operating in the U.S. filed a petition with the USDA for emergency rulemaking to create a fee-for-service inspection regime, whereby the slaughterhouses would pay for FSIS inspectors to oversee their continued operations.  USDA granted that petition without any public notice or comment and against the express intent of Congress.  *See Johanns*, 520 F. Supp. 2d at 12-13.

140.    The HSUS and other parties filed a complaint with the United States District Court of the District of Columbia claiming that USDA's implementation of this rule, which would have allowed horse slaughter to continue without performing a NEPA analysis, was a

violation of NEPA.  On the parties' cross-motions for summary judgment, the court ruled that the USDA's interpretation of 7 C.F.R. § 1b.4 as permitting FSIS to ignore whether its actions have environmental impacts was arbitrary and capricious, and thus a violation of the APA. *Johanns*, 520 F. Supp. 2d 8, 36.  The Court stated that "any notion that USDA may avoid NEPA review simply by *failing* even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the CEQ regulations."  *Id.* at 34 (internal quotation omitted).

141.     In November 2011, Congress failed to renew the ban on funding federal FSIS inspectors at horse slaughter plants in the United States.  Presently, FSIS has appropriations to conduct horse slaughter plant inspections.

142.     In response to the appropriations by Congress for horse slaughter inspections, and because of the great threat to human health associated with the consumption of meat from American horses, Plaintiffs FRER and HSUS filed two petitions for rulemaking, requesting the USDA and the Food and Drug Administration to recognize the potential dangers of horsemeat and to issue rules in connection with those dangers.  *See* footnotes 1, 2, *supra*.

143.     During the time that FSIS considered and approved the applications for inspection to slaughter horses throughout the United States, USDA had for its consideration Plaintiffs' April 2012 rulemaking petition that underscored for USDA the serious health risks and environmental harms inherent in permitting horse slaughter plants to operate in the United States.  USDA has not acted on the rulemaking petition Plaintiffs filed, but it has stated that in order to begin horse slaughter again, the agency would need to develop new protocols, policies and procedures in order to comply with the FMIA and provide inspections of horse slaughter plants.

144.     Plaintiffs have provided USDA with undisputed evidence that virtually every American horse who goes to slaughter has received medications that federal law specifically states are not to be used on animals intended to be eaten.  Thus, USDA must come up with a new plan or policy that addresses the fact that every American horse is potentially excluded from the food supply as a matter of law.

145.     The rulemaking petition also provided USDA with ample evidence demonstrating the inevitable environmental effects of the agency's action if the agency were to proceed by granting an inspection to a horse slaughter facility.

146.     On June 28, 2013, USDA denied FRER's and HSUS' rulemaking petition, and issued a grant of inspection for Valley Meat, announced that it would be granting inspection to horse slaughter facilities in Iowa and Missouri, so that the companies could begin slaughtering horses for human consumption.

147.     Defendants are aware of Valley Meat's past noncompliance with environmental regulations.  When Valley Meat was in the business of slaughtering cattle, FSIS documented maggot-infested piles of decaying animals as high as fifteen feet on its property.[5]  FSIS itself first noted Valley Meat's gross violations of waste removal requirements for its cattle slaughter operations.  USDA has taken the final agency action of granting inspection to Valley Meat, conditionally authorizing it to slaughter horses, despite Valley Meat's past problems processing cattle, and despite the obvious environmental and health effects associated with horse slaughter.

148.     Given its history of environmental violations, Valley Meat's operations, as well as other horse slaughter plant's operations, should be subjected to heightened environmental scrutiny.  However, USDA has granted and says it will grant permits of inspection to engage in horse slaughter without engaging in such scrutiny.

149.     USDA possessed information that was directly relevant to the grant of inspection to domestic horse slaughter plants.  While Defendants have not made their decision documents available at this time, this information presumably was not a part of the agency's decision of whether a grant of inspection to a horse slaughter facility was subject to NEPA's review requirements.

---

[5] January 22, 2010 Letter from Dr. Ron Nelson, Denver District Manager, FSIS to the Roswell Health Office of the New Mexico Health Department.

150.    USDA has stated that it needed to develop new drug residue testing plans, plans and policies in connection with the renewal of horse slaughter in America.  USDA will need to provide new training to its inspectors in order to begin horse slaughter operations again.

151.    Defendants have now adopted a fatally flawed new residue testing plan, specifically for horse slaughter, that will govern all horse slaughter operations in the country. Defendants presumably did not conduct any environmental review prior to adopting and implementing this new testing program.

152.    Because of the grant of inspection to domestic horse slaughter plants and the adoption of a new drug residue testing plan for regulating horse slaughter nationwide, the status quo of no domestic horse slaughter has ended, and the slaughter of American horses for human consumption is now resuming for the first time in this country since 2007.

