**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **FRONT RANGE EQUINE RESCUE,** *et al.,* | ) ) ) ) | |
| **Plaintiffs,**<br>**v.** | ) ) ) | Civ. No. 1:13-cv-00639-MCA-RHS |
| **TOM VILSACK, Secretary,**<br>**U.S. Department of Agriculture,** *et al.,* | ) ) ) ) | **MEMORANDUM IN SUPPORT OF**<br>**MOTION TO INTERVENE BY**<br>**YAKAMA NATION** |
| **Federal Defendants.** | ) ) ) ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE**
**BY YAKAMA NATION**

The Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation") respectfully submit this memorandum of law in support of its motion for leave to intervene in support of defendants in this matter pursuant to Rule 24 of the Federal Rules of Civil Procedure. As demonstrated below, Yakama Nation have an immediate and compelling need to join in this action, and otherwise satisfy every requirement for intervention as a matter of right, or in the alternative, permissive intervention.

**PRELIMINARY STATEMENT**

This case raises critical issues about whether Defendant United States Department of Agriculture ("USDA") is required to undertake environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq*. prior to allowing horse slaughter inspection by USDA Food Safety Inspection Service ("FSIS") inspectors and adoption of a drug

1

residue testing program.   Plaintiffs Front Range Equine Rescue seek a temporary restraining order and preliminary injunction to prevent FSIS from beginning horse slaughter inspection and implementing its drug residue program pending the outcome of a NEPA environmental review. Plaintiffs include the Humane Society of the United States, which has the stated goal of eliminating horse slaughter in the United States.   Press Release, Humane Society of the United States, Lawsuit Filed to Block Horse Slaughter (July 3, 2013) (*available at* http://www.humanesociety.org/news/press_releases/2013/07/lawsuit-filed-to-block-horse-slaughter-070213.html).   This lawsuit is a mean's to accomplish that goal.

Yakama Nation has experienced economic and environmental devastation brought about by an overpopulation of feral horses on its tribal property.   The primary causes of this overpopulation is a lack of an economically-viable option for managing horses, such as domestic horse slaughter.   Yakama Nation has a substantial interest in ensuring that domestic horse slaughter commences without the unnecessary delays demanded by Plaintiffs.

## BACKGROUND

### A. Interests of Yakama Nation

The heart of this matter is whether FSIS is required to conduct an environmental review prior to the re-commencement of horse slaughter inspection in the United States.   FSIS has inspected horse slaughter operations since the inception of the Federal Meat Inspection Act of 1906. Plaintiffs would have this Court believe that, by following the law and inspecting horses for slaughter, FSIS is required to undertake a costly and expensive environmental review pursuant to NEPA despite clear law to the contrary.   Plaintiffs have made it known that they intend to do whatever is necessary to prevent the re-commencement of domestic horse slaughter

in the United States.  Plaintiffs are using this action and this Court in an attempt to delay the re-commencement of horse slaughter in the United States.

The Yakama Nation live on a Native American reservation in south-central Washington State whose natural resources have been decimated in recent years due to overgrazing from excess horses.  Affidavit of Jim Stephenson.  Yakama Nation relies on the natural resources of their tribal lands to generate income from livestock, timber, fishing, hunting, and recreational activities.  (Stephenson Aff.).  Tribal members also use their land to grow food, livestock, medicinal plants, fish, and wild game for their personal consumption.  (Stephenson Aff.).

Until 2006, Yakama Nation used domestic horse slaughter as a tool to manage the population of feral horses on their tribal lands.  (Stephenson Aff.).  Since the *de facto* ban on domestic horse slaughter enacted in 2006, Yakama Nation has experienced a substantial increase in the number of feral horses residing on tribal lands.  In that time, Yakama Nation has seen the value for the horses on their property fall from a range of $300 to $400 to $5 to $20.  (Stephenson Aff.).  In many instances, Yakama Nation cannot find a taker for free horses.  (Stephenson Aff.).

The overpopulation of feral horses and the inability to effectively manage horse numbers without the option of domestic horse slaughter has also had a devastating effect on Yakama Nation's environmental resources.  Yakama Nation relies on rangeland (grasslands composed of native grasses and forbs) for grazing of cattle, sheep, horses, and wild game.  Rangeland is sensitive to environmental pressures, especially overgrazing.  The overpopulation of feral horses on tribal lands has decimated Yakama Nation's rangeland resources.  Feral horses compete with tribal livestock and wild game for grazing forage.  This has directly impacted the amount of

livestock that can be raised on tribal lands.  Furthermore, competition for grazing resources has also substantially reduced the population of deer and elk found on Yakama Nation's land.

The overpopulation of feral horses has negatively impacted the soil quality on Yakama Nation's property.  Horse hooves have the effect of compacting soil.  This compaction alters the soil's absorption of precipitation and impacts root growth in sensitive rangelands.  In addition, through trampling, grazing, and compaction, feral horse overpopulation has negatively impacted the population of traditional food and medicinal plants on tribal lands.  These plants, including camas and bitterroot, are culturally-important traditions of the Yakama Nation.  Tribal members' interests in maintaining these traditions are threatened by the overpopulation of feral horses.

