UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| FRONT RANGE EQUINE RESCUE, THE HUMANE SOCIETY OF THE UNITED STATES, MARIN HUMANE SOCIETY, HORSES FOR LIFE FOUNDATION, RETURN TO FREEDOM, FOUNDATION TO PROTECT NEW MEXICO WILDLIFE, RAMONA CORDOVA, KRYSTLE SMITH, CASSIE GROSS, DEBORAH TRAHAN, BARBARA SINK, SANDY SCHAEFER, TANYA LITTLEWOLF, CHIEF DAVID BALD EAGLE, CHIEF ARVOL LOOKING HORSE and ROXANNE TALLTREE-DOUGLAS, | Civil No. 1:13-CV-00639-MCA-RHS |
| Plaintiffs, | |
| v. | |
| TOM VILSACK, Secretary U.S. Department of Agriculture; ELIZABETH A. HAGEN, Under Secretary for Food Safety, U.S. Department of Agriculture; and ALFRED A. ALMANZA, Administrator, Food Safety and Inspection Service, U.S. Department of Agriculture, | |
| Defendants. | |

**PLAINTIFFS' OPENING BRIEF ON THE MERITS**

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................... 3

    A.    Horses Are Not Raised for Slaughter for Human Consumption........................... 3

    B.    Horse Slaughter Causes Significant Environmental Harm .................................. 3

    C.    For Six Years the Status Quo Has Been No Domestic Horse Slaughter ............... 5

    D.    USDA Adopted a New Drug Residue Program to Address the Unique
        Risks Caused by Horse Slaughter Without Conducting Any NEPA Review........ 6

    E.    USDA Granted Horse Slaughter Inspection Without Conducting
        Environmental Review...................................................................................... 8

III.  STATUTORY AND REGULATORY BACKGROUND ............................................. 10

    A.    National Environmental Policy Act ................................................................... 10

    B.    Administrative Procedure Act............................................................................ 13

    C.    Federal Meat Inspection Act ............................................................................. 14

IV.   PROCEDURAL HISTORY....................................................................... 15

V.    ARGUMENT ....................................................................................... 16

    A.    Legal Standard ................................................................................................. 16

    B.    The Defendants Violated NEPA and the APA by Failing to Engage in
        NEPA Review for the New Residue Testing Program ....................................... 17

    C.    The Defendants Violated NEPA and the APA by Failing to Prepare at
        Least an EA for the Grants of Inspection to VM and RT ................................... 20

        1.    The Grants of Inspection Are Major Federal Actions ............................ 20

        2.    The Evidence Establishes that the Grants of Inspection May Have
            Significant Environmental Effects ....................................................... 21

            a.    The Defendants Failed to Apply the CEQ Significance
                Factors Despite Recognizing Facts that Should Trigger
                NEPA Review........................................................................... 22

**TABLE OF AUTHORITIES**
(continued)

**Page**

b.      The Defendants' Actions Were Arbitrary and Capricious
        Because Invoking a CE in Response to Acknowledged
        Risks of Environmental Harm is Contrary to NEPA ................... 26

c.      The Defendants' Actions Were Arbitrary and Capricious
        Because They Relied on Improper Political Considerations ....... 28

VI.     CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Bird Conservancy, Inc. v. F.C.C.*,
   516 F.3d 1027 (D.C. Cir. 2008) ........................................................................... 24

Amigos Bravos v. U.S. Bureau of Land Mgmt., 6:09-CV-00037-RB-LFG, 2011 WL
   7701433 (D.N.M. Aug. 3, 2011) (quoting Marsh v. Ore. Natural Res. Council, 490
   U.S. 360, 378 (1989)............................................................................................... 22

Appalachian Power Co. v. E.P.A., 208 F.3d 1015 (D.C. Cir. 2000) ............................... 14

Baltimore Gas & Elec. Co. v. Natural. Res. Def. Council, Inc., 462 U.S. 87 (1983)................. 10

Bennett v. Spear, 520 U.S. 154 (1997) .................................................................... 14, 17

Better Gov't Ass'n v. Dep't of State, 780 F.2d 86 (D.C. Cir. 1986) .......................... 14

*Brady Campaign to Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1, 23 (D.D.C. 2009) .................................................................. 27

*California v. Norton*,
   311 F.3d 1162 (9th Cir. 2002) ............................................................................. 27

Catron County Bd. of Comm's v. U.S. Fish & Wildlife Serv., 75 F.3d 1429 (10th Cir.
   1996) .................................................................................................................. 11, 13

Ciba-Geigy Corp. v. U.S.E.P.A., 801 F.2d 430 (D.C. Cir. 1986)............................... 14

Citizens Against Rails-to-Trails v. Surface Transp. Bd., 267 F.3d 1144 (D.C. Cir. 2001) .......... 16

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   481 F. Supp. 2d 1059 (N.D. Cal. 2007) ............................................................. 27

Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv., 297 F.3d 1012 (10th Cir.
   2002) .................................................................................................................. 12, 18

Coal. of Ariz./N. M. Counties for Stable Growth v. U. S. Fish and Wildlife Serv., No.
   1:03-cv-00508-MCA-LCS (dismissed Jan. 31, 2005) ........................................... 2

Colo. Wild v. U.S. Forest Serv., 435 F.3d 1204 (10th Cir. 2006) ........................... 12

*Conservation Cong. v. U.S. Forest Serv.*,
   2013 WL 2457481 (E.D. Cal. June 6, 2013) ......................................................... 27

Conservation Cong. v. U.S. Forest Serv., 2013 WL 2457481 (E.D. Cal. June 6, 2013).. 13, 26, 28

D.C. Fed'n of Civic Ass'ns v. Volpe, 459 F.2d 1231 (D.C. Cir. 1971) ......................... 13, 16, 29

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ........................................................................... 18

Davis v. Morton, 469 F.2d 593 (10th Cir. 1972) ...................................................... 21

*Defenders of Wildlife v. Norton*,
   257 F. Supp. 2d 53 (D.D.C. 2003) ...................................................................... 17

Dep't of Transp. v. Pub. Citizen, 541 U.S. 752 (2004) ..................................... 11, 16, 18

Environment v. Klein, 747 F. Supp. 2d 1234 (D. Colo. 2010)............................... 11

Envtl. Def. Fund, Inc. v. Blum, 458 F. Supp. 650 (D.D.C. 1978) .................... 13, 28, 29

Forest Guardians v. U. S. Forest Serv., No. 1:04-cv-00011-MCA-RHS (Feb. 4, 2004)............... 2

Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs, 109 F. Supp. 2d 30 (D.D.C.
   2000) .................................................................................................................. 21

*Fuel Safe Wash. v. F.E.R.C.*,
   389 F.3d 1313 (10th Cir. 2004) ........................................................................... 19

Fund for Animals v. Norton, 281 F. Supp. 2d 209 (D.D.C. 2003) ......................... 20, 23

## TABLE OF AUTHORITIES
(continued)

**Page**

*Heckler v. Chaney,*
  470 U.S. 821 (1985)..................................................................................... 15

*High Country Citizens' Alliance v. Norton,*
  448 F. Supp. 2d 1235 (D. Colo. 2006)......................................................... 24

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,*
  702 F.3d 1156 (10th Cir. 2012) ................................................................... 24

Humane Soc'y of the U.S. v. Johanns, 520 F. Supp. 2d 8 (D.D.C. 2007)............................ passim

*Jones v. Gordon,*
  792 F.2d 821 (9th Cir. 1986) ....................................................................... 24

*Lemon v. Geren,*
  514 F.3d 1312 (D.C. Cir. 2008) ................................................................... 17

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)..................................................................................... 17

Macht v. Skinner, 916 F.2d 13 (D.C. Cir. 1990) ............................................... 21

*McLouth Steel Prod.'s Corp. v. Thomas,*
  838 F.2d 1317 (D.C. Cir. 1988) ................................................................... 18

*Monsanto v. Geertson Seed Farms,*
  130 S. Ct. 2743 (2010) ................................................................................ 27

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ....................................................................... 27

*Native Ecosystems Council & Alliance for the Wild Rockies v. U.S. Forest Serv. ex rel. Davey,*
  866 F. Supp. 2d 1209 (D. Idaho 2012) .................................................. 10, 18

*Natural Res. Def. Council v. Johnson,*
  461 F.3d 164 (2d Cir. 2006).......................................................................... 14

*New York v. U.S. E.P.A.,*
  350 F. Supp. 2d 429 (S.D.N.Y. 2004).......................................................... 14

*Norton v. S. Utah Wilderness Alliance,*
  542 U.S. 55 (2004)................................................................................. 10, 18

Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994) ................... 13, 16, 28, 29

Oregon Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977 (9th Cir. 2006) .......... 14, 17, 18

*Presidio Golf Club v. Nat'l Park Serv.,*
  155 F.3d 1153 (9th Cir. 1998) ..................................................................... 25

*Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  940 F.2d 679 (D.C. Cir. 1991) ..................................................................... 18

Ramsey v. Kantor, 96 F.3d 434 (9th Cir. 1996) ................................................ 20

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)...................... 11

Sierra Club v. Mainella, 459 F. Supp. 2d 76 (D.D.C. 2006) .............................. 11

Sierra Club v. United States, 255 F. Supp. 2d 1177 (D. Colo. 2002)....................... 21

*Town of Superior v. U.S. Fish & Wildlife Serv.,*
  913 F.2d 1087 (D. Colo. 2012)..................................................................... 23

Tr. of Oral Argument, Front Range Equine Rescue v. Vilsack, No. 13-cv-639 (D.N.M. Aug. 2, 2013) ....................................................................................... 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

