# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**FRONT RANGE EQUINE RESCUE,**
***et al.***

         Plaintiffs,

    vs.                                No. 1:13-CV-00639-MCA-RHS

**TOM VILSACK, Secretary U.S.**
**Department of Agriculture,** ***et al.***

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves applications for grants of inspection for federal meat inspection services for commercial horse slaughter operations at Valley Meat Company, LLC (Valley Meat), Responsible Transportation, LLC (Responsible Transportation), and Rains Natural Meat.  The Federal Meat Inspection Act (FMIA), 21 U.S.C. § 601 *et seq.*, regulates the inspection of meat and meat food products.  The Food Safety Inspection Service (FSIS), as the delegate of the United States Department of Agriculture (USDA), is the agency responsible for conducting inspections and issuing grants of inspection to such facilities.  The grants of inspection allow for facilities such as Valley Meat, Responsible Transportation, and Rains Natural Meats to engage in commercial slaughtering of horses intended for human consumption.  Plaintiffs seek to have the Court permanently enjoin Valley Meat, Responsible Transportation, Rains Natural Meats, and the USDA from performing house slaughter inspections or utilizing a June 28, 2013 FSIS

Directive until the USDA has satisfied its obligations under the National Environmental

Policy Act (NEPA) 42 U.S.C. § 4321 *et seq.*

This matter is before the Court on Plaintiffs' *First Amended Complaint for*

*Declaratory and Injunctive Relief.* [Doc. 54] Consistent with <u>Olenhouse v. Commodity</u>

<u>Credit Corp.</u>, 42 F.3d 1560, 1580 (10th Cir. 1994), the Court has processed Plaintiffs'

*First Amended Complaint for Declaratory and Injunctive Relief* [Doc. 54] as an appeal.

[<u>See</u> Doc. 137]  Having considered the submissions, the Administrative Record, the

relevant case law, and otherwise being fully advised in the premises, the Court affirms the

agency's decision.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

The FMIA governs the slaughter of "amenable species," including horses, <u>see</u> 21

U.S.C. § 601(w), and requires that all amenable species be examined and inspected

"before they shall be allowed to enter into any slaughtering, packing, meat-canning,

rendering, or similar establishment in which they are to be slaughtered and the meat and

meat food products thereof are to be used in commerce . . . ," 21 U.S.C. § 603(a).  The

FMIA also requires "a post mortem examination and inspection of the carcasses and parts

thereof of all amenable species to be prepared at any slaughtering, meat-canning, salting,

packing, rendering, or similar establishment in any State, Territory or the District of

Columbia as articles of commerce which are capable of use as human food . . .."  21

U.S.C. § 604.  The FMIA prohibits the slaughter or preparation of "cattle, sheep, swine,

goats, horses, mules, or other equines . . . which are capable of use as human food at any

2

establishment preparing any such article for commerce, except in compliance with the requirements of this chapter."  21 U.S.C. § 610(a).

For fiscal years 2006 through 2011, Congress prohibited the use of federal funds to "pay the salaries or expenses of personnel to inspect horses under section 3 of the Federal Meat Inspection Act (21 U.S.C. Sec. 603) or under the guidelines issued under section 903 the Federal Agriculture Improvement and Reform Act of 1996 (7 U.S.C. [§] 1901 note; Public Law [No.] 104–127)."  Pub. L. No. 109-97, § 794 (2005); see also Pub. L. 110-1161, div. A, § 741(1) (2007); Pub. L. No. 111-80, div. A, tit. VII, § 744 (2009).  As a consequence, horse slaughter in the United States ceased during this time period.  However, the prohibition was not enacted for fiscal years 2012 or 2013.  Because there is federal funding to pay the salaries and expenses of horse slaughter inspectors, commercial horse slaughtering may once again be carried out lawfully in the United States.

The USDA has received "[a]t least six applications for horse slaughtering inspections in five states . . . since Congress appropriated funding for inspections."  [Doc. 54 at 3]  Valley Meat, a slaughter facility located in Roswell, New Mexico, submitted an application dated December 13, 2011, to add equines to its preexisting grant of inspection.  However, federal regulations require the slaughter of "horses, mules, or other equines" to be "done in establishments separate from any establishment in which cattle, sheep, swine, or goats are slaughtered or their products are prepared."  9 C.F.R. § 305.2(b).  On March 2, 2012, Valley Meat submitted an amended application seeking "to modify its grant of inspection to receive inspection services for the commercial slaughter

3

of horses, mules, and other equines." [Doc. 66-2 at 2]  On June 28, 2013, the Food Safety

Inspection Service (FSIS) issued a decisional memorandum granting Valley Meat's

modified application. [AR 2467]

Responsible Transportation, a facility located in Sigourney, Iowa, filed an

application dated December 13, 2012, for a grant of inspection for equines. [Doc. 22-5 at

3]  On July 1, 2013, FSIS issued a decisional memorandum granting Responsible

Transportation's application.  [AR 3282]

Rains Natural Meats, a facility located in Gallatin, Missouri, submitted an

application dated January 15, 2013, for a grant of inspection for equines.  [Doc. 201-1 at

2]  Rains Natural Meat's application has been reviewed, a decisional memorandum

granting Rains Natural Meat's application, and FSIS is in a position to issue a grant of

inspection pending the resolution of this action.  [Doc. 201-1 at 2; Doc. 154]

The three other establishments that have submitted applications for grants of

inspection for equines are: American Beef Company/Unified Equine, LLC in Rockville

Missouri, Oklahoma Meat Company in Washington, Oklahoma, and Trail South Meat

Processing Company in Woodbury, Tennessee. [Doc. 54 at 3]  None of these three

companies have "actively pursued completion of the grant process after the first

submission of their applications to FSIS."  [Doc. 66-1 at 5]

The grants of inspection issued to Valley Meat and Responsible Transportation are

conditional in nature and shall not "exceed 90 days, during which period the

establishment must validate its HACCP [Hazard Analysis and Critical Control Point]

4

plan."  9 C.F.R. § 304.3(b); see 9 C.F.R. §§ 417.2 and 417.4 (discussing HACCP plans).

After the successful validation of a HACCP plan, the conditional grants of inspection

become permanent.