153.    By granting inspection to a horse slaughter plant and by adopting a new residue testing plan to apply to horse slaughter nationwide, USDA has substantively changed its operations by allocating its finite resources to authorize and oversee horse slaughter.  This is a major change in policy and practice that has direct, indirect, and cumulative impacts on the environment.

154.    The grant of inspection to a horse slaughter facility creates a significant change in the status quo because without it, horse slaughterhouses could not legally operate.

155.    In addition to the domestic change in status quo from a practical prohibition on horse slaughter since 2006 to now USDA issuing a grant of inspection to domestic horse slaughterhouses, relevant international regulations of horse meat have also changed.  The European Union (EU) adopted in 2009 new regulations that will require any imported horse meat to satisfy additional and higher export safety and inspection requirements.

156.    USDA has not incorporated any change in policy or inspection requirements to address the adopted EU regulations.  Horses slaughtered in the U.S. are exported to EU markets, and U.S. horse meat will have to satisfy these new EU regulations.  Because there has been no horse slaughter in the U.S. since these regulations were adopted, USDA did not have to worry

about whether its inspections complied with EU regulations.  If American horse slaughter starts up again pursuant to FSIS's grant of inspection, there is a new regulatory framework in place, and USDA needs to revise its inspection procedures to comply with it.  This is an additional change in the status quo triggering the requirements of NEPA.

157.    In response to the prospect of resuming horse slaughter operations in the United States and in response to public opposition to American horse slaughter, Congress is considering a bipartisan bill, the Safeguard American Food Exports (SAFE) Act, that would prohibit U.S. horse slaughter facilities and also ban the exporting of horses for slaughter.  S. 541/H.R. 1094.

158.    In response to the Obama Administration eliminating funding for USDA inspection of horse slaughter facilities in its proposed budget for FY2014, both the House and Senate Appropriations committees unanimously amended the FY2014 Agriculture Appropriations bill to eliminate funding for the inspection of horse slaughter facilities.

159.    Recent events overseas have also emphasized the dangers of horse slaughter. Horse meat has been found in many samples of beef in several European countries.  Recalls because of the horse meat problem were reported on a regular basis for weeks in 2013.  For example, furniture (and meat) company IKEA removed 1670 pounds of meatballs from fourteen countries across the European continent.  Horse meat in beef products in Ireland and England raised great concerns as well.  The potential for contamination of beef products with the drugs and other substances associated with horse slaughter, as well as the effects on the human environment, are a reality overseas.

160.    USDA officials have stated that Americans did not have to worry about toxic horse meat in their beef, for the specific reason that there was no horsemeat being produced in America.  This is a virtual admission by USDA that, if production of horse meat begins in America, there will be a significant effect on the human environment, and a potential contamination of the American meat supply.

C.     **The Effect of Horse Slaughter on Endangered Species.**

161.    The horse slaughtering process produces by-products and waste products that are a threat to the environment and to wildlife in the vicinity of the slaughter facility.  Horse slaughtering produces the following:  (1) manure, contents of rumen and intestines; (2) edible products, including offal and blood; (3) inedible products such as bones, and hair; (4) fat; and (5) large volumes of wastewater.

162.    Most slaughterhouse processes require the use of water, and the pollutants contained in wastewater can impact the environment when the wastewater runoff enters into groundwater, streams, and rivers.  Horse slaughtering also requires large amounts of hot water and steam for sterilizing and cleaning.  Generating the energy for heating water emits gasses, which contribute to air pollution.

163.    Horse slaughter facilities, with their combination of contaminated by-products and excessive steam generation and the need to discharge massive amounts of wastewater, represent a threat to the environment as well as threatened and endangered species in the area. For example, Valley Meat is located near South Spring River, Pecos River, Bitter Lake Wildlife Refuge, and Bottomless Lakes State Park.  Threatened and endangered species are found within the vicinity of Valley Meat, and their continued existence may be jeopardized by the horse slaughtering activities.  Valley Meat's operations may also adversely affect or destroy the habitats of the threatened and endangered species.  Affected species may include, but are not limited to, the Pecos bluntnose shiner, the Least tern, the Pecos Assiminea snail, Koster's springsnail, Roswell springsnail (collectively "snails"), and Noel's Amphipod.

164.    The Least tern is a bird listed as endangered by FWS.  The tern's breeding area is in the Bitter Lake refuge and some breeding may occur at the Bottomless Lakes.  The tern and its habitat, both Bitter Lake and the Bottomless Lakes, could be impacted by air emissions and wastewater from the slaughterhouse.