Feral horses also impact the water quality resources on Yakama Nation's lands.  Overgrazing can result in silt runoff.  Siltation negatively impacts water quality and fisheries by blocking sunlight and reducing photosynthesis.  Feral horses also break down stream banks, causing erosion and clouding water with sedimentation.  Yakama Nation depends on streams and rivers for fishing.  Additionally, Yakama Nation's streams contain multiple threatened and endangered salmonids, which Yakama Nation seeks to protect.

Abandoned horses are also a problem for the Yakama Nation.  Given its remote location, many owners of domestic horses, left without humane options for disposing of unwanted horses, will abandon their horses on Yakama Nation land.  Some of the horses are still wearing halters. These horses are not well-adapted to surviving on rangeland and suffer substantially.

Yakama Nation seeks intervention in this matter to provide their unique perspective on the unintended consequences of banning domestic horse slaughter and to prevent efforts to delay the re-commencement of horse processing.  Without domestic horse slaughter as a management

option, the harm suffered by the Yakama Nation because of horse overpopulation will only continue to worsen.

### B. Procedural and Factual Background

Horse slaughter for human consumption is a lawful practice in the United States. 21 U.S.C. § 601, *et seq.* However, one prerequisite to conducting horse slaughter is pre-slaughter and post-mortem inspection by FSIS inspectors. *Id.* at §§ 603-604. In 2006, Congress banned funding for horse slaughter inspectors in its FY2007 agricultural appropriations bill. This action amounted to a *de facto* ban of horse slaughter in the United States. This ban continued for several years.

Although Congress may have had good intentions, the unintended consequences of the horse slaughter ban were substantial. After reports of abandoned horses and increased numbers of horses shipped for slaughter in Canada and Mexico, Congress lifted the ban on FSIS inspection of horse slaughter starting in October 2011. There have been no legal impediments to horse slaughter since that time.

Upon USDA's grant of inspection for two horse slaughter plants, Plaintiffs filed this action on July 2, 2013.

### AGRUMENT: THE STANDARDS FOR INTERVENTION ARE MET HERE

Federal Rule of Civil Procedure 24(a)(2) provides that intervention must be allowed if a proposed intervener claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

5

Federal Rule of Civil Procedure 24(b) provides that intervention may be allowed if an intervener has a claim or defense that shares with the main action a common question of law or fact.

### A. Applicant's Motion is Timely

This motion is timely because this Court issued an order on July 16, 2013 stating that the deadline for intervention in this matter is July 19, 2013. The Yakama Nation has filed by this deadline. Furthermore, "[t]he timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the pallication and the exitences of any unusual circumstnaces." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1250 (10th Cir. 2001) (quotations omitted). This action was filed on July 2, 2013. Yakama Nation is now filing this Motion to Intervene seeking to join the case in less than three weeks after the action was filed. Yakama Nation is not requesting any change in the hearing scheduled for August 2, 2013. There will be no prejudice to any of the parties in terms of changing the court's briefing schedule. In contrast, the Yakama Nation would be prejudiced if their Motion to Intervene was not granted because the interest of the Yakama Nation are not adequately represented by the parties in this action.

### B. Yakama Nation Have Significant Interests At Stake

The threat of economic injury is sufficient to satisfy this element. *See Utahns for Better Transp. V. U.S. Dep't of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002). The viability of the Yakama Nation's natural resources are at stake in this matter. The members of the Yakama Nation depend on their grazing lands, livestock, fisheries, and wild game resources for sustenance and income. The overpopulation of horses and the resulting environmental

degradation and resource decimation has caused and will continue to cause substantial economic damage to the Yakama Nation.

In addition to economic damages, overgrazing has harmed and continues to harm traditional food and medicinal plants used by members of the Yakama Nation.

### C. Disposition of This Action Would Substantially Affect Yakama Nation's Interests

Fed.R.Civ.P. 24(a)(2), *inter alia,* requires that the applicant be so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest.  In applying this element of the intervention test, the "court is not limited to consequences of a strictly legal nature." *Utah Ass'n of Counties v. Clinton*, 255 F.3d at 1253 (quoting *Natural Res. Def. Council, Inc. v. United States Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978). Therefore, a "would-be intervenor must show only that impairment of its substantial interest is possible if intervention is denied. This burden is minimal." Id. (quoting *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999)).

The Yakama Nation's interest in the existence of horse slaughter facilities will be impaired if the Plaintiff succeeds in this litigation. If the Court grants the relief requested by the Plaintiff, the Yakama Nation's ability to address the dire economic and environmental harm that thousands of feral horses are caused on tribal lands will be severely impaired.  "[T]he *stare decisis* effect of the district court's judgment is sufficient impairment for intervention under Rule 24(a)(2)." *See Utah Ass'n of Counties v. Clinton*, 255 F.3d at 1254 (*citing Coal. of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of the Interior*, 100 F.3d 837, 844 (10th Cir. 1966)); *see also NRDC,* 578 F.2d at 1345. Accordingly, this Court's judgment in this litigation could, as a practical matter, impair or impede the Yakama Nation's ability to protect its members' economic and environmental interests.