United Keetoowah Band of Cherokee Indians of Oklahoma v. U.S. Dept. of Housing &
    Urban Dev., 567 F.3d 1235 (10th Cir. 2009)............................................... 16
Utah Envtl. Cong. v. Dale Bosworth, 443 F.3d 732 (10th Cir. 2006) .................................... 12, 20
W. Illinois Home Health Care, Inc. v. Herman, 150 F.3d 659 (7th Cir. 1998) ...................... 14, 17
Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs, 351 F. Supp. 2d 1232 (D. Wyo.
    2005) ................................................................................................... 21
*Wyoming v. U.S. Dept. of Agr.,*
    277 F. Supp. 2d 1197 (D. Wyo. 2003)................................................................. 28
*Wyoming v. U.S. Dept. of Agr.,*
    277 F. Supp. 2d at 1232 (finding political motivations ........................................ 29
Wyoming v. U.S. Dept. of Agr., 277 F. Supp. 2d 1197 (D. Wyo. 2003), *vacated as moot*,
    414 F.3d 1207 (10th Cir. 2005) ............................................................... 13

## STATUTORY AUTHORITIES

5 U.S.C. § 551, et seq.................................................................................. 13, 17, 20
21 U.S.C. § 603............................................................................................. 14
21 U.S.C. §603(a)......................................................................................... 15
42 U.S.C. §4321............................................................................................ 10
42 U.S.C. §4332............................................................................................ 11
42 U.S.C. §4332(2)(C)................................................................................... 12
42 U.S.C. §4332(C) ....................................................................................... 19
5 U.S.C. § 704.............................................................................................. 14
Agriculture, Rural Development, Food and Drug Administration, and Related Agencies
    Appropriations Act, 2006, Pub. L. 109-97, §794, 119 Stat. 2120 (Nov. 10, 2005) .................. 5
Clean Water Act, 33 U.S.C. §1251 et seq...................................................................... 25
Federal Meat Inspection Act, 21 U.S.C. §601 et seq......................................................... 1
National Environmental Policy Act (NEPA), 42 U.S.C. §4321 et seq......................................... 1
The Administrative Procedure Act, 5 U.S.C. §551, et seq ............................................. 13, 17, 20

TABLE OF AUTHORITIES
(continued)

**Page**

## RULES AND REGULATIONS

40 C.F.R. §1500.1(a) ............................................................................................... 10

40 C.F.R. §1500.1(b) ............................................................................................... 11

40 C.F.R. §1500.1(b)-(c) ......................................................................................... 10

40 C.F.R. §1500.2(f) ............................................................................................... 11

40 C.F.R. §1508.18 ..................................................................................... 10, 20, 21

40 C.F.R. §1508.18(a) ............................................................................................. 18

40 C.F.R. §1508.18(b)(1) ........................................................................................ 10

40 C.F.R. §1508.18(b)(2) ........................................................................................ 18

40 C.F.R. §1508.25 ................................................................................................. 18

40 C.F.R. §1508.27 ................................................................................................. 22

40 C.F.R. §1508.27(b)(10) ...................................................................................... 25

40 C.F.R. §1508.27(b)(2) ........................................................................................ 23

40 C.F.R. §1508.27(b)(4) ................................................................................. 20, 23

40 C.F.R. §1508.27(b)(6) ........................................................................................ 25

40 C.F.R. §1508.4 ....................................................................................... 12, 13, 17, 18

40 C.F.R. §1508.8 ................................................................................................... 11

40 C.F.R. §1508.9 ............................................................................................ 12, 19

40 C.F.R. §1508.9(b) .............................................................................................. 12

7 C.F.R. § 1b.1(a) ................................................................................................... 11

7 C.F.R. § 1b.4 ......................................................................................................... 2

7 C.F.R. § 1b.4(a) .............................................................................................. 12, 18

9 C.F.R. §304.2(b) ................................................................................................... 15

9 C.F.R. §416.2 .................................................................................................. 14, 15

Assessment for the Cotton Quality Research Station Land Transfer, 78 Fed. Reg. 42928
   (Jul. 18, 2013) ...................................................................................................... 2

Senior, Natural Resource Conservation Center Land Transfer, 78 Fed. Reg. 40425  (Jul.
   5, 2013) ................................................................................................................. 2

## ADDITIONAL AUTHORITIES

*Press Release, U.S. Senator Mary Landrieu, Landrieu Horse Slaughter Ban Passes
   Appropriations Committee*, available at
   http://www.landrieu.senate.gov/?p=press_release&id=3816. (Jun. 20, 2013) .......................... 6

Re the Matter of: Cavel Int'l, Inc., DeKalb Sanitary District: (Mar. 17, 2005) .............................. 4

## I.      PRELIMINARY STATEMENT

This Court has already held that the defendants likely violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, when the U.S. Department of Agriculture ("USDA" or "Agency") (1) adopted Food Safety and Inspection Service Directive 6130.1, Ante-Mortem, Postmortem Inspection of Equines and Documentation of Inspection Tasks ("Directive"), which established a new nationwide program for testing for dangerous drug residues in horses going to slaughter, without undertaking any environmental analysis, and (2) granted inspection for horse slaughter at two facilities without preparing an environmental assessment ("EA") or an environmental impact statement ("EIS"). Order Granting Pls.' Mot. TRO (Aug. 2, 2013), ECF No. 94 ("TRO Order") at 4-5. This was the second time a court ruled that USDA's authorization of horse slaughter inspections requires NEPA review. *See Humane Soc'y of the U.S. v. Johanns*, 520 F. Supp. 2d 8, 34 (D.D.C. 2007). While this Court's ruling was decided under the standards for issuing a temporary restraining order, the administrative record before the Court confirms the merit of that ruling. USDA spent over a year devising its new residue testing program because of its concerns about the controversial nature of horse slaughter and the significant environmental and public health harms that horse slaughter presents. Yet the Agency undertook no NEPA review to analyze the potentially grave environmental impacts of that program, even though USDA already has relied – and will continue to rely – on it to authorize the start-up of horse slaughter around the country.

There has been no horse slaughter in America for six years. However, in 2011, Congress authorized funding for horse slaughter inspections. In April 2012, Plaintiffs Front Range Equine Rescue ("FRER") and The Humane Society of the United States ("The HSUS") submitted a Petition for Rulemaking (the "Petition") requesting that USDA promulgate rules ensuring horse meat intended for human consumption is not adulterated under the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq*. ("FMIA"). Administrative Record ("AR") AR1-1819. The Petition documented concrete risks to public health from consuming meat from American horses, who are administered numerous substances throughout their lives that are prohibited for use in food animals. AR94-123.

Defendants have issued the Directive and incorporated it into grants of inspection for horse slaughter at two plants without undertaking environmental review. These intertwined decisions are,

independently and collectively, major federal actions that present risks of potentially significant environmental issues. Yet, unlike the typical NEPA cases that come before this Court, the Agency did not bother to undertake the preparation of either an EIS, *see Coal. of Ariz./N. M. Counties for Stable Growth v. U. S. Fish and Wildlife Serv.*, No. 1:03-cv-00508-MCA-LCS (dismissed Jan. 31, 2005), or even a very basic EA, *see Forest Guardians v. U. S. Forest Serv.,* No. 1:04-cv-00011-MCA-RHS (Feb. 4, 2004). Consequently, this is not a case where the parties are debating the adequacy of the Agency's environmental review document, but rather one in which the Agency has conducted no environmental review at all.

This is no small omission. USDA regularly prepares EAs for even the most routine Agency decisions, including publishing not one, but two EAs for mere land transfers in the last few months.[1] Defendants cannot refuse to invoke a categorical exclusion ("CE"), as they have done with the Directive, nor exempt themselves from environmental review based on a conclusory memorandum, as they have done with the grants of inspection. As described below, the Agency's own regulations state that it cannot avoid preparation of an EA or EIS if the action under review "may have a significant environmental effect." 7 C.F.R. § 1b.4. The reality is that the Directive, and the horse slaughter facilities here, like previous horse slaughter facilities, not only "may" but likely "will" have significant impacts.

As described in the record, individuals in the vicinity of previous horse slaughter plants were forced to endure a noxious stench, dealt with blood in streams, and sometimes even found blood and horse tissue running through their water faucets. AR32-33. Whether this will happen again is precisely the question that should be explored in a properly prepared NEPA document, with public participation and expert comment – especially in light of the fact that at least one of the plants has a laundry list of past state environmental violations, as documented in New Mexico's intervention papers. Pl. Intervenor State of New Mexico Mem. ("Pl. Int. Mem.") at 2, ECF No. 69. And the record confirms that the Agency based its decisions about environmental safety and NEPA compliance on improper political considerations. Decision Memorandum for the Under Secretary ("Decision Memo"), AR1827.

---

[1] *See* Draft Environmental Assessment for the Cotton Quality Research Station Land Transfer, 78 Fed. Reg. 42928 (Jul. 18, 2013) ("10 Acre Land Transfer EA"); Draft Environmental Assessment for the J. Phil Campbell, Senior, Natural Resource Conservation Center Land Transfer, 78 Fed. Reg. 40425 (Jul. 5, 2013).

The Agency's decisions were arbitrary and capricious, and this Court should reiterate its prior ruling, and find that the defendants violated NEPA in both adopting the Directive and issuing the grants of inspection without NEPA review, set aside the Agency's decisions, and enter a permanent injunction enjoining USDA from granting or performing any horse slaughter inspections or utilizing the Directive until it has satisfied its NEPA obligations.

## II.    FACTUAL BACKGROUND

### A.    Horses Are Not Raised for Slaughter for Human Consumption.

Horses are different. Unlike traditional food animals such as cows, pigs, and chickens, horses are not raised in a regulated environment, but rather as pets, on racetracks, and as working animals. As a result, the vast majority of American horses are given a wide variety of drugs and other substances that render their blood and tissue contaminated and potentially dangerous to consume.[2] Consequently, the horse slaughter industry is highly controversial.