On June 28, 2013, FSIS issued FSIS Directive 6130.1 (the Directive) regarding

"Ante-Mortem, Postmortem Inspection of Equines and Documentation of Inspection

Tasks."  [Doc. 22-3 at 2]

> This directive provides instructions to inspection program personnel (IPP)
> on how to perform ante-mortem inspection of equines before slaughter and
> post mortem inspection of equine carcasses and parts after slaughter.
> Additionally, this directive instructs Food Safety and Inspection Service
> (FSIS) Public Health Veterinarians (PHVs) making ante-mortem and post-
> mortem dispositions of equines how to perform residue testing, verify
> humane handling, verify marking of inspected equine products, and
> document results using the Public Health Inspection (PHIS) for equine
> when available.

[Id.]  In the Directive, FSIS "recognizes that most equines presented for slaughter will

likely not have been raised for human consumption" and that, therefore, there are

"concerns regarding the potential presence of chemical residues from drugs not

previously approved for use in all food animals including equine."  [Id. at 7]  In addition

to following pre-existing residue testing policies, IPP are instructed to "conduct random

residue testing of normal-appearing" horses at "at least the same rate as for show

livestock." [Id. at 8]  Thus, "IPP are to randomly select, on the slaughter floor from

normal-appearing equine[s], "[a] minimum of 4 animals if there are more than 100

animals in the lot."  [Id.]

On July 2, 2013, Plaintiffs Front Range Equine Rescue, the Humane Society of the United States, Marin Humane Society, Horses for Life Foundation, Return to Freedom, Ramona Cordova, Krystle Smith, Cassie Gross, Deborah Trahan, and Barbara Sink (collectively, "Plaintiffs") filed their *Complaint for Declaratory and Injunctive Relief* in the United States District Court for the Northern District of California.  [Doc. 1]  In their complaint, Plaintiffs allege that Defendants, Tom Vilsack, Secretary of the USDA, Elizabeth A. Hagen, USDA Under Secretary for Food Safety, and Alfred V. Almanza, USDA Administrator for FSIS (collectively, "Federal Defendants") "are proceeding with the inspection of horses under the [FMIA] without compliance with their federally mandated environmental review obligations."  [Doc. 1 at 2; see also Doc. 54 at 2] Specifically, Plaintiffs allege that the Federal Defendants violated the NEPA and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C)), and (D), when it issued grants of inspection for horse slaughter and "adopt[ed] and implement[ed] a new residue testing plan applicable to all horse slaughter plants throughout the nation that may be authorized to operate by Defendants" without first preparing an environmental impact statement (EIS) or environmental assessment (EA) in accordance with the requirements of NEPA and its implementing regulations. [Doc. 1 at 3]  As a remedy, Plaintiffs seek a declaratory judgment setting aside the grants of inspection and drug residue testing policy as "arbitrary and capricious, and without observance of procedure required by law" and a preliminary and permanent injunction enjoining Federal Defendants from "granting or conditionally granting any applications for inspection of horse slaughter facilities," or

6

"implementing the new drug residue testing plan for horse slaughterhouses nationwide, without performance of adequate NEPA review."  [Doc. 1 at 35-36]  On July 2, 2013, Plaintiffs also filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin Federal Defendants "from authorizing horse slaughter at a domestic horse slaughter facility pending consideration of the merits of Plaintiffs' claims."  [Doc. 16-1 at 37]

Pursuant to the stipulation of the parties, the case was transferred from the United States District Court of the Northern District of California to the District of New Mexico. [Doc. 31]  After the transfer, Plaintiffs filed their *First Amended Complaint for Declaratory and Injunctive Relief.*  [Doc. 54]  The *First Amended Complaint* adds several new Plaintiffs, including Foundation to Protect New Mexico Wildlife, Sandy Schaefer, Tanya Littlewolf, Chief David Bald Eagle, Chief Arvol Looking Horse and Roxanne Talltree-Douglas.  [Doc. 54 at 1]  Otherwise, the *First Amended Complaint* mirrors the original complaint, in that it alleges that the Federal Defendants have violated NEPA and the APA by issuing grants of inspection for horse slaughter and implementing a drug residue testing policy for equines without first preparing an EIS or an EA.

Numerous parties have filed motions to intervene in the present proceedings, and the Court has granted the motions to intervene filed by the following interested parties: Valley Meat, Responsible Transportation, Rains Natural Meats, Chevaline, LLC, Confederated Tribes and Bands of the Yakama Nation, State of New Mexico, International Equine Business Association, New Mexico Cattlegrowers' Association,

South Dakota Stockgrowers Association, Ranchers-Cattlemen Action Legal Fund United

Stockgrowers of America, Marcy Britton, Bill and Jan Wood, Leroy and Shirley Wetz,

Doug and Judy Johnson, Kujyukuri, Ltd., United Horseman, and Scenic View Ranch.

[See Docs. 43, 90, and 140]

On August 2, 2013, the Court conducted a hearing on Plaintiffs' motion for a

temporary restraining order and preliminary injunction. [See Doc. 96] After the hearing,

the Court granted Plaintiffs' request for a temporary restraining order concluding, in

relevant part, that Plaintiffs had demonstrated a substantial likelihood of success on the

merits of their NEPA and APA claims.  With respect to the Directive, the Court

provisionally determined that the Directive "constitute[d] final agency action as defined

by the APA" and also "major Federal action[] significantly affecting the quality of the

human environment under NEPA." [Doc. 94 at 2, 3] Because the grants of inspection

issued to Valley Meat and Responsible Transportation "were based, in relevant part, on

the existence of the FSIS Directive . . . to protect the public health and safety," the Court

provisionally determined that the grants of inspection were also flawed.  Furthermore, the

Court determined that Plaintiffs had "fulfilled their burden to prove that environmental

harm is likely to occur in the absence of the issuance of a temporary restraining order,"

that the potential environmental harm outweighed "the legitimately incurred costs to

defendants resulting from a temporary restraining order," and that a temporary restraining

order was not adverse to the public interest. [Id. at 5-6]  Accordingly, Plaintiffs' request

for a temporary restraining order was granted, and Federal Defendants were enjoined