165.    The Pecos bluntnose shiner is a fish listed as threatened by FWS.  In 2006, the FWS New Mexico Ecological Services Field Office issued a 5-year review of the shiner stating

that the shiner's habitat is in the Pecos River—from the Fort Sumner Irrigation District Diversion Dam to Brantley Reservoir—and has been found near Valley Meat's location.  FWS has issued a final rule designating as a critical habitat for the shiner large portions of the Pecos River, located both upstream and downstream from Valley Meat's location.  The shiner and its critical habitat may be adversely affected by the introduction of wastewater from the slaughterhouse into the waterways.

166.    Additionally, the snails and Noel's Amphipod may be affected by Valley Meat's activities.  FWS issued a final rule designating critical habitat for the snails and Noel's Amphipod.  The designated critical habitats are in close proximity to Valley Meat and are within Bitter Lake refuge and part of the Pecos River.  The snails and Noel's Amphipod, and their critical habitats, may be adversely affected by any wastewater or air emissions.

167.    Similar threats to threatened and endangered species likely exist in the proximity of other potential domestic horse slaughter facilities.  Given the complexity of the environmental impacts of wastewater discharge, USDA should have completed a comprehensive consultation under Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), before granting any application for inspection at a domestic horse slaughter facility, and any operation has a potential significant impact on the human environment.

## VI.    CLAIMS FOR RELIEF

### A.    Claim One:  Violation of the National Environmental Policy Act, 42 U.S.C. § 4332(C).

168.    Plaintiffs hereby restate and incorporate by reference the allegations contained in this Complaint.

169.    By granting inspection to a horse slaughter facility without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C), USDA has violated NEPA and CEQ's implementing regulations, and has acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq.*

170.    Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in this Complaint.

**B.    Claim Two:  Violation of the National Environmental Policy Act, 42 U.S.C. § 4332(C).**

171.    Plaintiffs hereby restate and incorporate by reference the allegations contained in this Complaint.

172.    By establishing, issuing and authorizing a drug residue testing plan for horse slaughter to be used at horse slaughter facilities without first conducting an environmental review and producing an EIS according to NEPA, 42 U.S.C. § 4332(C), USDA has violated NEPA and CEQ's implementing regulations, and has acted arbitrarily and capriciously, and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2) *et seq*.

173.    Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in this Complaint.

**C.    Claim Three:  Violation of The Administrative Procedure Act, 5 U.S.C. § 706.**

174.    Plaintiffs hereby restate and incorporate by reference the allegations contained in this Complaint.

175.    By providing a grant of inspection to domestic horse slaughter plants, USDA has abused its discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

176.    Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in this Complaint.

WHEREFORE, Plaintiffs request that the Court issue an Order:

1.    Declaring that USDA's grant of inspection to a horse slaughter facility without the required NEPA review is arbitrary and capricious, and without observance of procedure

required by law, and not in accordance with the Administrative Procedure Act or the National

Environmental Policy Act;

2. Declaring that USDA's establishment of a drug residue testing plan for horse

slaughter without NEPA review is arbitrary and capricious, and without observance of procedure

required by law, and not in accordance with the Administrative Procedure Act or the National

Environmental Policy Act;

3. Setting aside any grants of inspection given to horse slaughter plants throughout

the United States;

4. Preliminarily and permanently enjoining USDA or FSIS from granting or

conditionally granting any applications for inspection of horse slaughter facilities, and from

otherwise carrying out any inspections of horse slaughter facilities, without the performance of

adequate NEPA review;

5. Preliminarily and permanently enjoining USDA or FSIS from implementing the

new drug residue testing plan for horse slaughterhouses nationwide, without the performance of

adequate NEPA review;

6. Awarding Plaintiffs costs and reasonable attorneys' fees' and

7. Awarding Plaintiffs any other relief that the Court may deem just and proper.


Respectfully submitted this 19th day of July 2013.


      _/s/ Bruce A. Wagman_
      BRUCE A. WAGMAN (*Pro Hac Vice* Pending)
      ROCKY N. UNRUH (NM Bar #3626)
      SCHIFF HARDIN LLP
      One Market, Spear Tower, 32nd Fl.
      San Francisco, CA  94105
      Telephone: (415) 901-8700
      Facsimile: (415) 901-8701
      bwagman@schiffhardin.com
      runruh@schiffhardin.com

      Attorneys for Plaintiffs

BRIAN EGOLF
EGOLF + FERLIC + DAY, LLC
128 Grant Avenue
Santa Fe, NM  87501
Telephone:    (505) 986-9641
brian@egolflaw.com

Attorneys for Foundation to Protect New Mexico
Wildlife

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19th, 2013, I filed through the United States District Court

ECF System the foregoing document to be served by CM/ECF electronic filing on all counsel of

record.

*/s/ Bruce A. Wagman*
BRUCE A. WAGMAN (*Pro Hac Vice* Pending)
SCHIFF HARDIN LLP