### D. **Absence of Adequate Representation**

The United States, Plaintiffs and Valley Meat will not adequately protect the interests of the Yakama Nation in the present action. The burden of this showing is "minimal." *Trbovich v. United MineWorkers*, 404 U.S. 528, 538 n.10 (1972). The Yakama Nation "need only show that representation of [its] interest 'may be' inadequate, not that representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). While the United States, Valley Meat and the Yakama Nation appear to share the same goal—affirming FSIS's issuance of a grant of inspection to Valley Meat -- their respective interests and the facts giving rise thereto are entirely different.[1]

The United States' interests in this matter are substantially different than those of the Yakama Nation. Although the United States and the Yakama Nation are governmental entities, the federal government's interests are regulatory in nature, while the Yakama Nation's interests are intrinsic to its status as a sovereign nation and its inherent authority over tribal lands. Moreover, it is unclear that the United States, as a policy matter, intends to defend the actions of FSIS with the vigor normally expected in cases challenging final agency action. Shortly after issuing the Grant of Inspection to Valley Meat, USDA spokeswoman Courtney Rowe stated "[s]ince Congress has not yet acted to ban horse slaughter inspection, (the agriculture department) is legally required to issue a grant of inspection today to Valley Meats in Roswell, N.M., for equine slaughter. . . . The administration has requested Congress to reinstate the ban on horse slaughter. Until Congress acts, the Department must continue to comply with current law." In light of the Administration's clear preference that horse slaughter not be permitted

---

[1] The Tribes are seeking to intervene as a defendant; the interests of the Plaintiffs are antagonistic to the Tribes' interests.

8

domestically, it is hardly clear that the United States will vigorously defend this matter, let alone adequately represent the Yakama Nation's interests.

Similarly, the interests of Valley Meat (and any other equine slaughter facilities that may seek to intervene in this matter) are not co-extensive with the Yakama Nation's.   Although Valley Meat has a vested interest in having the propriety of the issuance of Grant of Inspection upheld, its interests are exclusively commercial in nature. To the contrary, the Yakama Nation is a non-commercial governmental actor whose lands are overrun with an over-abundance of feral and domestic horse that causes substantial environmental harm to tribal property.  The Yakama Nation is highly dependent on its natural resources to generate income to house, clothe, feed, and educate its members.  (Stephenson Aff.).

Moreover, the environmental and resulting economic harm that the Yakama Nation has sustained will dramatically increase in the event that domestic horse slaughter operations are not permitted.  Tribal experts estimate that the feral horse population on Yakama Nation rangelands will double every four years because no economically viable opportunity to humanely reduce this population has existed since the last domestic horse slaughter facility closed during 2007. (Stephenson Aff.).  The Yakama Nation way of life is also being impacted based on the lack of domestic horse slaughter facilities as the increased number of horses on the reservation is causing compaction on the soil and is destroying traditional food and medicinal plants, including as camas and bitterroot.  These plants are sacred to the Yakama Nation and play an important role in the cultural life of the Yakama Nation. (Stephenson Aff.).   Only the Yakama Nation is in a position to assert these unique sovereign and tribal interests.

Other factors weigh heavily in favor of granting intervention. Rule 24(b) does not require any particular interest to justify intervention. Thus, when--as here--the proposed intervenor has a

tangible economic interest to be protected, permissive intervention is often appropriate. 7C
Charles A. Wright et al., Federal Practice and Procedure: Civil 2d § 1913 (1986). In addition,
should intervention be denied, Mutual would have to commence separate litigation to protect its
interests, thereby creating a multiplicity of lawsuits. This needless duplication of suits is
precisely the evil Rule 24 was designed to eliminate. See e.g., *Natural Res. Def. Council v.
Castle*, 561 F.2d 904, 910-11 (D.C. Cir. 1977)

## **CONCLUSION**

For the above reasons, the Yakama Nation respectfully asks the Court to grant its motion
to intervene in this action as a matter of right.

Dated: July 19, 2013

/s/   *David H. Urias*
John W. Boyd
David Urias
Freedman Boyd Hollander Goldberg
Urias & Ward, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
Telephone:  (505) 842-9960
Facsimile:  (505) 842-0761
Email:  jwb@fbdlaw.com
Email:  dhu@fbdlaw.com

Gary H. Baise
Stewart D. Fried
John G. Dillard
OFW LAW
Olsson Frank Weeda Terman Matz P.C.
600 New Hampshire Ave., NW
Suite 500
Washington, DC 20037
Phone: (202) 789-1212
Fax: (202) 234-3550

gbaise@ofwlaw.com
sfried@ofwlaw.com
jdillard@ofwlaw.com

*Attorneys for Yakama Nation*

## CERTIFICATE OF SERVICE

I CERTIFY that on the 19th day of July, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/   *David H. Urias*
David H. Urias