USDA agrees that horses are different and that their slaughter poses risks of unknown environmental and public health dangers. It admits that "drug use is widespread in equines" and that it has "concerns about residues in horses" because those residues "may be markedly different" than for "other livestock." Decision Memo, AR1828, 1825; 1856. It also agrees that horses are not raised like traditional food animals, and that the public is concerned about "the potential impacts of commercial horse slaughter on public health." Valley Meat Decision Memo ("VM Memo"), AR2471. It even concedes that "[f]ew drugs approved for use in horses [are] intended for human food," and that horse meat may contain "drugs that have not been approved for use in animals [used for food]." *Id.*; Responsible Transportation Decision Memo ("RT Memo"), AR3285; AR1891.

### B.    Horse Slaughter Causes Significant Environmental Harm.

In addition to the potential public health dangers associated with eating contaminated horse meat, the record is replete with evidence that horse slaughter operations cause significant environmental

---

[2] Undisputed record evidence shows that virtually every American horse sent to slaughter has received substances that federal law specifically states cannot be used on animals intended to be eaten, in addition to other substances that have not been approved or even tested for use in horse meat. AR18, 35-38, 94-147, 4034-48. The record includes an illustrative list of 115 substances commonly administered to horses. AR94-123.

impacts in surrounding communities. The environmental havoc caused by horse slaughter byproducts, such as blood, entrails, urine, feces, heads, and hooves, entering local water systems, overwhelming local waste water infrastructures, and causing numerous environmental violations, is well documented in the record before the Court. *See, e.g.*, AR391-92. The record also contains considerable evidence that the substances horses regularly are given create unknown effects and dangers in the water discharged from horse slaughter plants. *Id.*

The last three American horse slaughter plants closed in 2007. While in operation, these facilities caused extensive environmental harms, including the destruction of community members' ability to enjoy the area surrounding the slaughterhouse and the contamination of the waste management and disposal systems.[3] The Cavel plant in DeKalb, Illinois repeatedly violated its state and federal discharge limits for wastewater.[4] The Beltex facility in Fort Worth, Texas committed several wastewater violations, pumping horse blood into a nearby creek and causing a separate spill into a nearby creekbed. AR391-92. The mayor of Kaufman, Texas decried the tragic environmental consequences of horse slaughter to her town, which "robbed [ ] citizens of the quiet and peaceful enjoyment of their property." Declaration of Paula Bacon ("Bacon Decl.") at ¶ 4, Wagman Decl., Ex. 13, ECF 13. Horse slaughter "caused massive economic and environmental problems since its inception. It has also violated . . . a

---

[3] *See* Declaration of Bruce Wagman ("Wagman Decl.") ¶¶ 2-11, Jul. 2, 2013, ECF No. 6; Declaration of Robert Eldridge, Wagman Decl., Ex. 2, ECF No. 13 (Kaufman, Texas resident "unable to use [his] yard" because of stench of plant, seeing blood spills and animal parts, concerned for loss of property values); Declaration of Tonja Runnels, Wagman Decl., Ex. 3, ECF No. 13 (same); Declaration of Juanita Smith, Wagman Decl., Ex. 4, ECF No. 13 ("blood in my bathtub, sinks, and toilets," unable to have family over because of "severe stench on daily basis"); Declaration of Yolanda Salazar, Wagman Decl., Ex. 5, ECF No. 13 (Fort Worth, Texas resident unable to go outside for activities because of stench); Declaration of Margarita Garcia, Wagman Decl., Ex. 6, ECF No. 13 ("constantly exposed to the severe stench of the plant;" cannot open windows because "odor is unbearable"); Declaration of Mary Farley, Wagman Decl., Ex. 7, ECF No. 13 (DeKalb, Illinois resident stating that "smell was so bad, and it would linger in my head for the rest of the day"); Declaration of Elizabeth Kershisnik, Wagman Decl., Ex. 8, ECF No. 13 (describing "ongoing water pollution violations"; "polluted, green foam oozing from the plant's wastewater treatment tank"); and Declaration of James Kitchen, Wagman Decl., Ex. 9, ECF No. 13 (same).

[4] See Administrative Orders in `Re the Matter of: Cavel Int'l, Inc., DeKalb Sanitary District: (Mar. 17, 2005) (Cavel in "'significant' non-compliance" with discharge permit for first six months of 2004), Wagman Decl., Ex. 10, ECF 13 ; (Jan. 30, 2006) (Cavel in "'significant' non-compliance" with discharge requirements for first eleven months of 2005), Wagman Decl., Ex. 11, ECF 13 ; and (Oct. 18, 2006) (Cavel in "'significant' non-compliance" with discharge permit first nine months of 2006), Wagman Decl., Ex. 12, ECF 13 (together, "Cavel Administrative Orders").

multitude of local laws pertaining to waste management, air and water quality, and other environmental concerns." *Id.* at ¶ 5. The stench from the plant "permeated the community and adversely affected" its citizens, who continuously complained about the odor from the slaughter facility. *Id.* at ¶ 8.[5] Kaufman residents even found blood and horse tissue running through their. AR391. Dallas Crown's environmental contamination and repeated waste water code violations imposed environmental, aesthetic, public health, and economic harms on its host community. AR429-31.

The disposal of horse blood and other horse slaughter byproducts presents a unique environmental threat because of the substances horses, as opposed to traditional food animals, receive throughout their lives. AR17-27, 31-33; *see also* Song W. *et al.*, *Selected Veterinary Pharmaceuticals in Agricultural Water and Soil from Land Application of Animal Manure*, 39 J. Environ. Qual. 4, 1211-17 (2010) (discarded animal byproducts pose particular environmental and public health risks when they seep into the ground and water supply).

**C.**      <u>For Six Years the Status Quo Has Been No Domestic Horse Slaughter.</u>

Until 2006, USDA's Food Safety Inspection Service ("FSIS") inspected horse slaughter facilities pursuant to the FMIA. In 2006, Congress withdrew funding for the inspection of horses.[6] Because the FMIA prohibits the sale of meat for human consumption without federal inspections, the defunding amendment effectively shut down the horse slaughter plants. The funding prohibition was reinstated annually until 2011.

After the 2006 defunding, USDA enacted a rule allowing "fee-for-service" horse slaughter inspections, to circumvent Congress's decision to shut down horse slaughter.  It did so without subjecting its decision to any NEPA analysis. The District Court for the District of Columbia found USDA's attempt to authorize horse slaughter inspections without conducting any NEPA review was a

---

[5] A local physician reported, "I myself and my staff have been nauseated and sick with this smell. Our patients have also been sick with this smell. . . ." Bacon Decl. at ¶ 8. A local hospital president stated that the "pollution caused by [the horse slaughterhouse] is causing a health threat that [a]ffects the emotional and physical well being of our patients and families." *Id.* The City's Zoning Board of Adjustments "unanimously declared that [the horse slaughterhouse] constituted a public nuisance. . . ." *Id.* at ¶ 10.

[6] Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2006, Pub. L. 109-97, § 794, 119 Stat. 2120, 2164 (Nov. 10, 2005).

violation of NEPA and its implementing regulations, however, as the District Court for the District of Columbia found. *See Johanns*, 520 F. Supp. 2d at 34 (NEPA applies to USDA's authorization of horse inspections: "any notion that USDA may avoid NEPA review simply by *failing* even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the [Council on Environmental Quality] regulations." (internal quotation omitted)).

Congress failed to renew its ban on funding for USDA's horse slaughter inspections in 2011, opening the door for horse slaughter to resume in this country. However, due to the controversial nature of horse slaughter, members of Congress from both parties immediately acted to prevent resumption of this inhumane, unpopular, environmentally destructive, and health-threatening industry. Several members of Congress from both parties sponsored the Safeguard American Food Exports (SAFE) Act, S. 541/H.R. 1094, which would end all horse slaughter for human consumption in the U.S. and would also prohibit the export of American horses for slaughter abroad. In addition, President Obama's 2014 budget proposal recommended that Congress once again remove all funding for any inspections of horse slaughter plants in the U.S.[7] Subsequently, both the House and Senate Appropriations Committees amended the FY2014 Agriculture Appropriations bills to eliminate funding for horse slaughter inspections.[8] That defund may become law within the very near future.

### D.    USDA Adopted a New Drug Residue Program to Address the Unique Risks Caused by Horse Slaughter Without Conducting Any NEPA Review.

In light of the significant differences between horses and traditional food animals and in response to the public health and environmental threat posed by the routine administration of prohibited, dangerous, and untested substances to horses who may end up at slaughterhouses, USDA implemented the Directive. VM Memo, AR2471; RT Memo, AR3285; Directive, AR1866. The Directive, among other things, instructs food safety inspectors on protocol associated with the Agency's "new drug

---

[7] Office of Mgmt. & Budget, Exec. Office of the President, Budget of the United States Government, Fiscal Year 2014, Dept. of Agriculture, Title VII, Sec. 725 (Apr. 10, 2013).

[8] Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2014, Sec. 749, H. R. 2410 [Report No. 113–116] (Jun. 18, 2013), available at http://www.gpo.gov/fdsys/pkg/BILLS-113hr2410rh/pdf/BILLS-113hr2410rh.pdf; *Press Release, U.S. Senator Mary Landrieu, Landrieu Horse Slaughter Ban Passes Appropriations Committee* (Jun. 20, 2013), available at http://www.landrieu.senate.gov/?p=press_release&id=3816.

residue testing program." *Id.* USDA devoted "a significant amount of time" to designing the Directive following Congress's decision not to defund horse slaughter inspections. AR3189. By adopting this program, the Agency conceded that horses are materially different than cows, pigs, and chickens, and that treating them the same is inadequate to protect the environment and the public health. As explained in the Decision Memo and Directive, the new program requires FSIS to (1) test horses more frequently than it tests traditional food animals and (2) test horse tissue for more substances than other animals. Decision Memo, AR1826, 1851-52; Directive, AR1866-68.