"from dispatching inspectors to the horse slaughterhouse facilities operated by the Intervenor-Defendants Valley Meat and Responsible Transportation until further order of the Court." [Id. at 6-7] The Court further ordered Federal Defendants to "suspend or withhold the provision of meat inspection services to Valley Meat and Responsible Transportation until further order of the Court."[1] [Id. at 6-7]  The Court also enjoined Valley Meat and Responsible Transportation "from commercial horse slaughter operations until further order of the Court," and stated that it would "set a hearing on Plaintiffs' request for a preliminary injunction within thirty (30) days."  [Id. at 7]

On August 26, 2013, the Federal Defendants and Defendant-Intervenors (collectively, "Defendants") filed a *Joint Motion to Consolidate the Preliminary Injunction Hearing on the Merits, and For Expedited Briefing on the Merits*. [Doc. 131] Plaintiffs and Plaintiff-Intervenor, the State of New Mexico, "support[ed] Defendants' request that the Court expedite resolution of this case with briefing on the merits." [Doc. 133] Therefore, the Court consolidated "Plaintiffs' pending motion for preliminary injunction . . . with the hearing on the merits" and ordered briefing on an expedited basis. [Doc. 137] The Court also clarified that it would process Plaintiffs' *First Amended Complaint for Declaratory and Injunctive Relief* as an appeal consistent with Olenhouse, 42 F.3d at 1580, and that the parties would not be permitted to "submit additional

---

[1] Per an *Amended Order* filed on August 21, 2013, the Court clarified that its August 2, 2013 Order applied only to *horse* slaughter inspections and did not prohibit the dispatch of federal inspectors to Valley Meat or Responsible Transportation to inspect other amenable species under the Federal Meat Inspection Act. [See Docs. 124 and 125]

evidence in support of and in opposition to the substantive result of the Federal

Defendants' NEPA process." [Doc. 137]

On September 13, 2013, Federal Defendants filed *Notice Regarding Grant of*

*Inspection for Rains Natural Meats in Gallatin, Missouri*. [Doc. 154]  The notice

provided that "FSIS ha[d] completed an analysis of the proposed grant of inspection for

the Rains Natural Meats facility in accordance with NEPA, [and] determin[ed] that the

grant f[ell] under the USDA categorical exclusion for FSIS actions" and, therefore, FSIS

was "presently in a position to issue the grant of inspection for Rains Natural Meats as

required by the FMIA." [Doc. 154 at 2] As a result of Federal Defendants' *Notice*

*Regarding Grant of Inspection for Rains Natural Meats in Gallatin, Missouri*,  Plaintiffs

filed an *Emergency Motion to Modify the Amended Temporary Restraining Order* [Doc.

156], requesting "that the Court modify its Order enjoining . . . [F]ederal [D]efendants

from conducting horse meat inspections at [Rains Natural Meats]." [Id. at 4]

On September 20, 2013, the Court issued an Order enjoining Federal Defendants

from dispatching inspectors to the horse slaughterhouse facility operated by Intervenor-

Defendant Rains Natural Meats and referred the matter to the Honorable Robert H. Scott

for an evidentiary hearing regarding whether the Order should be extended beyond

October 4, 2013. [Doc. 168 at 2] On September 25, 2013, the Parties filed a *Stipulation*

*and Joint Motion to Extend the Temporary Restraining Order Regarding Rains Natural*

*Meats, to Modify Briefing Schedule and to Vacate October 1, 2013 Evidentiary Hearing*,

[Doc. 178], in which the Parties agreed that the "Court's September 20, 2013 temporary

restraining order, [Doc. 168], will remain in effect until October 31, 2013, when the Court

anticipates issuing its ruling on the merits of Plaintiffs' claims." [Doc 178 at 1]

Expedited briefing on the merits has now been completed and the matter is now

ripe for adjudication.

**III**.   **STANDARD OF REVIEW**

Because NEPA does not provide for a private right of action, the Court  must

review Plaintiffs' NEPA claims under the APA.  Utah Envtl. Cong. v. Bosworth, 443

F.3d 732, 739 (10th Cir. 2006).  Review under the APA is limited to final agency actions.

See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action

for which there is no other adequate remedy in a court are subject to judicial review.").

"[T]he finality requirement is concerned with whether the initial decisionmaker has

arrived at a definitive position on the issue that inflicts an actual, concrete injury . . .."

Darby v. Cisneros, 509 U.S. 137, 144 (1993) (internal quotation marks and citation

omitted) (alteration in original).

> As a general matter, two conditions must be satisfied for agency action to
> be final:  First, the action must mark the consummation of the agency's
> decisionmaking process, —it must not be of a merely tentative or
> interlocutory nature.  And second, the action must be one by which rights or
> obligations have been determined, or from which legal consequences will
> flow.

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations

omitted).  Our Tenth Circuit has interpreted the finality requirement in a flexible and

pragmatic manner. <u>Center for Native Ecosystems v. Cables</u>, 509 F.3d 1310, 1329 (10th

Cir. 2007).

When examining agency action under the APA, the Court reviews the final agency

action to determine whether it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This requires a reviewing

court to determine whether the agency

> examined the relevant data and articulated a rational connection between
> the facts found and the decision made. In reviewing the agency's
> explanation, the reviewing court must determine whether the agency
> considered all relevant facts and whether there has been a clear error of
> judgment.

<u>Olenhouse</u>, 42 F.3d at 1574 (citation omitted).  The agency's decision will be deemed

arbitrary and capricious if

> the agency (1) entirely failed to consider an important aspect of the
> problem, (2) offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be ascribed
> to a difference in view or the product of agency expertise, (3) failed to base
> its decision on consideration of the relevant factors, or (4) made a clear
> error of judgment.

<u>New Mexico ex rel. Richardson v. Bureau of Land Mgmt.</u>, 565 F.3d 683, 704 (10th Cir.

2009) (internal quotation marks and citations omitted).  The reviewing court "should not

attempt to make up for such deficiencies; it *may not supply* a reasoned basis for the

agency's action that the agency itself has not given."  <u>Olenhouse</u>, 42 F.3d at 1574-75

(internal quotation marks and citation omitted) (emphasis in original).  Moreover, when

resolving issues that require a "high level of technical expertise, [the reviewing court]

must defer to the informed discretion of the responsible federal agencies." Marsh v. Oregon Nat'l Res. Council, 490 U.S. 360, 377 (1989) (internal quotation marks and citation omitted).