First, the Directive requires Agency inspectors to randomly test "normal-appearing" horses for residues of certain substances at higher rates than it tests other livestock. Engeljohn Declaration ("Engeljohn Dec.") at ¶ 16, ECF 66-1; Directive, AR1866-67. Second, the new program purports to test for substances commonly administered to horses, as opposed to traditional food animals. Whereas prior to 2007, USDA's testing of horses targeted substances commonly administered to traditional food animals, AR2285, the new program requires inspectors to test for 31 substances that USDA did not test for when horses were slaughtered six years ago. Decision Memo, AR1826, 1851-52. Despite having authorized inspections, USDA is not prepared to test for 9 of those substances it acknowledges it should test for, and which are potentially dangerous hormones and tranquilizers, *until 2014. Id.*, AR1851-52.

USDA selected these 31 substances from a list of 115 substances commonly administered to horses that was submitted by plaintiffs, along with their Petition. Decision Memo, AR1826, 1851-52; AR94-123. The new residue testing program ignores *several dozen* other substances commonly given to horses that may be harmful to humans. *See id*. USDA relied on plaintiffs' Petition and list to prepare the new program, even though it found "no merit" in the petitioners' arguments and denied the Petition. AR1853. Nothing in the record suggests that USDA has made independent efforts to identify substances to test for in horses. *See* Decision Memo, AR1826-27. USDA asserts that its new testing program will detect "any drug" administered to horses. *Id.*

USDA determined that the Directive's mandates will protect the public health, based on the results of prior residue testing conducted on horses. Defendants' employee Daniel Engeljohn has stated that, not counting antibiotics, National Residue Program ("NRP") testing yielded few positive results in prior years. Engeljohn Dec. at ¶ 17. However, the Agency acknowledges that the NRP was designed to

detect substances commonly administered to traditional food animals, not the drugs commonly given to horses. *See* AR2285. Prior NRP testing excluded all but a few dozen of the 115 substances commonly administered to horses. *Compare* Engeljohn Dec. Att. 1 *with* AR94-123. The Agency also acknowledged significant flaws in the NRP:  its algorithm for testing was based on a "one size fits all" strategy and had not been updated in nearly a decade, the NRP provided minimal information on the "true chemical residue burden" in inspected meat and, the NRP was "slow to respond to emerging residue issues." AR563. While admitting that horses are different in this specific area, USDA adopted the Directive based on the results of residue tests conducted on traditional food animals. Engeljohn Dec. at ¶¶15-17. USDA concluded that horse slaughter will cause no more significant impact than does the slaughter of "cattle, pigs, sheep, and goats." VM Memo, AR2471.

USDA issued its Directive implementing this new program – which the Agency purports will address public health concerns associated with horse slaughter – without undertaking any NEPA review. USDA did not even conclude that the Directive is exempt from NEPA analysis pursuant to a CE.

### E.   USDA Granted Horse Slaughter Inspection Without Conducting Environmental Review.

USDA granted applications for horse slaughter inspection to Valley Meat ("VM") and Responsible Transportation ("RT") – the first such grants in over six years – without conducting any environmental review pursuant to NEPA. AR2457-59, 3275-76. The defendants first concluded that NEPA did not apply, asserting that (1) the grants of inspection were not discretionary but ministerial, (2) the Agency lacks the authority to impose conditions or make decisions that affect the environment, and (3) federal inspection is not the legally relevant cause of any environmental effects caused by horse slaughter. VM Memo, AR2467-70; RT Memo, AR3282-85. Therefore, the Agency decided that its decision to grant the applications for inspection did not "constitute major federal action that will significantly affect the quality of the environment and thus [did] not trigger any requirements under NEPA." VM Memo, AR2470; RT Memo, AR3285.

Nevertheless, despite the defendants' apparent belief that NEPA is inapplicable here, the Agency proceeded to examine whether, even if NEPA did not apply to the grants of inspection, the Agency was required to conduct an environmental analysis or whether it properly could invoke a CE,

citing "the high level of public interest" in horse slaughter. VM Memo, AR2470; RT Memo, AR3285. The Agency "recognize[d] that the potential impacts of commercial horse slaughter on public health may cause concern with segments of the public." VM Memo, AR2471; RT Memo, AR3285. Yet USDA concluded that a grant of horse slaughter inspection to RT "will safeguard public health and safety by ensuring that commercial horse slaughter at [RT] has *no* potential to have a significant impact on public health and safety." RT Memo, AR3286 (emphasis added). USDA also concluded that VM's horse slaughter operation "has no more potential to have a significant impact on public safety than did the commercial slaughter of [traditional food animals] that preceded it." VM Memo, AR2471. Consequently, USDA invoked a CE for its grants of inspection to VM and RT and did not conduct any substantive analysis of the myriad potential environmental impacts of authorizing horse slaughter operations to commence. VM Memo, AR2471; RT Memo, AR3285.

USDA was aware that VM broke numerous laws when it operated a cattle slaughter facility, but it dismissed these violations based on the existence of environmental laws (which VM has broken) that require VM to not harm the environment. VM Memo, AR2474-75. USDA also concluded that VM's planned waste disposal systems are adequate to prevent harm to the environment, despite the fact that VM lacks a discharge permit required for VM to legally operate according to its submitted plans. *Id.*[9] Despite the plain existence of evidence to the contrary in the record, USDA concluded that there was not even a *possibility* of any significant environmental effect, and invoked the CE. VM Memo, AR2476; RT Memo, AR3289. Accordingly, the Agency did not consider basic NEPA issues, such as (1) the controversial nature of the effects of horse slaughter on the environment; (2) the possibility of highly uncertain, unique, or unknown risks of horse slaughter; (3) the precedential nature of its actions; or (4) the overwhelming evidence of significant environmental harms caused by the last three domestic commercial horse slaughter facilities operating pursuant to USDA grants of inspection.

USDA did, however, seriously consider politics in making its decision to authorize horse slaughter without undertaking NEPA review. Defendant Almanza expressed concern that some

---

[9] While VM claims it will use alternative methods to dispose of slaughter byproducts, VM's Resp. to Pls.' Mot. to Modify TRO Order at 2-3 Aug. 21, 2013, ECF No. 121, the Agency has not considered the environmental threat posed by these methods either.

members of Congress thought USDA was "dragging its feet on the equine slaughter issue," and that further delay could result in "punitive congressional action." Decision Memo, AR1827. When considering the "pros" and "cons" of postponing a decision on horse slaughter to evaluate the risks posed by residues of drugs and other substances, the cons were almost all political. *Id.*, AR1829.[10] USDA stated that it may have "no choice but to institute equine slaughter" and that, under this view, "the fact that drug use is widespread in equines is essentially irrelevant." *Id.*, AR1828.

## III.   STATUTORY AND REGULATORY BACKGROUND

### A.   National Environmental Policy Act.

NEPA is the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), established to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA has twin aims. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Natural. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal quotation omitted). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Id.*

"'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." *Id.* § 1508.18(a).[11]

---

[10] "*Con*: FSIS could be seen as not following *congressional direction* . . . FSIS would likely need to deflect persistent efforts from all interested stakeholders to change the Agency's course in the meantime. Industry would be indefinitely prevented from proceeding. . . . " (emphasis added).

[11] Major federal action also includes (1) adoption of "formal documents establishing an agency's policies which will result in or substantially alter agency programs," (2) adoption of plans that "guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based, (3) connected agency decisions allocating agency resources to implement a specific statutory program or executive directive" , and (4) approval of "specific projects," including "by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. §1508.18(b)(1), (3)-(4); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) (land use approval plan constitutes major federal action); *Native Ecosystems Council & Alliance for the Wild Rockies v. U.S. Forest Serv. ex rel. Davey*, 866 F. Supp. 2d 1209, 1225-26 (D. Idaho 2012) (adoption of a

*(Footnote continued on next page)*

For NEPA to apply, the federal action must also cause "some environmental effect." *Johanns*, 520 F. Supp. 2d at 22. Causation is satisfied where an agency has *some ability* to "countermand" those effects. *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 104-05 (D.D.C. 2006) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 766 (2004)); *see also Johanns*, 520 F. Supp. 2d at 22 (NEPA applies where an agency "makes a decision which permits action by other parties which will affect the quality of the environment.").

"Federal agencies must comply with NEPA 'to the fullest extent possible.'" *Catron County Bd. of Comm's v. U.S. Fish & Wildlife Serv.,* 75 F.3d 1429, 1434 (10th Cir. 1996) (quoting 42 U.S.C. § 4332). "Although NEPA's statutory text specifies *when* an agency must comply with NEPA's procedural mandate[,] it is the [Council on Environmental Quality ("CEQ")] regulations which dictate the *how,* providing the framework by which all federal agencies comply with NEPA." *Diné Citizens Against Ruining our Environment v. Klein*, 747 F. Supp. 2d 1234, 1248 (D. Colo. 2010).

The CEQ requires that federal agencies "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f). Those "effects" include, but are not limited to, ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative. 40 C.F.R. § 1508.8. USDA has expressly adopted all of CEQ's NEPA implementing regulations. *See* 7 C.F.R. § 1b.1(a). "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). This is why agencies must complete NEPA review "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

Whether an action "significantly" affects the environment requires considerations of both "context" and "intensity." *See id*. § 1508.27. For a site-specific action, such as the grant of inspection to horse slaughter facilities, significance usually depends on the effects in the locale. *Id*. For intensity,

---

*(Footnote continued from previous page)*
revised map delineating analysis units for Canadian lynx within a national forest was a major federal action because it opened federal land to new uses).

relevant considerations include but are not limited to "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id*. Courts have found that the presence of one or more of these "significance" factors should result in an agency decision to prepare an EIS. *See, e.g.*, *Johanns*, 520 F. Supp. 2d at 19-20.

Agencies may comply with NEPA by preparing either an EIS or an EA. *Utah Envtl. Cong. v. Dale Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006)*. An EIS contains an in-depth discussion of the potential impacts a proposal may have upon the environment, and it is required where a major federal action may "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Where the environmental impacts are less certain, an agency may first perform an EA in order to determine whether preparation of an EIS is required. 40 C.F.R. § 1508.9; *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1209 (10th Cir. 2006). An EA describes the proposed action being considered, other alternatives, the environmental impact of the proposal and its alternatives, and a listing of agencies and persons consulted. *See* 40 C.F.R. § 1508.9(b). An EA allows an agency to decide if its action may have a significant effect on the environment, or that the proposed action will have no significant impact.