Notwithstanding the fact that this standard of review is very deferential to the agency,  the Court's review must be thorough.  Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Engineers, 702 F.3d 1156, 1165 (10th Cir. 2012).  "A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action."  Id. (internal quotation marks and citation omitted).  Therefore, an agency's decision will not be overturned, unless the agency's decision is determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  Colorado Wild, Heartwood v. U.S. Forest Serv., 435 F.3d 1204, 1213 (10th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)).

## III.    STATUTORY FRAMEWORK: NEPA AND THE FEDERAL MEAT INSPECTION ACT

## A.    APPLICABILITY OF NEPA

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. 1500.1(a). "NEPA was enacted to regulate government activity that significantly impacts the environment and 'to help public officials make decisions that are based on [an] understanding of environmental consequences and take actions that protect, restore, and enhance the environment.'"  Colorado Wild, 435 F.3d at 1209 (quoting 40 C.F.R. § 1500.1(C)) (alteration in original).  "NEPA dictates the process by which federal agencies

must examine environmental impacts, but does not impose substantive limits on agency conduct." Utah Envtl. Cong. v. Russell, 518 F.3d 817, 821 (10th Cir. 2008). As our Tenth Circuit Court of Appeals has observed, NEPA "does not require agencies to elevate environmental concerns over other appropriate considerations," but rather requires "that the agency take a 'hard look' at the environmental consequences before taking a major action." Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1207 (10th Cir. 2002). "In other words, it prohibits uninformed-rather than unwise-agency action." Id. at 1207-08 (internal quotation marks and citation omitted).

NEPA "requires all federal agencies to consider the environmental consequences of 'major federal actions significantly affecting the human environment. . ..'" Goos v. Interstate Commerce Comm'n, 911 F.32d 1283, 1293 (8th Cir. 1990) (42 U.S.C. § 4332(2)(C)). In order to satisfy NEPA's procedural requirements, an agency must produce one of the following: "(1) an environmental impact statement (EIS), (2) an environmental assessment (EA), or (3) a categorical exclusion [(CE)]." Russell, 518 F.3d at 821 (internal quotation marks and citation omitted). "An EIS is required for 'major Federal actions significantly affecting the quality of the human environment.'" Colorado Wild, 435 F.3d at 1209 (quoting 42 U.S.C. § 4332(2)(C)).

> If an agency is uncertain whether a proposed action will significantly affect the environment, it may first prepare an EA, a concise public document that [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare' a more detailed EIS. If, pursuant to that EA, the agency determines that a more detailed EIS is not required, it must issue a finding of no significant impact (FONSI), which briefly presents the reasons why

the proposed agency action will not have a significant impact on the human
environment.

Russell, 518 F.3d at 821 (internal quotation marks and citation omitted).

In rare instances, however, an agency will not have to prepare an EA or an EIS.
"Under regulations promulgated by the Council on Environmental Quality (CEQ), an
agency is not required to prepare either an EIS or [an] EA if the proposed action does not
'individually or cumulatively have a significant effect on the human environment.'"
Citizens' Comm. to Save Our Canyons v. U.S. Forest Service, 297 F.3d 1012, 1023 (10th
Cir. 2002) (quoting 40 C.F.R. § 1508.4). "[F]ederal regulations delegate to individual
agencies the responsibility [of] defining what types of actions may be categorically
excluded from NEPA review." Citizens' Comm. to Save Our Canyons, 297 F.3d at 1023.
Federal regulations define a categorical exclusion as follows:

> a category of actions which do not individually or cumulatively have a
> significant effect on the human environment and which have been found to
> have no such effect in procedures adopted by a Federal agency in
> implementation of these regulations (§ 1507.3) and for which, therefore,
> neither an environmental assessment nor an environmental impact statement
> is required.  An agency may decide in its procedures or otherwise, to
> prepare environmental assessments for the reasons stated in § 1508.9 even
> though it is not required to do so.  Any procedures under this section shall
> provide for extraordinary circumstances in which a normally excluded
> action may have a significant environmental effect.

40 C.F.R. § 1508.4.  "Federal law limits categorical exclusions in one critical respect: a
proposed action is precluded from categorical exclusion if 'extraordinary circumstances'
exist such that 'a normally excluded action may have a significant environmental effect.'"
Bosworth, 443 F.3d at 736  (quoting 40 C.F.R. § 1508.4).

15

The USDA has adopted federal regulations governing categorical exclusions, see 7 C.F.R. 1b.1, and pursuant to 7 C.F.R. § 1b.4, has found that certain "agencies and agency units," including FSIS, "conduct programs and activities that have been found to have no individual or cumulative effect on the human environment."  Thus, FSIS is "excluded from the requirements of preparing procedures to implement NEPA" and its actions are "categorically excluded from the preparation of an EA or EIS unless the agency determines that an action may have a significant environmental effect."  7 C.F.R. § 1b.4.

Pursuant to 7 C.F.R. § 1b.3(c), agencies that have been categorically excluded from having to prepare an EIS or an EA "shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion," and the "agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action." Id.

**B.      Federal Meat Inspection Act**

FMIA "regulates the inspection, handling, and slaughter of livestock for human consumption," Nat'l Meat Ass'n v. Harris, __ U.S.__, 132 S.Ct. 965, 968 (2012), and "applies to all slaughterhouses producing meat for interstate and foreign commerce," id. at 968 n.1(citing 21 U.S.C. § 601(a),(h)).

The FSIS is responsible for administering the FMIA and for "promot[ing] its dual goals of safe meat and humane slaughter." Harris, 132 S.Ct. at 968.

**III.     DISCUSSION**

16

Plaintiffs challenge both the FSIS Directive and the grants of inspection issued to Valley Meat and Responsible Transportation.  The Court will address each of these challenges in turn.