In certain limited circumstances, an agency may categorically exclude from environmental review a class of actions that do not "individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. A CE is not an environmental analysis under NEPA, but rather a decision *not* to engage in NEPA review. *See, e.g.*, *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002).

FSIS actions cannot be categorically excluded from the preparation of an EA or EIS if the action "*may* have a significant environmental effect." 7 C.F.R. § 1b.4(a) (emphasis added); *see also* 40 C.F.R. § 1508.4 ("[a]ny procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect"); *Utah Envtl. Cong.*, 443 F.3d at

- 12 -

736 ("[A] proposed action is precluded from categorical exclusion if 'extraordinary circumstances' exist such that 'a normally excluded action may have a significant environmental effect.'"). An extraordinary circumstance is simply one "'in which a normally excluded action *may* have a significant environmental impact.'" *Conservation Cong. v. U.S. Forest Serv.*, 2013 WL 2457481, at *7 (E.D. Cal. June 6, 2013) (quoting 40 C.F.R. § 1508.4). If a proposed action presents possible environmental effects that "are *uncertain*, the agency must prepare an [EA] to determine whether a significant effect will result from the proposed action." *Catron County Bd.*, 75 F.3d at 1434 (emphasis added).

Agencies are prohibited from letting political pressures guide or control the NEPA process. *See, e.g.*, *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971) ("[T]he decision would be invalid if based in whole or in part on the pressures emanating from [Congress.]"); *Wyoming v. U.S. Dept. of Agr.*, 277 F. Supp. 2d 1197, 1232 (D. Wyo. 2003), *vacated as moot*, 414 F.3d 1207 (10th Cir. 2005) (NEPA violated when an action was "driven through the administrative process" for the "political capital" of the administration); *Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 663 (D.D.C. 1978) (remanding and advising the agency to exclude congressional pressures).

## B. Administrative Procedure Act.

The Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* ("APA"), provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . ., is entitled to judicial review thereof." *Id.* § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." *Id.* §§ 706(2)(A), (C), and (D).

Agency action is arbitrary and capricious if the agency (1) "relied on factors which Congress has not intended for it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

Final agency action is subject to judicial review. 5 U.S.C. § 704. Agency action need not be formal to be final. *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986). Courts take a "flexible" and "pragmatic" view in determining whether agency action is final.[12] *Id.* An agency action is final where (1) it marks the consummation of the agency's decisionmaking process and (2) it determines rights or obligations or legal consequences that flow from it. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Stated differently, courts look to whether an agency's action is "definitive" and whether it has a "direct and immediate" effect on the parties. *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435-36 (D.C. Cir. 1986). An action consummates a decisionmaking process where it amounts to a "settled agency position." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). An action has legal consequences where, for example, it subjects a party to penalties, *W. Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659, 663 (7th Cir. 1998), "alters the legal regime" to which an agency is subject, *Bennett*, 520 U.S. at 169, or fixes "*some* legal relationship." *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 986-87 (9th Cir. 2006).

    **C.**     **Federal Meat Inspection Act.**

The FMIA is a statutory inspection scheme designed to prevent "adulterated" meat products from entering the human food supply and to prevent "inhumane slaughtering." 21 U.S.C. § 603. FSIS inspection is required to sell human-grade meat, and a horse slaughter facility must apply to FSIS for inspection in order to process meat for human consumption. Review of an application for inspection necessarily requires FSIS to assess detailed paperwork regarding the applicant's premises, standard operating procedures, and management of waste-streams, including sewage and water. 9 C.F.R. § 416.2.

---

[12] If an agency modifies an existing program, this does not "strip the agency's actions of finality or effect" or "preclude judicial review." *New York v. U.S. E.P.A.*, 350 F. Supp. 2d 429, 435 (S.D.N.Y. 2004) *aff'd sub nom.*, *Natural Res. Def. Council v. Johnson*, 461 F.3d 164 (2d Cir. 2006). Similarly, the "fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power*, 208 F.3d at 1022.

FSIS has discretion to grant inspection applications.[13] *See id.* § 304.2. For example, FSIS "is authorized to . . . refuse to grant inspection at any establishment if [it] determines" the plant does not meet the requirements of the FMIA or the Agency's various regulations. *Id.*

## IV.   PROCEDURAL HISTORY

On July 2, 2013, Plaintiffs commenced this action alleging USDA violated NEPA and the APA by authorizing federal inspections at horse slaughter facilities and implementing a new drug residue testing program without undertaking NEPA review of the potential impacts of those actions. *See* Compl., July 2, 2013, ECF No. 1; *see also* Am. Compl., July 19, 2013, ECF No. 54. On August 2, after briefing and oral argument, this Court entered its Order granting Plaintiffs' motion for a temporary restraining order, which enjoined defendants from dispatching inspectors or carrying out inspection services at domestic horse slaughter facilities. TRO Order at 7. The Court has ordered expedited briefing on the merits of this case and extended the temporary restraining order until October 31, 2013. *See* Order Granting Mot. Expedite, Aug. 29, 2013, ECF No. 137; Order, Sept. 5, 2013, ECF No. 142.

The Court has already determined that plaintiffs have established a substantial likelihood of success on the merits, TRO Order at 3-4, and has rejected all of defendants' excuses for failing to comply with NEPA. *See* Federal Defs.' Opp. Pls.' Mot. for TRO, July 19, 2013 ("TRO Opp."), ECF No. 66, at 12-26; Tr. of Oral Argument, *Front Range Equine Rescue v. Vilsack*, No. 13-cv-639 (D.N.M. Aug. 2, 2013), ECF 100, at 29:4-12 ("TRO Hearing Transcript").

Specifically, the Court held that the new residue testing program established by the Directive is final agency action subject to review under the APA "from which rights and obligations are determined and legal consequences flow," in part because the Agency expressly relied on the Directive in granting inspection to horse slaughterhouses. TRO Order at 2. The Court also found that the Directive is a legally relevant cause of plaintiffs' alleged environmental harm because the Agency "adopted the Directive in

---

[13] FSIS "shall cause to be made . . . an examination and inspection of all amenable species before they shall be allowed to enter" a slaughterhouse, 21 U.S.C. § 603(a), but this does not mean that FSIS *must* grant the application for inspection; it simply means that *if* amenable species are going to be slaughtered and used in commerce, they must first be inspected by FSIS. FSIS's regulations recognize the discretionary nature of its authority, stating that FSIS "*is authorized* to grant inspection upon [its] determination that the applicant and the establishment are eligible therefore." 9 C.F.R. § 304.2(b) (emphasis added); *see also Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (authority suggests discretion).

response to concerns regarding the potential presence in slaughtered horses of chemical residues from drugs not previously approved for use in food animals" and "incorporated the Directive into each grant of inspection." TRO Order at 2-3. Further, the Court held that the Directive was a major federal action subject to NEPA, because it is a "formal plan or policy regarding drug residue testing in equines" upon which "future agency action will be and indeed was based." TRO Order at 3. Consequently, the Court concluded that NEPA applies to the Directive. Separately, the Court held that the grants of inspection also trigger NEPA review and that plaintiffs were likely to succeed on their NEPA claim challenging the Agency's review of these grants – that a categorical exclusion was inadequate. TRO Order at 4.

## V.   ARGUMENT

### A.   Legal Standard.

When a party challenges an agency's application of NEPA, courts review the claim under the APA. *Pub. Citizen*, 541 U.S. at 763; *Olenhouse*, 42 F. 3d at 1575. But when an agency entirely fails to apply NEPA, its failure is entitled to no deference. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150 (D.C. Cir. 2001).

Under the APA, the reviewing court is must "engage in a substantial inquiry and to conduct a thorough, probing, in-depth review." *United Keetoowah Band of Cherokee Indians of Oklahoma v. U.S. Dept. of Housing & Urban Dev.*, 567 F.3d 1235, 1239 (10th Cir. 2009) (quoting *Volpe*, 401 U.S. at 415). Its inquiry should focus on the record, which must support the agency's decision. *Olenhouse*, 42 F. 3d at 1575. The agency must examine all relevant data and clearly provide a reasoned explanation for its action. *Id.* at 1575-76. After-the-fact rationalizations will not cure an agency's arbitrary and capricious action. *Id.* at 1575; TRO Order at 3.

Both acts challenged here – granting inspection to domestic horse slaughter facilities and creating a new drug residue testing program – trigger NEPA. Defendants have deprived decisionmakers and the public of a frank discussion of the environmental impacts of starting up numerous horse slaughter facilities in this country after years of dormancy.[14]

---

[14] As a threshold matter, Plaintiffs clearly have standing to bring this action because they will be directly affected by the grant of inspection and residue program and by the USDA's actions challenged here, Declaration of Krystle Smith at ¶¶ 3-7, 10-17, Wagman Decl., Ex. 20, ECF No. 13; Declaration of Deborah

*(Footnote continued on next page)*

**B.**     **The Defendants Violated NEPA and the APA by Failing to Engage in NEPA Review for the New Residue Testing Program.**

As this Court has already determined, the Directive (and the residue testing program that it incorporates) is a final agency action, a "major federal action," and a legally relevant cause of plaintiffs' alleged environmental harm. TRO Order at 2-3. Therefore, at an absolute minimum, USDA violated NEPA by not even invoking a CE for this new program. *See* 40 C.F.R. § 1508.4. USDA also violated NEPA by failing to prepare an EA.