A.      *FSIS Directive 6130.1*

FSIS "directives are instructions written to FSIS employees to implement the USDA's policies and procedures."  FPL Food, LLC v. U. S. Dept. of Agric., 671 F.Supp. 2d 1339, 1344 (S.D. Ga. 2009).  In this case, the FSIS's Directive contains information regarding the specific conditions that must be satisfied before a grant of inspection can be issued, how to ensure the humane handling of equines, how to conduct the ante-mortem and post-mortem inspection of equines, and how to conduct the drug residue testing of equines. [Doc. 22-3] The Directive explicitly sets forth the rules and regulations governing the ante-mortem and post-mortem inspection of equines, humane handling, and drug residue testing. [Doc. 22-3]  It outlines the process by which inspection program personnel (IPP) are to select equines for random drug residue testing and the procedure for submitting residue samples and reporting violations. [Doc. 22-3] Pursuant to the Directive, the Public Health Veterinarian (PHV) "is to make final disposition on the carcass and parts and take any necessary regulatory actions based on the results." [Doc. 22-3 at 9]  Any equine that tests positive for drug residues must be condemned and destroyed and regulatory action may be instituted.  [Doc. 22-3 at 9]

Plaintiffs contend that FSIS's adoption of the Directive is "final agency action" and violates the APA and NEPA because Federal Defendants failed to conduct an EA or

EIS prior to adopting or implementing the Directive. [Doc. 54 at 3] Plaintiffs further contend that the fact that the USDA incorporated the Directive into its Categorical Exclusion memos and expressly relied on the Directive in its decision to issue the grants of inspection, demonstrates that the Directive contains the "FSIS's final statement regarding drug residue testing in equines." [Doc. 170 at 39] Both Plaintiffs and Intervenor-Plaintiff assert that the Directive constitutes a new agency plan, policy, or procedure, as defined by the CEQ regulations, that amounts to major federal action that may have a significant effect on the human environment and, therefore, the FSIS was required to prepare an EA or EIS. [Doc. 170 at 40-41]

In response, Defendants assert that the FSIS Directive does not constitute final agency action, and therefore that Plaintiffs' challenge to the Directive is without merit. [Doc. 185 at 29; Doc. 183 at 44]  Defendant-Intervenors further contend that because the question regarding what constitutes final agency action is to be approached pragmatically, the Directive cannot be viewed as a consummation of the Agency's decision making process.  [Doc. 183 at 45]  Alternatively, Federal Defendants argue that even if the Directive does constitute final agency action, it is not the legally relevant cause of any alleged harm to the environment and that the environmental effects alleged by Plaintiffs are the result of horse slaughter operations, not the Directive  and, therefore, the Directive does not trigger a NEPA review.  [Doc. 185 at 29]

*1. Final Agency Action*

18

As discussed below, review under the APA is limited to final agency action.  See 5 U.S.C. § 704.  Agency action is considered final if it "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett, 520 U.S. at 177-78 (internal quotation marks and citations omitted).  As the United States Court of Appeals for the District of Columbia observed in Munsell v. Dept. of Agriculture, 509 F.3d 572, 586 (D.C. Cir. 2007), "[i]t is not altogether clear whether" a FSIS directive "reflects a final agency rule that is subject to judicial review . . . or a nonreviewable policy statement."  Id. (declining to decide whether an FSIS Directive constitutes final agency action).

Defendant-Intervenors rely on Lujan v. National Wildlife Federation, 497 U.S. 871 (1990), to support their assertion that the Plaintiffs and Plaintiff-Intervenor's challenge of the drug residue program contained in the Directive is not a discrete, identifiable action or decision and is nothing more than the type of broad generalized challenge that is expressly  precluded by Lujan.  [Doc. 183 at 41,43]

In Lujan, the United States Supreme Court held that the Bureau of Land Management's "so-called 'land withdrawal review program'" did not constitute "'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704" because

> [t]he term 'land withdrawal review program' (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM

orders and regulations. It is simply the name by which petitioners have
occasionally referred to the continuing (and thus constantly changing)
operations of the BLM in reviewing withdrawal revocation applications and
the classifications of public lands and developing land use plans as required
by the FLPMA. It is no more an identifiable 'agency action'—much less a
'final agency action'—than a 'weapons procurement program' of the
Department of Defense or a 'drug interdiction program' of the Drug
Enforcement Administration. As the District Court explained, the 'land
withdrawal review program' extends to, currently at least, '1250 or so
individual classification terminations and withdrawal revocations.'

Id. at 890.  Unlike the broad ongoing national program challenged in Lujan, the FSIS

Directive is an identifiable action or event, i.e., it is a discrete directive adopted by FSIS

on a specific date, June 28, 2013, for a specific purpose.  Accordingly, Lujan does not

support Defendant-Intervenors' argument.

Defendants also rely on Schweiker v. Hansen, 450 U.S. 785 (1981) and W. Radio

Services Co., Inc. v. Espy, 79 F.3d 896 (9th Cir. 1996), to support their contention that

the Directive is an internal agency document that is not binding on the agency, nor legally

enforceable in court. [Doc. 66 at 28; Doc. 183 at 33]  However, these cases do not address

the issue of "final agency action" under the APA and, therefore, are distinguishable.  See

Schweiker, 450 U.S. at 789 (holding that the Social Security Administration (SSA) was

not estopped from denying retroactive benefits, even though the plaintiff had been

advised, in violation of the SSA's Claims Manual and internal Administration handbook,

that she was ineligible for such benefits); W. Radio Services Co., Inc., 79 F.3d at 901

(holding that the Forest Service's issuance of a special use permit was not arbitrary and

capricious, despite alleged violations of the guidelines in the Service's Manual and

Handbook, because the Manual and Handbook are not a binding limitation on the Service's authority).

Because the Directive appears to be FSIS's final statement regarding drug residue testing in equines and because the policy was drafted to address the public health concerns posed by "the potential chemical residues from drugs not previously approved for use in all food animals including equine," [Doc. 22-3 at 7] the Court concludes that the Directive constitutes final agency action from which legal consequences flow. Moreover, in the grants of inspection issued to Valley Meat and Responsible Transportation, FSIS relied on the Directive to conclude that the risk to public health posed by commercial horse slaughter is not significant.  Accordingly, the Directive satisfies the statutory definition of "final agency action" under the APA.

2.      *FSIS Directive 6130.1 is Excluded from the Requirement of an EIS and/or EA under NEPA*

Plaintiffs assert that the Federal Defendants acted arbitrarily and capriciously, or not in accordance with the law, in violation of the APA when they adopted FSIS Directive 6130.1 and established a new drug residue testing program.  [Doc. 170 at 12] They contend that Federal Defendants failed to comply with NEPA when adopting the Directive because they failed to prepare an EIS, an EA, or invoke a CE.  [Doc. 170 at 12] Defendants contend that the adoption of Directive is not an action that would trigger any obligation under NEPA.  [Doc. 183 at 54, 185 at 30]  The Court agrees.