The Agency's new residue testing program constitutes final agency action because it marked the "consummation" of its decisionmaking process and has legal consequences. *See Bennett*, 520 U.S. at 177-78. First, the Agency spent "a significant amount of time" designing this new program. AR3189. Based on the time and effort devoted to its design, and USDA's conclusion that it will protect the "public health and safety," VM Memo, AR2471, the Directive "appears to be FSIS's final statement regarding drug residue testing in equines." TRO Order at 2. Second, legal consequences flow from the Directive, AR1868: it determines rights and obligations – including, as this Court found, the right of slaughter facilities to be inspected and commence operations based on the implementation of this program – and failure to comply with its standards may result in penalties. *See W. Ill. Home Health Care, Inc.*, 150 F.3d at 663. Further, the new program altered the Agency's testing regime. *See Bennett*, 520 U.S. at 169. Moreover, because the Agency relied on the Directive in both of its CE Memos, it is clear that the defendants created it to try to satisfy their obligations to make horse slaughter for human consumption consistent with public health and safety. *See Ore. Natural Desert Ass'n*, 465 F.3d at 986-87. That USDA incorporated the Directive into its CE Memos and expressly relied on it in granting

---

*(Footnote continued from previous page)*

Trahan at ¶¶ 5-9, 12, Wagman Decl., Ex. 21, ECF No. 13; Declaration of Cassie Gross at ¶¶ 9-13, 16-21, Wagman Decl., Ex. 22, ECF No. 13; Declaration of Ramona Cordova at ¶¶ 6-11, Wagman Decl., Ex. 23, ECF No. 13; Declaration of Barbara Ann Sink at ¶¶ 5-12, Wagman Decl., Ex. 24, ECF No. 13; Declaration of Lawrence Steven Seper at ¶¶ 5-10, Wagman Decl., Ex. 25, ECF No. 13, and their injuries will be remedied by the requested relief. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992) (the "desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (NEPA plaintiffs have standing where they live "near where the federal action would occur and would feel the environmental effects of that action if it went forward"); *Defenders of Wildlife v. Norton*, 257 F. Supp. 2d 53, 63 (D.D.C. 2003) (injury in fact where members of plaintiff groups "state that they have visited the region repeatedly and aver that they will be returning there within a period of months or a few years for study, work, and recreation").

inspection demonstrates that the new program is "definite" and has a "direct and immediate" effect. *See Ciba-Geigy Corp.*, 801 F.2d at 435-36.[15]

The Directive is also major federal action as defined by the CEQ regulations. For instance, the Directive is clearly a new agency plan, policy, or procedure. *See Norton*, 542 U.S. at 73; 40 C.F.R. § 1508.18(a). Like the revised map in *Native Ecosystems Counsel*, the Directive guides or prescribes the use of federal resources. *See* 866 F. Supp. 2d at 1225-26. And as explained above, the Directive is a formal plan or policy establishing the Agency's new drug residue testing program for horses and was the basis for further Agency action. *See* TRO Order at 3; 40 C.F.R. § 1508.18(b)(2).[16]

And the Directive is a legally relevant cause of the alleged environmental harm caused by horse slaughter operations because USDA has the ability to "countermand" the harm, *see Pub. Citizen*, 541 U.S. at 766, by, for example, testing for all substances regularly administered to horses or adopting a passport system like the one required in Europe and recommended in the Petition for Rulemaking. *See* Decision Memo, AR1826-28. Further, USDA adopted the new program in response to concerns about the dangers posed by drugs regularly administered to horses, TRO Order at 2-3, and relied on it in issuing each grant of inspection, which "permits action" by horse slaughter facilities that will "affect the quality of the environment." *See Johanns*, 520 F. Supp. 2d at 22. Consequently, the Agency must at least invoke a CE for the Directive to comply with NEPA. 40 C.F.R. § 1508.4; 7 C.F.R. § 1b.4(a).[17]

---

[15] USDA has attempted to excuse its failure to even invoke a CE for the Directive by labeling the Directive a mere "policy statement." TRO Hearing Transcript at 32:9-16. But policy statements can trigger NEPA review. *Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n*, 940 F.2d 679, 684-85 (D.C. Cir. 1991); *see also McLouth Steel Prod.'s Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) (an action labeled a policy statement by the agency is subject to judicial review where the agency's "conduct applying it confirms its binding character"). USDA's reliance on and incorporation of the Directive in issuing the grants of inspection suggests that the Directive is binding. *See McLouth Steel Prod.'s*, 838 F.2d at 1320-21.

[16] It is curious that the defendants simultaneously assert that the Directive is neither final agency action nor major federal action subject to NEPA while asserting that their reliance on that action mitigates the inherent risks of horse slaughter. VM Memo, AR2469; RT Memo, AR3284. Defendants should not be permitted to rely on their action as a mitigation measure for purposes of their CE justification but also deny that their action is a final action. *See Davis v. Mineta*, 302 F.3d 1104, 1125 (10th Cir. 2002).

[17] The Agency must also consider the new residue testing program and grants of inspection to VM and RT in concert, evaluating the environmental effects of those actions in a single environmental review. *See* 40 C.F.R. §1508.25 (single NEPA document required for "connected," "cumulative," or "similar" actions); *Save Our Canyons*, 297 F.3d at 1028 ("One of the primary reasons for requiring an agency to evaluate 'connected actions' in a single EIS is to prevent agencies from minimizing the potential environmental consequences of a

*(Footnote continued on next page)*

But a CE is insufficient because the Agency must conduct an EA where there is a major federal action that may significantly affect the environment. The Directive establishes the scope of third parties' permissible activities that may affect the environment, through the dissemination of the byproducts of horse slaughter. As the Court found, the Directive has been adopted "to protect the public health and safety from the dangers posed by [drug residues in horses]." TRO Order at 3. Given that the new program only tests for a select few substances rather than testing for all of the substances administered to horses or requiring a drug history passport for each horse, it is unlikely to prevent the environmental and health risks posed by horse slaughter. *See* Section II.D *supra*. Because the Agency adopted a new residue testing program to respond to serious health and environmental concerns that has a number of obvious deficiencies, there is great doubt as to whether it is adequate to prevent environmental harms.

Pursuant to NEPA, an agency must prepare an EIS, or at minimum an EA, where a major federal action may significantly affect the environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.9. The new residue testing program announced in the Directive implicates several CEQ significance factors, and thus an EA or EIS is warranted. At minimum, the Directive implicates the following factors: (1) the "degree to which the effects on the quality of the human environment are likely to be highly controversial," given that the defendants acknowledge the controversial nature of horse meat and concern for public health risks, *see* VM Memo, AR2471; RT Memo, AR3285; (2) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," given that the defendants adopted the new program in order to address the unique and unknown risks of slaughtering domestic horses for human consumption, *see id.*; (3) the "degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," given that the new drug residue testing program is the basis for carrying out inspections at VM and RT and will likely serve as a basis for granting inspections to any

_____

*(Footnote continued from previous page)*
proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact."). Even if the new residue testing program and grants of inspection are not "connected actions," the Agency must analyze the cumulative effects of each action within each individual EA to determine whether it will have a significant impact on the environment. *See Fuel Safe Wash. v. F.E.R.C.*, 389 F.3d 1313, 1329-30 (10th Cir. 2004) (environmental review "must analyze . . . indirect and cumulative impacts").

additional facilities that may apply, *see* TRO Order at 2; and (4) "[w]hether the action threatens a violation of . . . State . . . law or requirements imposed for the protection of the environment," based on VM's potential violation of New Mexico water permitting and food safety laws and the history of environmental harm caused by horse slaughter, *see* Section II.B *supra*. *See* 40 C.F.R. § 1508.27(b)(4), (5), (6) and (10).

The presence of even *one* of the CEQ significance factors normally triggers the preparation of an EA or EIS requirement, and that document must be prepared prior to implementing the Directive. *See Johanns*, 520 F. Supp. 2d at 20; *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003); *Native Ecosystems Council*, 866 F. Supp. 2d at 1227 (agency-approved map "needed to be analyzed under NEPA . . . before using the map as a basis for approving [another agency project]"). USDA relied on the Directive to approve two commercial horse slaughter facilities without conducting any environmental review. Because the new program is a final agency action and a major federal action that implicates at least four significance factors and thus may significantly affect the environment, USDA violated NEPA and the APA by not conducting any substantive NEPA review, or even invoking a CE explaining why no such review was required, before issuing the Directive and establishing the new drug residue testing program for domestic horse slaughter.

    C.    **The Defendants Violated NEPA and the APA by Failing to Prepare at Least an EA for the Grants of Inspection to VM and RT.**

The defendants were required pursuant to NEPA and the APA to prepare at least an EA for their grants of inspection to VM and RT because the grants are major federal actions and may have a significant effect on the human environment.

    1.    *The Grants of Inspection Are Major Federal Actions.*

The grants of inspection are "major Federal actions" as defined in the CEQ regulations, which define the term to include "projects and programs . . . regulated, or approved by federal agencies," and the "[a]pproval of specific projects . . . [including] approv[al] by permit or other regulatory decision." *See* 40 C.F.R. § 1508.18; *see also Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) ("[I]f a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must conduct an EA and possibly

an EIS before granting it."); *Methow Valley*, 490 U.S. at 336 (agency's decision to issue recreational special use permit constitutes major federal action within the meaning of NEPA); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 30, 40 (D.D.C. 2000) (agency's decision to issue permit to casino builders was a major federal action); *Macht v. Skinner,* 916 F.2d 13 (D.C. Cir. 1990) (major federal action can exist even when the primary actors are not federal agencies); *Davis v. Morton*, 469 F.2d 593, 596-97 (10th Cir. 1972) (approving leases on federal land constitutes major federal action). Consistent with these numerous decisions, USDA's grants of inspections are the requisite authorizations to VM and RT to carry out horse slaughter for human consumption and are "major Federal actions." 40 C.F.R. § 1508.18. And the Agency holds significant sway over what happens at any horse slaughter plant. USDA regulates operations at the facilities through myriad protocols that are carried out through "several FSIS directives and notices," including the Directive, which this Court found to be an integral part of the inspection grants. VM Memo, AR2469; RT Memo, AR3284; TRO Order at 4. Indeed, without inspection there can be no slaughter.