21

The USDA adopted regulations to supplement the CEQ regulations governing the implementation of the NEPA.  See 7 C.F. R. § 1b.1.  In those regulations, the USDA categorically excluded certain actions, as well as certain agencies that "conduct programs and activities that have been found to have no individual or cumulative effect on the human environment."  7 C.F. R. §§ 1b.3, 1b.4.[2]  The USDA agencies and agency units, such as the FSIS, that are listed in 7 C.F.R. § 1b.4, "are excluded from the requirements of preparing procedures to implement NEPA . . . [and] are "categorically excluded from the preparation of an EA or EIS unless the agency determines that an action may have a significant environmental effect."  7 C.F.R. § 1b.4.  Although Section 1b.4 categorically excludes agencies from the requirements of NEPA, unless the agency determines that an action may have a significant environmental effect, Section 1b.3(c) places an obligation on the excluded agencies to examine whether the activities taken by the agency should be categorically excluded.  Section 1b.3(c) provides:

> Notwithstanding the exclusions listed in paragraphs (a) of this section and § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. *Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion*.

Reading Section 1b.4 in conjunction with Section 1b.3(c), the Court concludes that the regulations exclude FSIS from the requirements of NEPA, i.e. the preparation of an

---

[2]  The Court understands "activity" to be broader than an individual "action."  For example, an "activity" is the granting of inspections.  An "action" is the issuance of a specific grant of inspection.

EA, EIS, but place an affirmative duty on the agency to "continue to scrutinize [its] activities to determine continued eligibility for categorical exclusion." 7 C.F.R. § 1b.3 (c). The Court further concludes that FSIS did not have an affirmative obligation to expressly invoke a categorical exclusion for the Directive in the present case.

NEPA's CEQ regulations "instruct agencies to identify . . . categorical exclusions or CEs, which normally do not individually or cumulatively have a significant effect on the human environment and [which] are excluded from further NEPA review."  Aquifer Guardians in Urban Areas v. Fed. Highway Admin, 779 F.Supp.2d 542, 563 (W.D. Tex 2011) (internal quotation marks omitted) (quoting 23 C.F.R. § 771.115(b); see 40 C.F.R. § 1507.3(b)(2), 40 C.F.R. § 1508.4).  "Establishing and using CEs can reduce excessive paperwork by eliminating unnecessary preparation of environmental impact statements." Aquifer Guardians, 779 F.Supp.2d at 563; see 40 C.F.R. § 1500.1(c).  Because USDA determined that the FSIS was categorically excluded from NEPA procedures unless the agency determined that an action may have a significant environmental effect, the Court concludes that FSIS does not have an obligation to affirmatively invoke a categorical exclusion before taking any action.

The Parties have pointed to only one case, Humane Society of the United States v. Johanns, that has examined NEPA obligations in the context of horse slaughter and 7 C.F.R. § 1b.4. Johanns, 520 F.Supp 2d 8, 11 (D.C. Cir. 2007).  In Johanns, the Humane Society of the United States (HSUS) alleged that  the United States violated NEPA and the CEQ's implementing regulations when it created a fee-for-service ante-mortem horse

slaughter inspection system without first conducting an environmental review under NEPA. 520 F.Supp 2d at 11.  The Johanns court agreed with HSUS and found the interim-final rule to be a violation of NEPA and APA.  "At the time [HSUS] filed their [c]omplaint, horses were slaughtered at three different facilities in the United States to provide horse meat for human consumption abroad and for use in zoos and research facilities domestically."  Id. at 12.  After Congress' amendment to the 2006 Agriculture Appropriations Act, which prevented any funds made available in the Act from being used to pay the salaries and expenses associated with  horse slaughtering under 21 U.S.C. § 603, the FSIS amended "the Federal Meat Inspection regulations to provide for a voluntary fee-for-service program under which official establishments will be apply to apply for and pay for ante-mortem inspection."  Johanns, 520 F.Supp 2d at 12-13.

	The Johanns court, in examining whether a violation of NEPA had occurred, noted that although the adoption of the interim-final rule was clearly major federal action, "some environmental effect must be caused by the [interim-rule]for it to come within the rubric of NEPA."  Johanns, 520 F.Supp 2d at 22.  The court explained that "[t]here is a major federal action subject to NEPA review when an agency makes a decision which permits action by other parties which will affect the quality of the human environment." Johanns, 520 F.Supp 2d at 22-23.  Whether the major federal action caused the environmental effect, requires examining whether the major federal action was the "'legally relevant cause' of the effect."  Johanns, 520 F.Supp 2d. at 22-23.  The Johanns court looked to Department of Transportation v. Public Citizen, 541 U.S. 752 (2004), for

guidance in how to determine whether major federal action caused the environmental

effect, Johanns, 520 F.Supp 2d. at 22-23.

In Public Citizen, the United States Supreme Court held that "where an agency has

no ability to prevent a certain effect due to its limited statutory authority over the relevant

actions, the agency cannot be considered the legally relevant cause of the effect . . . [and]

need not consider the effects in its EA when determining whether its action is a 'major

federal action.'" Id. at 770.  The Johanns court distinguished Public Citizen, where the

Court concluded that the FMCSA lacked any discretion not to act, from its case by

emphasizing the discretion surrounding the promulgation of the interim-rule.  Johanns,

520 F.Supp 2d at 27.  The Johanns court held that the interim-rule was the legally relevant

cause of the environmental effects of the horse slaughter facilities.  Johanns, 520 F.Supp

2d at 27.

Here, the challenged action, i.e. adoption of the Directive and drug residue

program, is not the legally relevant cause of the environmental effects of horse slaughter.

Although the Directive contains information regarding conditions that determine whether

a grant of inspection may be issued, the Directive's main focus is to inform FSIS

employees how to conduct an inspection once a grant of inspection is already issued.

Moreover, to the extent the Directive contains information regarding the conditions to

grant inspection, FSIS's role in the process is akin to FMCSA's activity in Public Citizen,

which was deemed not to be the legally relevant cause of the pollution.