Moreover, contrary to what defendants have argued, to constitute a major federal action and trigger NEPA review, an agency need not engage in oversight of a facility's day-to-day operations. *See* 40 C.F.R. § 1508.18 (major federal actions include programs partly financed, regulated, or approved by federal agencies); *see also Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1185 (D. Colo. 2002) ("The fact that a private company will undertake the [project] is irrelevant under NEPA regulations" when the agency has granted the permit, access, right-of-way, or license that is a condition precedent of the project.). Moreover, several of the arguments already offered by the defendants were the same ones rejected in *Johanns*. 520 F. Supp. 2d at 25-27 ("when an agency serves effectively as a 'gatekeeper' for private action, that agency can no longer be said to have 'no ability to prevent a certain effect'" (*quoting Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1242 (D. Wyo. 2005)).

Finally, as in *Johanns*, USDA is the "legally relevant cause" of the environmental impacts of the slaughter facilities because (1) USDA had discretion over whether to authorize horse slaughter inspections and (2) the grants of inspections that are a prerequisite to slaughter are "functionally inseparable" from the effects of horse slaughter. *Johanns*, 520 F. Supp. 2d at 25-27. USDA has

- 21 -

authorized horse slaughter, and it cannot evade NEPA review under the rationale that it is not directly slaughtering the horses but only approving horses for slaughter.

### 2. *The Evidence Establishes that the Grants of Inspection May Have Significant Environmental Effects.*

NEPA review – at least an EA – is required here because the record makes clear that the grants of inspection may have significant environmental effects. As explained above, American horses are given a pharmacopeia of different drugs during their lives, and those drugs are given without any consideration of the federal laws restricting the administration of drugs to animals intended for human consumption. AR18, 35-38, 94-147, 4034-48. The fact that American horses are not intended for human consumption also means that there is a high likelihood that horse slaughter operations could affect the human environment surrounding the horse slaughter plants, because the discarded parts, organs, and blood could be dangerous to the environment. AR31-33. The operations of past horse slaughter facilities regulated by USDA and the evidence in the Petition are proof that the defendants' actions may significantly harm the environment. *See id.*; Bacon Decl., at ¶¶ 4-10; Cavel Administrative Orders; *see also Johanns*, 520 F. Supp. 2d at 19 ("Neither Defendants nor Defendant-Intervenors refute Plaintiffs' argument that horse slaughter operations have 'significantly' impacted the environment within the meaning of NEPA. . . .").

This evidence of possible environmental impacts, which was before the USDA prior to the grants of inspection, surpasses the threshold to trigger the Agency's duties under NEPA. As described below, USDA acted arbitrarily and capriciously by failing to consider the applicability of several CEQ significance factors, invoking a CE in response to acknowledged risks rather than conducting substantive NEPA review, and relying on improper political considerations.

### a. The Defendants Failed to Apply the CEQ Significance Factors Despite Recognizing Facts that Should Trigger NEPA Review.

There is clear evidence in the record that the defendants' granting horse slaughter inspections implicates several CEQ "significance" factors. This triggers an EIS, or at least a detailed EA. *See* 40 C.F.R. § 1508.27; *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 6:09-CV-00037-RB-LFG, 2011 WL 7701433, at *20 (D.N.M. Aug. 3, 2011) ("The APA requires the reviewing court to 'consider whether

the [agency] decision was based on a consideration of the relevant factors. . . .'") (quoting *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378 (1989)); *Fund for Animals*, 281 F. Supp. 2d at 235.

First, the grants of inspection pose serious risks to public health or safety and unique or unknown health and safety risks. *See* 40 C.F.R. § 1508.27(b)(2), (5). The record provides ample evidence of the long list of the unknown ramifications of starting horse slaughter operations. As documented in the Petition, there are dozens of drug and chemical residues that are routinely administered to American horses that are specifically "not intended for use" in horses who will be eaten. *See* AR17-18, 94-123. That federal agencies have gone so far as to expressly prohibit the use of those drugs for horses destined for slaughter and human consumption, combined with the fact that virtually every American horse has been administered several of those drugs,[18] in itself should trigger a comprehensive review of the public health impacts of authorizing any horse slaughter plants to operate. *See* AR17-18, 35-38, 94-147, 4034-48. Some of these substances are indisputably known to be unsafe, and there is no minimal residue that scientists can guarantee is safe. AR17-31, 246-50. Not only are the drugs prohibited for food animals, but the byproducts from horse slaughter may also contain dangerous residues, capable of contaminating local ecosystems and water and soil supplies. *See* AR391-92.

USDA specifically acknowledges the "potential public health risks" stemming from the slaughter and sale of contaminated meat. VM Memo, AR2471; RT Memo, AR3285. This concession alone is enough to satisfy one of the CEQ significance factors and trigger substantive NEPA review. *See* 40 C.F.R. § 1508.27(b)(2); *Fund for Animals*, 281 F. Supp. 2d at 235 (presence of one or more of the CEQ significance factors normally requires preparation of an EIS); *see also Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F.2d 1087, 1120 (D. Colo. 2012) ("An EIS is warranted where uncertainty [regarding proposed action] may be resolved by further collection of data, especially where such data may reduce the need for speculation." (citation and quotation omitted)).

Second, the significant unknown human health and environmental impacts of the Agency's actions are highly controversial, implicating another CEQ significance factor. 40 C.F.R. § 1508.27(b)(4). The CEQ controversy factor is triggered where there is "a substantial dispute as to the

---

[18] And, it is unknown which horses have received which drugs.

size, nature, or effect of the action." *High Country Citizens' Alliance v. Norton*, 448 F. Supp. 2d 1235, 1244 (D. Colo. 2006) (citation omitted) (finding controversial and significant effects where there was a "wide disparity in the estimates of water required for the designation . . .  indicat[ing ] a substantial dispute exists as to the effect of the designation"). Just as the defendants recognized and summarily dismissed the potential health risks caused by their actions here, they also recognized and summarily dismissed the controversy over whether "blood produced by commercial horse slaughter will overwhelm any waste water disposal system." *See* VM Memo, AR2476 n.6.

The declaration of defendants' employee, Daniel Engeljohn, further highlights the existence of a controversy over the potential impacts of horse slaughter, and the need for environmental review here. In particular, Engeljohn's conclusion that the new residue testing program will protect the public health is highly suspect. Engeljohn reasoned that because NRP testing of horses from 1997 to 2006 yielded few positive results for the classes of drugs tested, the likelihood of the horse slaughter process yielding tainted meat and byproducts is minimal. Engeljohn Dec., at ¶ 17. Yet, Engeljohn fails to mention that of the 115 substances commonly administered to horses identified by FRER and HSUS in the Petition, at most a few dozen of them were tested for in horses when horses were tested. *Compare* Engeljohn Dec. Att. 1 *with* AR94-123. Therefore, these "exceedingly low" positive results, Engeljohn Dec., at ¶ 17, signify grossly inadequate residue testing and further highlight the unknown and controversial nature of the impacts here. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012) (a project is "highly controversial" if there is "a substantial dispute as to the size, nature, or effect of the action"); *Am. Bird Conservancy, Inc. v. F.C.C.*, 516 F.3d 1027, 1034 (D.C. Cir. 2008) ("Indeed, the *Order*'s emphasis on 'conflicting studies' and 'sharply divergent views' regarding the number of birds killed confirms, rather than refutes, that towers may have the requisite effect. . . . Under such circumstances, the Commission's regulations mandate at least the completion of an EA before the Commission may refuse to prepare a programmatic EIS."); *Jones v. Gordon*, 792 F.2d 821, 829 (9th Cir. 1986) (finding CE inadequate and noting "[w]hile the Service report disputes or rebuts several of these points, it nowhere explains why these points do not suffice to create a public controversy based on potential environmental consequences").

Third, the grants of inspection require NEPA review because they have such wide-ranging future consequences and thus surely "establish a precedent for future actions with significant effects." 40 C.F.R. § 1508.27(b)(6). The grants of inspection signal, falsely, that without NEPA review, USDA can ensure the safety of the communities where horses are slaughtered. Furthermore, the record shows that "similar or related projects are being contemplated" by the defendants. *See Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998); *see* TRO Opp. at 4 (USDA has applications for grants of inspection for horse slaughterhouses in Missouri, Oklahoma, and Tennessee). Because what happens in this Court will provide authority and precedent for the Agency's future actions, the Agency may not invoke a CE here. *See Presidio*, 155 F.3d at 1162-63 ("The purpose of [40 C.F.R. § 1508.27(b)(6)] is to avoid the thoughtless setting in motion of a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." (internal quotation omitted)). Horse slaughter has not occurred for the past six years, and the Agency should not be permitted to authorize its start without conducting substantive environmental review.

Fourth, the grants of inspection implicate the CEQ significance factor regarding "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). For example, USDA knows that VM has repeatedly committed gross violations of New Mexico environmental laws and regulations when it was in the business of slaughtering cattle,[19] yet it asserts that the mere existence of these laws will prevent future violations. *See* VM Memo, AR2474-75. Further, VM has operated in violation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, for years, without a permit or an official exclusion from the permitting process. AR2570-71.