Plaintiffs further assert that Federal Defendant's violated NEPA by not expressly invoking a categorical exclusion.  The Court concludes that 7 C.F.R. § 1b.4 does not require FSIS to affirmatively invoke a categorical exclusion for its actions because the USDA has pre-determined that FSIS as a whole is categorically excluded from further compliance with NEPA procedures.  Furthermore, although the agency head has a continuing duty to scrutinize its activities to ascertain if the categorical exclusion should still apply, see 7 C.F.R. § 1b.3, the record indicates that FSIS complied with that obligation.  The Court views the Directive and the drug residue program to be evidence of FSIS's compliance with Section 1b.3(c).  Therefore, reading 7 C.F.R. § 1b.4 in conjunction with 7C.F.R. § 1b.3, the Court concludes that FSIS complied with the relevant regulations.

B.      *Grants of Inspection*

Plaintiffs and Intervenor-Plaintiff assert that "Federal Defendants were required to prepare at least an EA for their grants of inspection to Valley Meat and Responsible Transportation because the issuance of the grants of inspection are major federal actions that may have a significant effect on the human environment."  [Doc. 170 at 43; Doc. 172 at 16]  Plaintiffs contend that by failing to prepare an EA or an EIS prior to issuing the grants of inspection to Valley Meat and Responsible Transportation, Federal Defendants violated NEPA and the APA.  [Id.]

Defendants respond by asserting that the issuance of grants of inspection are mandatory actions and are not subject to the procedural requirements of NEPA.  [Doc.

185 at 33; Doc. 183 at 57]  They contend that although FSIS prepared a CE decisional

memorandum discussing the issuance of grants of inspection to Valley Meat, Responsible

Transportation, and Rains Natural Meats, it did not believe NEPA was applicable to those

actions and did not believe such documentation was required.  [Doc. 185 at 34; Doc. 183

at 57]  Defendants further assert that even if the grants of inspection were subject to

NEPA, the categorical exclusion was properly applied insofar as the agency engaged in

careful consideration of the potential effects of its action, and concluded that a categorical

exclusion was appropriate.  [Doc. 183 at 62]

1.      *NEPA Does Not Apply to FSIS' Grants of Inspection*

NEPA applies only to discretionary agency actions, not to ministerial or mandatory

actions."  Nevada v. U.S., 221 F.Supp. 2d 1241, 1247 (D.Nev. 2002); see  Sac & Fox

Nation of Mo. v. Norton, 240 F.3d 1250, 1262 (10th Cir. 2001) (providing that "NEPA

compliance is unnecessary where the agency action at issue involves little or no discretion

on the part of the agency").  Defendants assert that because the decision to issue a grant of

inspection is mandatory, NEPA does not apply. [Doc. 185 at 37, 43; Doc.183 at 56]  The

Court agrees.

"Several [district and circuit courts] have held that NEPA compliance is

unnecessary where the agency action at issue involves little or no discretion on the part of

the agency."  Norton, 240 F.3d at 1262.  Because the "primary purpose of the impact

statement is to aid agency decisionmaking, courts have indicated that nondiscretionary

acts should be exempt from the [NEPA's procedural] requirement."  Goos, 911 F.2d at

1296.  Therefore, "[m]inisterial acts . . . have generally been held outside the ambit of NEPA's EIS requirement."  Id. (alterations in original).

In Nevada v.United States, the state alleged  that the United States had failed to comply with NEPA. 221 F.Supp. 2d at 1241.  The court explained that "NEPA applies to the action of federal agencies, and requires the preparation of an EIS when a federal agency engages in a major federal action that significantly affects the quality of the human environment."  Id. at 1247.  The court, however, noted that "NEPA applies only to discretionary agency actions, not to ministerial or mandatory actions."  Id.  Therefore, because the government's action was mandatory, the court concluded that NEPA was not triggered.

Our Tenth Circuit has reached the same conclusion when determining whether NEPA applies to a ministerial or mandatory action.  In Sac & Fox Nation of Missouri v. Norton, the plaintiffs asserted that the secretary "violated the APA by determining it was unnecessary for the agency to comply with [NEPA]."  240 F.3d at 1262.  The secretary responded by asserting that "NEPA analysis was unnecessary due to the mandatory nature of the [land] acquisition."  Id. at 1262. In examining whether NEPA was triggered, the court determined that "NEPA compliance is unnecessary where the agency action at issue involves little or no discretion on the part of the agency."  Id. at 1262.

In Department of Transportation v. Public Citizen (cited earlier), the United States Supreme Court held that because the Federal Motor Carrier Safety Administration (FMCSA) had limited discretion regarding motor vehicle carrier registration, NEPA did

not require it to evaluate the environmental effects of such operations.  541 U.S. at 768.

In reaching this conclusion the Court discussed that the FMCSA was required to "grant

registration to all domestic or foreign motor carriers that are willing and able to comply

with the applicable safety, fitness, and financial-responsibility requirements"  Public

Citizen, 541 U.S. at 758-59 (citing 49 U.S.C. § 13902(a)(1)).  Section 13902(a)(1)

provides that "[e]xcept as otherwise provided in this section, the Secretary of

Transportation shall register a person to provide transportation . . . as a motor carrier

using self-propelled vehicles the motor carrier owns, rents, or leases only if the Secretary

determines that the person" is willing and able to comply with the six requirements listed

in subsection (A).  See 49 U.S.C. § 13902(a)(1).  The Court noted that under a reasonable

reading of Section 13902(a)(1), FMCSA must "certify any motor carrier that can show

that it is willing and able to comply with the various substantive requirements for safety

and financial responsibility contained in the [Department of Transportation] regulations. .

.." Public Citizen, 541 U.S. at 766.  The Court, therefore, concluded that because

FMCSA "has no statutory authority to impose or enforce emissions controls or to

establish environmental requirements unrelated to motor carrier safety," Public Citizen,

541 U.S. at 758-59, the FMCSA "lacks the power to act on whatever information might

be contained in the EIS," Public Citizen, 541 U.S. at 768.  The Court discussed that if an

agency's action is mandatory, the preparation of an EIS serves 'no purpose' in light of

NEPA's regulatory scheme as a whole.  Public Citizen, 541 U.S. at 767.  Because the

preparation of an EIS would be futile, FMCSA did not violate NEPA or the

accompanying regulations by failing to consider environmental effects, <u>Public Citizen</u>,

541 U.S. at 768 ("It would not. . .satisfy NEPA's 'rule of reason' to require an agency to

prepare a full EIS due to the environmental impact of an action it could not refuse to

perform.").