Moreover, the defendants know that the last three horse slaughter plants in the U.S. wreaked environmental havoc on their host communities, which included violations of environmental laws and regulations. *See Johanns*, 520 F. Supp. 2d at 19; Bacon Decl., ¶¶ 4-10; Cavel Administrative Orders. It

---

[19] *See, e.g.*, Letter from William C. Olson to Richard De Los Santos, May 7, 2010, Wagman Decl., Ex. 14, ECF No. 13; Letter from Dr. Ron Nelson to Director, New Mexico State Government Health Department, Jan. 22, 2010, Wagman Decl., Ex. 15, ECF No. 13; Letter from George W. Akeley, Jr. to Ricardo and Sarah De Los Santos, Jan. 4, 2011, Wagman Decl., Ex. 16, ECF No. 13; E-mail from Auralie Ashley-Marx to Troy O. Grant, NMED, Re: Pecos Valley Meat Company, Apr. 18, 2012, 5:51 p.m., Wagman Decl., Ex. 17, ECF No. 13.

is particularly troubling that when deciding to revive an extinct horse slaughter industry in this country, despite the controversy surrounding the industry and practice and plaintiffs' Petition confronting the Agency with evidence of repeated gross environmental law violations by each one of the last horse slaughter facilities that it inspected, USDA did not so much as bother to include a mention of any of this evidence in the CE Memos. The failure to consider the relevant evidence before it not only demonstrates why a detailed EA at a minimum is required but also why the Agency's reliance on the CE Memos was arbitrary and capricious and an abuse of discretion. *See Olenhouse*, 42 F. 3d at 1574 (agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem").

> b. <u>The Defendants' Actions Were Arbitrary and Capricious Because Invoking a CE in Response to Acknowledged Risks of Environmental Harm is Contrary to NEPA.</u>

Despite USDA's claim to the contrary, the Directive, which on its own triggers NEPA review, does not resolve the above concerns. Instead, it demonstrates that USDA "recognize[d] that the potential impacts of commercial horse slaughter on public health may cause concern with segments of the public," including "the potential public health risks that could arise from the presence in horse meat of trace amounts of certain classes of drugs that have not been approved for use in animals that will or could be slaughtered to produce food for human consumption." VM Memo, AR2471; RT Memo, AR3285. A full NEPA analysis is warranted to address these public health risks, not a CE in which the Agency summarily dismisses them.

Similarly, defendants' express statements in their CE Memos do not bolster their self-serving rationalizations and actually highlight the need for substantive environmental review. What defendants have done here in purporting to satisfy their NEPA mandate is to recite *some* of the significance factors that are present for their proposed horse slaughter actions and then in the most perfunctory manner resolve all of those factors and controversies in their favor without undertaking any actual detailed analysis of the risks. This falls far short of satisfying NEPA. *See, e.g., High Country*, 448 F. Supp. 2d at 1244. As such it is arbitrary and capricious action because it "entirely failed to consider an important aspect of the problem" and offered an explanation for its decision that runs counter to the evidence before the agency. *See Olenhouse*, 42 F.3d at 1574.

USDA claims it has addressed the risk of environmental contamination through the Directive and other measures. VM Memo, AR2471; RT Memo, AR3285; TRO Opp. at 19 (defendants' "screening process" will "ensur[e] that [residues] endanger[] neither public health and safety nor the local environment"). However, the entire purpose of the NEPA review process is to evaluate the extent of the risk, and the adequacy of such measures. Setting aside the fact that the Directive itself requires NEPA review, TRO Order at 2-3, and that the residue testing program is woefully inadequate because USDA will not be testing for a majority of drugs that horses are routinely given, these statements demonstrate that there are indeed potentially "unique" or "extraordinary" circumstances that warrant substantive environmental review." *See Conservation Cong. v. U.S. Forest Serv.*, 2013 WL 2457481, at *7 (E.D. Cal. June 6, 2013) (unique or extraordinary circumstances exist where there is evidence that "a normally excluded action *may* have a significant environmental impact") (emphasis added)).

It is *not* NEPA-compliant for the defendants to acknowledge health and environmental risks and then summarily dismiss those issues without conducting at least an EA. *See id.* at *7-8 (agency's finding of no extraordinary circumstances was arbitrary and capricious where agency acknowledged "possible loss of suitable spotted owl habitat"); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 16, 23 (D.D.C. 2009) (agency violated NEPA in applying a CE where it failed to consider "all direct, indirect, and cumulative impacts that were *foreseeable* as a result" of its action and ignored information in the record concerning environmental impacts); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001), *abrogated on other grounds by Monsanto v. Geertson Seed Farms*, 130 S. Ct. 2743, 2757 (2010) (NEPA document inadequate where it identified "an environmental impact" but "did not establish the intensity of that impact"); *California v. Norton*, 311 F.3d 1162, 1176-77 (9th Cir. 2002) ("heightened" need for adequate justification for a CE where "there is substantial evidence in the record that exceptions to the categorical exclusion *may* apply, and the fact that the exceptions may apply is all that is required to prohibit" CE). USDA *admits* there is a potential problem and purports to address it with the Directive, conceding that such impacts are present, and may be significant. Based on this record, at least an EA is required, in order to assess the nature of these indisputable potential impacts. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d

1059, 1090 (N.D. Cal. 2007) ("If the USDA wishes to obtain a ruling that no significant effects are likely, it will first have to prepare an EA.").

Defendants should not be permitted to substitute their CE for actual environmental review when a thorough EA is required and the NEPA statutory framework does not tolerate such a substitution. *See Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1023 (a CE is not NEPA review). Indeed, as articulated recently in *Conservation Congress*, "an agency's explanation as to why a categorical exclusion applies is a necessary, but not sufficient, condition to correctly apply a categorical exclusion. While [the agency] included discussion in the Decision Memo explaining its decision, the court finds that [the agency's] explanation was not sufficient to establish that extraordinary circumstances were not present." 2013 WL 2457481, at *8 n.4. The same applies here, where the CE Memos are inadequate, and they rely on the Directive, for which not even a CE was invoked. Thus, defendants' grants of inspection to VM and RT violate NEPA and the APA and must be vacated.

c.   The Defendants' Actions Were Arbitrary and Capricious Because They Relied on Improper Political Considerations.

USDA's actions challenged by this lawsuit were arbitrary and capricious because the Agency "relied on factors which Congress has not intended for it to consider." *Olenhouse*, 42 F.3d at 1574. Federal agencies are prohibited from letting political pressures guide or control the NEPA process. *See, e.g.*, *Wyoming v. U.S. Dept. of Agr.*, 277 F. Supp. 2d 1197, 1232 (D. Wyo. 2003) (NEPA violated when an action was "driven through the administrative process" for the "political capital" of the administration); *Blum*, 458 F. Supp. at 663 (remanding and advising the agency to exclude congressional pressures).

As evidenced by the Decision Memo written by Defendant Almanza in response to a request from Defendant Hagen, political and industry pressures influenced the Agency's decision to finalize the residue testing program, and its decision to provide the grants of inspection, without NEPA review. USDA's decided to ignore the potentially significant environmental effects of horse slaughter operations, motivated by congressional pressures and its desire to avoid conflict with members of Congress and industry. *See* Decision Memo, AR1827, 1829.

The Decision Memo explicitly states that certain members of Congress felt that USDA was "dragging its feet on the equine slaughter issue" and that further delay could result in "punitive congressional action." *Id.*, AR1827. *Nothing* in NEPA or the CEQ regulations permits the consideration of such facts when determining the environmental effects of federal action. Indeed, such considerations are prohibited. *See*, *e.g.*, *Volpe*, 459 F.2d at 1246 (decision is invalid if based on political pressure); *Wyoming v. U.S. Dept. of Agr.*, 277 F. Supp. 2d at 1232 (finding political motivations improper); *Blum*, 458 F. Supp. at 663 (requiring agency to exclude congressional pressures). Yet, when considering the "pros" and "cons" of proceeding with horse slaughter inspections now versus taking additional steps to ensure the safety of horse meat, the "cons" listed in the Decision Memo were (1) that the Agency would not be following "congressional direction"; (2) that USDA would need to "deflect persistent efforts" to force its hand and allow horse slaughter; (3) that industry would be required to wait for the NEPA process to complete before beginning horse slaughter; and (4) that an in-depth NEPA review might demonstrate concerns in other USDA programs. Decision Memo, AR1827, 1829. The Memo takes it as a *fait accompli* that it has "no choice but to institute equine slaughter" and that, under this view, "the fact that drug use is widespread in equines is essentially irrelevant." *Id.*, AR1827-28.

These facts alone render the Agency's actions arbitrary and capricious. They also cast a long shadow over all of the Agency's other remaining excuses for why it did not undertake basic environmental review protocols for this potentially dangerous new activity.

## VI.    CONCLUSION

The record before the Court shows that the defendants undertook no environmental review and did not even bother to invoke a categorical exclusion before instituting a new nationwide residue testing program that clearly fails, to alleviate the serious health and environmental risks of slaughtering domestic horses for human consumption. Furthermore, the defendants have granted inspections to two horse slaughter facilities, and are prepared to grant inspection to one or more facilities in the near future, without conducting any environmental review, despite record evidence demonstrating significant environmental harms caused by horse slaughter operations that were inspected by USDA and in spite of the presence of unique, unknown, and controversial environmental and public health risks presented by

horse slaughter. These actions were arbitrary and capricious, violated NEPA and the APA, and should be set aside by this Court.

Respectfully submitted this 12th day of September 2013.

/s/ Bruce A. Wagman
BRUCE A. WAGMAN (Admitted *Pro Hac Vice*)
ROCKY N. UNRUH (NM Bar #3626)
SCHIFF HARDIN LLP
One Market, Spear Tower, 32nd Fl.
San Francisco, CA 94105
Telephone:    (415) 901-8700
Facsimile:     (415) 901-8701
bwagman@schiffhardin.com
runruh@schiffhardin.com

Attorneys for Plaintiffs

BRIAN EGOLF
EGOLF + FERLIC + DAY, LLC
128 Grant Avenue
Santa Fe, NM 87501
Telephone:    (505) 986-9641
brian@egolflaw.com

Attorneys for Foundation to Protect New Mexico
Wildlife

## CERTIFICATE OF SERVICE

I certify that on September 12, 2013, I filed through the United States District Court ECF System the foregoing document to be served by CM/ECF electronic filing on all counsel of record.

/s/ Bruce A. Wagman
BRUCE A. WAGMAN (Admitted *Pro Hac Vice*)
SCHIFF HARDIN LLP