2.    *The Code of Federal Regulations Lend Further Support to the Court's Conclusion*
      *that the Decision to Issue Grants of Inspection is Mandatory.*

In examining the Code of Federal Regulations, the Court is further persuaded that

the grants of inspection are mandatory. The Code of Federal Regulations, 9 C.F.R. §

304.3, outlines the conditions for receiving grants of inspection, and provides:

> (a) Before being granted Federal inspection, an establishment must have
> developed written sanitation Standard Operating Procedures [SOP], as
> required by part 416 of this chapter, and written recall procedures as
> required by part 418 of this chapter.
>
> (b) Before being granted Federal inspection, an establishment shall have
> conducted a hazard analysis and developed and validated a HACCP plan, as
> required by §§ 417.2 and 417.4 of this chapter. A conditional grant of
> inspection shall be issued for a period not to exceed 90 days, during which
> period the establishment must validate its HACCP plan.
>
> (c) Before producing new product for distribution in commerce, an
> establishment shall have conducted a hazard analysis and developed a
> HACCP plan applicable to that product in accordance with § 417.2 of this
> chapter. During a period not to exceed 90 days after the date the new
> product is produced for distribution in commerce, the establishment shall
> validate its HACCP plan, in accordance with § 417.4 of this chapter.

The grant or refusal of inspection is governed by 9 C.F.R. § 304.2(b), which

provides:

> The Administrator is authorized to grant inspection upon his [or her]
> determination that the applicant and the establishment are eligible therefor

and to refuse to grant inspection at any establishment if he [or she] determines that it does not meet the requirements of this part or the regulations in Parts 305, 307, and Part 416, §§ 416.1 through 416.6 of this chapter or that the applicant has not received approval of labeling and containers to be used at the establishment as required by the regulations in Parts 316 and 317.  Any application for inspection may be refused in accordance with the rules of practice in part 500 of this chapter.

9 C.F.R. § 304.2(b).  Part 500 of Chapter III is titled "Rules of Practice" and governs

various actions that the FSIS may take, including the withdrawal of a grant of inspection,

notification of appeals, withholding of actions with and without notice, and the refusal to

issue a grant of inspection, see 9 C.F.R. § 500.7.  "Refusal to grant inspection," 9 C.F.R.§

500.7, lists the instances in which the FSIS may refuse to grant Federal inspection., and

provides

> (a) The FSIS Administrator may refuse to grant Federal inspection because an applicant:
>
> > (1) Does not have a HACCP plan as required by part 417 of this chapter;
> > (2) Does not have Sanitation Standard Operating Procedures as required by part 416 of this chapter;
> > (3) Has not demonstrated that adequate sanitary conditions exist in the establishment as required by part 308 or part 381, subpart H, and part 416 of this chapter;
> > (4) Has not demonstrated that livestock will be handled and slaughtered humanely; or
> > (5) Is unfit to engage in any business requiring inspection as specified in section 401 of the FMIA or section 18(a) of the PPIA.
>
> (b) If the Administrator refuses to grant inspection, the applicant will be provided the opportunity for a hearing in accordance with the Uniform Rules of Practice, 7 CFR Subtitle A, part 1, subpart H.

These regulations, read in conjunction with FMIA, 21 U.S.C. § 601 *et seq*., indicate that

FSIS, much like the FMCSA in Public Citizen, has little to no discretion regarding

whether to issue a grant of inspection. For example, the inspection of meat and meat food

products is governed by FMIA, 21 U.S.C. Section 603(a) and provides:

> For the purpose of preventing the use in commerce of meat and meat food
> products which are adulterated, the Secretary shall cause to be made, by
> inspectors appointed for that purpose, an examination and inspection of all
> amenable species before they shall be allowed to enter into any
> slaughtering, packing, meat-canning, rendering, or similar establishment, in
> which they are to be slaughtered and the meat and meat food products
> thereof are to be used in commerce; and all amenable species found on such
> inspection to show symptoms of disease shall be set apart and slaughtered
> separately from all other amenable species, and when so slaughtered the
> carcasses of said amenable species shall be subject to a careful examination
> and inspection, all as provided by the rules and regulations to be prescribed
> by the Secretary, as provided for in this subchapter.

21 U.S.C. § 603(a).

Furthermore, Federal Defendants are correct that the House and Senate Reports for

the 1967 Amendments to the FMIA both indicate that 21 U.S.C. § 603(a), or Section 3, of

FMIA was amended so as to remove discretion from the Secretary.  [Doc. 185 at 36]  The

Amendments replaced the language "the Secretary of Agriculture, *at his discretion, may*

provide inspectors," with "the Secretary *shall*' provide such inspectors."  [Doc. 185-1].

Moreover, the House Report specifically states that this amendment "[m]akes ante

mortem inspection mandatory rather than permissive."  [Doc. 185-1]  Therefore, because

NEPA applies only to discretionary agency actions, [and] not to ministerial or mandatory

actions," Nevada, 221 F.Supp. 2d at 1247, the Court concludes that NEPA does not apply

to grants of inspection.  Therefore, the Court concludes that the grants of inspection were properly issued.

## III.    CONCLUSION

Based upon the review of the Administrative Record and in consideration of the applicable law, the Court concludes that the FSIS Directive 6130.1 and drug residue program did not require the agency to prepare an EIS, or EA, or affirmatively invoke a categorical exclusion under NEPA. Furthermore, the Court concludes that the issuing of a grant of inspection is a mandatory act not subject to NEPA review.

**IT IS THEREFORE HEREBY ORDERED AND DECLARED** that Plaintiffs' request for a permanent injunction is hereby **DENIED**.  In accordance with this ruling, the agency action challenged in Plaintiffs' *First Amended Complaint for Declaratory and Injunctive Relief* [Doc. 54] is **AFFIRMED** and all claims asserted in Plaintiffs' *First Amended Complaint for Declaratory and Injunctive Relief* [Doc. 54] are **DISMISSED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE**.

**SO ORDERED** this 1st day of November, 2013, in Albuquerque, New Mexico.


_____
M. CHRISTINA ARMIJO
Chief United States District Judge