UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| FRONT RANGE EQUINE RESCUE, et al., | Civil No. 1:13-CV-00639-MCA-RHS |
|      Plaintiffs, | |
| and | |
| STATE OF NEW MEXICO, | |
|      Plaintiff-Intervenor, | |
| v. | |
| TOM VILSACK, et al., | |
|      Defendants, | |
| and | |
| RESPONSIBLE TRANSPORTATION, LLC, et al., | |
|      Defendants-Intervenors. | |

**PLAINTIFFS' RESPONSE TO RESPONSIBLE TRANSPORTATION'S AND
VALLEY MEAT'S MOTIONS TO COLLECT ON INJUNCTION BOND[1]**

| | | |
|---|---|---|
| Bruce A. Wagman | Ari Biernoff | Brian Egolf |
| Schiff Hardin LLP | Office of the Attorney General | Egolf+Ferlic+Day, LLC |
| One Market, Spear Tower, 32nd Floor | P.O. Drawer 1508 | 128 Grant Avenue |
| San Francisco, CA 94105 | 408 Galisteo Street | Santa Fe, NM 87501 |
| 415-901-8700 | Santa Fe, NM 87504-1508 | 505-986-9641 |
| | 505-827-6086 | |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiff-Intervenor State of New Mexico* | *Attorneys for Plaintiff Foundation to Protect New Mexico Wildlife* |

---

[1] Pursuant to a ruling by this Court, ECF No. 218, Plaintiffs and Plaintiff-Intervenor the State of New Mexico are filing this consolidated response to the motions of Responsible Transportation and Valley Meat, ECF Nos. 213 & 215.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PROCEDURAL HISTORY ................................................................................. 1

II.   ARGUMENT ................................................................................................... 3

      A.    The Motions to Collect on the Security Bond Are Premature ............................. 3

            1.    This Court Lacks Jurisdiction to Act on the Motions Until the
                  Appeal Has Concluded ................................................................ 3

            2.    Prior to Collecting on the Bond, RT and VM Must Show That
                  They Were "Wrongfully Enjoined." ................................................ 5

            3.    Judicial Economy Is Best Served by Deferral of the Motions.................. 7

      B.    Should the Court Proceed to Hear the Motions and Consider Allowing
            Defendants to Recover on the Bonds, Plaintiffs Are Entitled to Discovery
            and an Evidentiary Hearing ........................................................... 8

            1.    RT's and VM's Purported Damages Are Speculative ........................... 11

            2.    VM's and RT's Purported Damages Were Not Caused by the
                  Injunction ............................................................................ 12

            3.    Any Purported Damages Must Be Reduced for RT's and VM's
                  Failure to Mitigate.................................................................. 15

III.  CONCLUSION ............................................................................................... 17

## TABLE OF AUTHORITIES

<u>C</u>ASES

*Adolph Coors Co. v. A&S Wholesalers, Inc.*,
  561 F.2d 807 (10th Cir. 1977) ........................................................................... 9

*Anaconda Co. v. Ruckelshaus*,
  352 F. Supp. 697 (D. Colo. 1972) ..................................................................... 6

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  910 F.2d 1049 (2d Cir. 1990) .................................................................... 5, 6, 9

*Coyne-Delany Co. Inc v. Capital Dev. Bd. of Ill.*,
  717 F.2d 385 (7th Cir. 1983) ......................................................................... 9, 16

*December v. Utah Dept. of Corrections*,
  531 F. App'x 926 (10th Cir. 2013) .................................................................... 3

*Garcia v. Burlington Northern R. Co.*,
  818 F. 2d 713 (10th Cir. 1987) .......................................................................... 4

*Glaxo Group Ltd. v. Leavitt*,
  481 F. Supp. 2d 434 (D. Md. 2007) ................................................................. 10

*Global Naps, Inc. v. Verizon New England, Inc.*,
  489 F.3d 13 (1st Cir. 2007) ............................................................................. 5, 7

*Int'l Paper Co. v. Whitson*,
  595 F.2d 559 (10th Cir. 1979) ........................................................................ 3, 4

*Intercapital Debt Trading Ltd. V. Cantor Fitzgerald Inc.*,
  1996 WL 167820 (S.D.N.Y. 1996) .................................................................. 16

*Lancaster v. Indep. Sch. Dist. No. 5*,
  149 F.3d 1228 (10th Cir. 1998) .......................................................................... 4

*McKissick v. Yuen*,
  618 F.3d 1177 (10th Cir. 2010) .......................................................................... 4

*Miche Bag, LLC v. Thirty One Gifts LLC*,
  2011 WL 13803 (D. Utah Jan. 4, 2011) ............................................................ 6

*Monroe Div., Litton Bus. Systems, Inc. v. De Bari*,
  562 F.2d 30 (10th Cir. 1977) .............................................................................. 5

*Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*,
  532 F.3d 1063 (10th Cir. 2008) .......................................................................... 9

*Mountain Solutions, Inc. v. State Corp. Comm'n of Kan.*,
  982 F. Supp. 812 (D. Kan. 1997) ....................................................................... 7

*NE Airlines, Inc. v. Nationwide Charters & Conventions, Inc.*,
  413 F.2d 335 (1st Cir. 1969) ............................................................................... 7

<u>TABLE OF AUTHORITIES</u>

<b><u>Page</u></b>

*Nokia Corp. v. InterDigital, Inc.*,
  645 F.3d 553 (2d Cir. 2011)....................................................................... 9, 15, 17

*Northern Natural Gas Co. v. L.D. Drilling, Inc.*,
  759 F. Supp. 2d 1282 (D. Kan. 2010) ............................................................... 6

*Old Town Neighborhood Ass'n, Inc. v. Kauffman*,
  2004 WL 2278748 (S.D. Ind. Aug. 20, 2004) ................................................... 6

*Pabst Brewing Co., Inc. v. Corrao*,
  999 F. Supp. 1242 (E.D. Wis. 1998)................................................................. 7

*St. Mary of the Plains College v. Higher Education Loan Program of Kansas, Inc.*,
  1989 WL 159368 (D. Kan. Dec. 15, 1989)..................................................... 6, 9

*State of New Mexico v. Valley Meat Co., L.L.C.*,
  No. 101-2013-03197 (N.M. Dist. Ct., 1st Judicial Dist. Jan. 17, 2014) .......... 13

*Stewart v. Dongeres*,
  915 F.2d 572 (10th Cir. 1990) .......................................................................... 4

*U.S. v. Madrid*,
  633 F.3d 1222 (10th Cir. 2011) ..................................................................... 4, 5

*Virginia Plastics Co. v. Biostim Inc.*,
  820 F.2d 76 (3d. Cir. 1987)............................................................................... 9

*Warren v. Am. Bankers Ins. of Fla.*,
  507 F.3d 1239 (10th Cir. 2007) ........................................................................ 4

<small>**STATUTES**</small>

42 U.S.C. § 4321 ................................................................................................... 1

<small>**OTHER AUTHORITIES**</small>

Export Requirements for the European Union, EU-157 (Feb 28, 2014), *available at*
  http://www.fsis.usda.gov/wps/portal/fsis/topics/international-affairs/exporting-
  products/export-library-requirements-by-country/European-Union................................ 15

Hearing Officer's Report, *In Re Application of Valley Meat Company for Ground Water*
  *Discharge Permit Renewal, DP-236*, No. GWB 13-05(P) at 36-37 (Jan. 7, 2014),
  *available at* http://equinewelfarealliance.org/uploads/NM_Hearing_Officer_s_Report.pdf
  ................................................................................................................................. 12

U.S. Food and Drug Administration Warning Letter, Three L Farm 12/19/13, No. NYK-2014-14,
  *available at*
  http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2013/ucm379652.htm.
  ................................................................................................................................. 14

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

<u>**R**ULES</u>

Fed. R. Civ. P. 65(c) .................................................................................................................... 5

Plaintiff-Appellants Front Range Equine Rescue *et al*. and Plaintiff-Intervenor-Appellant the State of New Mexico (collectively, "Plaintiffs") hereby oppose Defendant-Intervenors Responsible Transportation's ("RT") and Valley Meat's ("VM") separate motions (the "Motions") to recover on the injunction bonds posted in this case.  Because Plaintiffs' appeal of this Court's judgment is currently pending before the Tenth Circuit Court of Appeals, No. 13-2187, the Motions are untimely and this Court presently lacks jurisdiction to rule on them. Likewise, because there is a pending appeal, there has been no final resolution of the case, and consequently, no determination can be made that RT or VM have been "wrongfully enjoined" within the meaning of Rule 65(c) of the Federal Rules of Civil Procedure ("Rule 65(c)"). Therefore, the Motions should be denied without prejudice to re-filing at the appropriate time. Should the Court nonetheless decide to entertain these Motions now, Plaintiffs respectfully request that they first be given the opportunity to conduct appropriate discovery on the factual issues presented, and that the Court hold an evidentiary hearing to determine the various issues upon which a final determination on the bonds relies.

## I.  PROCEDURAL HISTORY

Plaintiffs filed this action against Defendant-Secretary of the United States Department of Agriculture ("USDA"), Tom Vilsack, and two other officials of USDA, seeking injunctive relief to prevent the irreparable harm that would result from the commencement of USDA-authorized commercial horse slaughter operations without the review required under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA").  *See* Motion for TRO, July 2, 2013, ECF No. 5.  After a hearing on Plaintiffs' motion for a TRO, this Court enjoined USDA from providing horse slaughter inspection services to RT and VM.  Order, Aug. 2, 2013, ECF

No. 94.  The Court also enjoined RT and VM from engaging in commercial horse slaughter operations.  *Id.*

Subsequently, the Court referred RT's and VM's request for a Rule 65(c) injunction bond to Magistrate Judge Scott, who held a telephone conference regarding the bond requests, *see* Minutes of Proceeding, Aug. 5, 2013, ECF No. 98 ("Bond Conference Minutes"), held a non-evidentiary hearing on August 8, 2013, ECF No. 97, 101, and thereafter ordered Plaintiffs to post a $60,000 bond with respect to RT and a $435,000 bond with respect to VM, for the time period of August 5, 2013 to September 1, 2013, *see* Order Requiring Injunction Bond, Aug. 8, 2013, ECF No. 102.  Shortly thereafter, Plaintiffs filed a motion requesting that this Court modify its TRO and set aside the Bond Order.  *See* Mot. to Modify, Aug. 14, 2013, ECF No. 112 ("Motion to Modify").[2]  The Court ordered all parties to provide expedited responses to Plaintiffs' Motion to Modify, *see* Order, Aug. 15, 2013, ECF No. 113, but has not issued a ruling on the Motion to Modify.  Magistrate Judge Scott later ordered Plaintiffs, VM, and RT to file position letters regarding Plaintiffs' ability to post an additional injunction bond, *see* Order Requiring Position Letters, Sept. 11, 2013, ECF No. 151, but has not ruled on that issue.

In ruling on the merits, this Court later lifted the injunction.  *See* Order, Nov. 1, 2013, ECF No. 205 ("November 1 Order").  Plaintiffs immediately appealed.  *See* Notice of Appeal,

---

[2] In their Motion, Plaintiffs requested that this Court modify the TRO to clarify that USDA was the only party enjoined.  *See* Motion to Modify at 4 ("Because Plaintiffs only sued the federal defendants under the APA and only sought in their Complaint to obtain relief from the federal defendants – compliance with NEPA – and because only the federal defendants have obligations under NEPA, the Court had no jurisdiction to enjoin non-federal third parties VM and RT." (citations omitted)).  Plaintiffs also requested that this Court set aside Magistrate Judge Scott's Bond Order "because it failed to consider the well-established public interest exception, is based on highly speculative damage calculations, and did not address substantial evidence that both VM and RT can mitigate any alleged damages."  *Id.* at 6.

Nov. 1, 2013, ECF No. 206.  This case is now pending review on the merits before the Tenth Circuit.

## II.    ARGUMENT

### A.    The Motions to Collect on the Security Bond Are Premature.

The Court should dismiss without prejudice the Motions for three reasons.  First, the Court lacks jurisdiction to hear them until the Tenth Circuit rules on Plaintiffs' appeal.  Second, even if the Court had jurisdiction to rule on these Motions, RT and VM cannot collect on the bonds until they demonstrate that they were "wrongfully enjoined," which they cannot do until the Tenth Circuit rules on the merits of the case.  Third, a ruling on the substance of the Motions prior to a decision by the Tenth Circuit would be a waste of the Court's resources because a decision from the Tenth Circuit in Plaintiffs' favor would render the Motions irrelevant; such a ruling would mean that RT and VM had not been wrongfully enjoined, and therefore are not entitled to any recovery on the bonds.

### 1.    This Court Lacks Jurisdiction to Act on the Motions Until the Appeal Has Concluded.

A federal district court generally lacks jurisdiction over a matter that has been appealed. *See Int'l Paper Co. v. Whitson*, 595 F.2d 559, 561-62 (10th Cir. 1979) ("The filing of a timely and sufficient notice of appeal has the effect of immediately transferring jurisdiction from the district court to the court of appeals with respect to *any matters* involved in the appeal.  It divests the district court of authority to proceed further with respect to such matters . . . until the district court receives the mandate of the court of appeals." (emphasis added)); *see also December v. Utah Dept. of Corrections*, 531 F. App'x 926, 928 (10th Cir. 2013) (A "district court generally loses jurisdiction when notice of appeal is filed." (citing *Warren v. Am. Bankers Ins. of Fla.*, 507

F.3d 1239, 1242 (10th Cir. 2007)); *McKissick v. Yuen*, 618 F.3d 1177, 1196 (10th Cir. 2010) ("[T]he general rule is that, when a litigant files a notice of appeal, the district court loses jurisdiction over the case . . . ." (quoting *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1237 (10th Cir. 1998)).

While a case is pending on appeal, a district court may exercise jurisdiction only in very limited circumstances, including "to correct clerical mistakes" and aid in the "execution of a judgment that has not been superseded," *Int'l Paper*, 595 F.2d at 561-62, or to address "collateral matters not involved in the appeal." *Garcia v. Burlington Northern R. Co.*, 818 F. 2d 713, 721 (10th Cir. 1987). *See also Stewart v. Dongeres*, 915 F.2d 572, 575 n.3 (10th Cir. 1990) (explaining that a district court only retains jurisdiction over issues that are tangential to appeal). Courts have developed additional limited exceptions to the rule, permitting district courts to "address certain matters when judicial efficiency is thereby enhanced." *U.S. v. Madrid*, 633 F.3d 1222, 1226-27 (10th Cir. 2011) (listing the following limited exceptions: "ministerial matters in aid of appeal and matters tangential to the appeal," where the district court certifies that "the appeal is frivolous or forfeited," or to maintain the status quo).

Here, the Court lost jurisdiction on October 1, 2013 when Plaintiffs filed their notice of appeal, and none of the limited circumstances applies to reinstate jurisdiction. RT and VM have not requested that the Court correct a clerical error, nor is the issue of whether the movants are entitled to any recovery on the bond a collateral matter that is unrelated to the issues on appeal. On the contrary, as explained below, the issue of whether RT and VM are entitled to collect on the injunction bond is inextricably intertwined with the issues pending on appeal: whether USDA's actions were lawful and, therefore, whether the movants were "wrongfully enjoined."

Fed. R. Civ. P. 65(c). For the same reason, it is clear that proceeding at this time to hear RT's and VM's Motions to recover on the bond would not in any way enhance judicial efficiency. *See Madrid*, 633 F.3d at 1226-27. Indeed, judicial efficiency would be impaired if this Court were required to rule on a matter subsumed by the merits determination currently before the Tenth Circuit, and the propriety of this Court's prior determination is squarely before that court. Accordingly, this Court has no jurisdiction to hear RT's and VM's Motions at this time.

**2. Prior to Collecting on the Bond, RT and VM Must Show That They Were "Wrongfully Enjoined."**

Even if this Court had jurisdiction to decide these Motions (which it does not) because they fall within some exception to the general rule that trial courts lose jurisdiction over actions upon filing of the notice of appeal, it should decline to rule on the Motions pending the Court of Appeals' resolution of this matter. In order for this Court to decide whether RT and VM have been "wrongfully enjoined," and thus whether they are entitled to recover on the bond, it will be essential to consider the Tenth Circuit's decision on the merits of the appeal. *See* Fed. R. Civ. P. 65(c); *Monroe Div., Litton Bus. Systems, Inc. v. De Bari*, 562 F.2d 30, 32 (10th Cir. 1977) ("Rule 65(c) creates a cause of action for costs and damages incurred by an enjoined party by reason of a wrongful injunction."). For a party to have been wrongfully enjoined, there must be a final determination that the enjoined party "had a right *all along* to do what it was enjoined from doing." *Global Naps, Inc. v. Verizon New England, Inc*., 489 F.3d 13, 22 (1st Cir. 2007) (emphasis added). *See also Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 910 F.2d 1049, 1054 (2d Cir. 1990) ("The focus of the 'wrongfulness' inquiry is whether, in hindsight in light of the ultimate decision on the merits . . . the injunction should not have issued in the first instance."). As both *Global Naps* and *Blumenthal* confirm, the determination of whether a party

has been wrongfully enjoined requires (1) a final resolution on the merits in favor of the enjoined party *and* (2) a conclusion that party was wrongfully enjoined in the first instance.

Courts in the Tenth Circuit consistently require a final ruling on the merits before determining whether a party has been wrongfully enjoined.  *See Miche Bag, LLC v. Thirty One Gifts LLC*, 2011 WL 13803, at *1 (D. Utah Jan. 4, 2011) (unreported) ("Under federal case law interpreting Rule 65(c), a party is considered wrongfully enjoined 'if it is *ultimately* found that the enjoined party had at all times the right to do the enjoined act.'" (quoting *Blumenthal*, 910 F.2d at 1054) (emphasis added)); *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, 759 F. Supp. 2d 1282, 1303 (D. Kan. 2010) (same); *St. Mary of the Plains College v. Higher Education Loan Program of Kansas, Inc.*, 1989 WL 159368, at *2 (D. Kan. Dec. 15, 1989) (unreported) (holding that the final dismissal of plaintiff's complaint with prejudice, from which plaintiff did not appeal, was a prerequisite to the defendant collecting on the bond for damages sustained as a result of the injunction); *Anaconda Co. v. Ruckelshaus*, 352 F. Supp. 697, 715 (D. Colo. 1972), *rev'd on other grounds,* 482 F.2d 1301 (10th Cir. 1973) ("Should . . . an appellate court determine that this injunction has been wrongfully issued, defendants will be entitled to recover 'such costs and damages as may be incurred or suffered by any party' who was wrongfully enjoined."); *see also Old Town Neighborhood Ass'n, Inc. v. Kauffman*, 1:02 CV 1505 DFH, 2004 WL 2278748, at *5-6 (S.D. Ind. Aug. 20, 2004) (explaining that a defendant cannot show that it was wrongfully enjoined – and move to collect on an injunction bond – until after the district court's issuance of a final judgment and the conclusion of any appeal).  Just as it would have been erroneous for this Court to *release* the bond to Plaintiffs without cause had Plaintiffs prevailed on the merits and prior to allowing an appeal by Defendants to run its course, so would

it be erroneous for the Court to allow Defendants to attempt to *collect* on the bond after prevailing on the merits and prior to allowing Plaintiffs' appeal to run its course.  *See NE Airlines, Inc. v. Nationwide Charters & Conventions, Inc.*, 413 F.2d 335, 338 (1st Cir. 1969) (holding that the district court erred in releasing plaintiff's bond).

Because Plaintiffs' appeal of this matter is yet to be decided, there has been no final determination that RT and VM were "wrongfully enjoined," and that they in fact "had a right all along to do what [they were] enjoined from doing."  *See Global Naps, Inc.*, 489 F.3d at 22. Indeed, if the Tenth Circuit were to reverse this Court's ruling on the merits, and find that USDA had violated NEPA and lacked authority to provide horse slaughter inspection services to the slaughter facilities, then RT and VM almost certainly would not have been wrongfully enjoined. Accordingly, the Motions to recover on the injunction bond are premature and must await the Tenth Circuit's ruling (and any further appeals or proceedings prior to final judgment) in this matter.  *See Pabst Brewing Co., Inc. v. Corrao*, 999 F. Supp. 1242, 1244 (E.D. Wis. 1998) ("[I]n view of the possibility of reversal of the [district court's] decision and order . . . it would be inappropriate at this stage of the proceedings to order enforcement of the surety's liability under Rule 65.1. . . ."); *Global Naps, Inc.*, 489 F.3d at 23.

### 3.    Judicial Economy Is Best Served by Deferral of the Motions.

The district court is divested of jurisdiction pending appeal to prevent it from "ruling on issues over which appellate review is imminent," *Mountain Solutions, Inc. v. State Corp. Comm'n of Kan.*, 982 F. Supp. 812, 816 (D. Kan. 1997) (internal citations omitted), and thus to prevent a situation in which the district court may reach a decision that conflicts with a decision of the appellate court.  For example, should the Tenth Circuit reverse this Court and find that

Plaintiffs should have prevailed on the merits, and thus, that Defendants were at all times *lawfully* enjoined, there would be no possible basis for recovery on the bonds, and any work done in this Court on the issue of recovery under the bonds would be wasted.

Because RT's and VM's potential recovery on the bonds cannot be resolved without extensive efforts on the parts of the parties and the Court, judicial economy and efficiency mandate that the Motions be denied until such time as the issues are truly ripe.  As explained below, to resolve the Motions, the parties will need to engage in discovery concerning RT's and VM's allegations of loss and proof of damages, and the Court will need to conduct an evidentiary hearing so that Plaintiffs can challenge RT's and VM's assertions before being deprived of the posted bonds.  If Plaintiffs prevail on appeal, no discovery or evidentiary hearing will be required and all efforts to prove RT's and VM's claimed damages will be wasted.  Nor will there be any harm in waiting until the Court is certain these proceedings are required:  the bonds are in the custody of the Court, and thus there is no risk that the bonds will not be available for RT and VM to attempt to recover on their claims at the appropriate time.  Accordingly, the Motions should be denied without prejudice so they may be re-filed at the appropriate time.

> **B.**      **Should the Court Proceed to Hear the Motions and Consider Allowing Defendants to Recover on the Bonds, Plaintiffs Are Entitled to Discovery and an Evidentiary Hearing.**

In light of the above, the Motions to assess damages for a wrongful injunction in this case will be timely only if and when a *final* resolution *against* Plaintiffs has been reached.  Even in the event that the Defendants prevail in the final resolution of this case, or should the Court decide to proceed to hear the Motions at this time, VM and RT are "not automatically entitled to

the damages sought."  *See Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 559 (2d Cir. 2011).

Rather, before any possible recovery on the bonds, VM and RT must "*properly substantiate* the

damages" and "demonstrate that the damages sought were proximately caused by the wrongful

injunction."[3]  *Id.* (emphasis added).  *See also Coyne-Delany Co. Inc v. Capital Dev. Bd. of Ill.*,

717 F.2d 385, 392-93 (7th Cir. 1983) (instructing the district court to "consider and evaluate the

full range of factors . . . that would be relevant" to whether defendants were entitled to recover

on the injunction bond).

In assessing damages for wrongful enjoinment, due process requires this Court to afford

Plaintiffs an evidentiary hearing before depriving them of their property.  *See St. Mary of the

Plains College*, 1989 WL 159368, at *2 ("[T]he existence and amount of damages in a

proceeding under [Rule 65.1] is generally not capable of summary resolution of papers, without

an evidentiary hearing." (quoting *Virginia Plastics Co. v. Biostim Inc.*, 820 F.2d 76, 80 n.4 (3d.

Cir. 1987))).  In order to meaningfully prepare for such a hearing, Plaintiffs would need to take

appropriate discovery to determine whether the injunction actually caused Defendants' alleged

damages, and whether VM and RT can properly substantiate those damages.  *See Glaxo Group

---

[3] Moreover, contrary to what RT contends, the bond amount does serve as a cap on the damages
that RT may recover.  *Blumenthal*, 910 F.2d at 1056 ("Plaintiffs are entitled to damages as may
be shown to have been proximately caused by the injunction . . . *up to the amount of the bond*."
(emphasis added)); *Adolph Coors Co. v. A&S Wholesalers, Inc.*, 561 F.2d 807, 813 (10th Cir.
1977) ("[A]bsent proof of malice in obtaining injunctive relief, a party cannot be liable in
damages resulting from a wrongfully or erroneously granted injunction beyond the limits or
maximum amount of the bond or bonds."); *see also Morrison Knudsen Corp. v. Ground
Improvement Techniques, Inc*., 532 F.3d 1063, 1072 (10th Cir. 2008) (discussing liability on a
supersedeas bond:  "one of the most fundamental rules of suretyship [is that] except in limited
circumstances, a surety's liability cannot extend beyond the penal sum announced in the bond").
Here, there was no malice, nor does any other exception to the general rule apply.

*Ltd. v. Leavitt*, 481 F. Supp. 2d 434, 435 n.1 (D. Md. 2007) (ordering discovery on a bond claim even where defendant's "*prima facie* showing of damages in excess of the bond is compelling").

The current action is a perfect example of why pre-hearing discovery is a necessary component of the court's analysis of the potential for recovery on an injunction bond. VM and RT obtained the bonds at issue solely on the basis of declarations submitted to the Court, without documentary evidence supporting Defendants' conclusory declarations, without the declarants being subject to cross-examination and without any opportunity for Plaintiffs to submit evidence disproving the claimed damages. Indeed, in this case there are more unresolved than established facts concerning VM's and RT's damages allegations, due to (1) the entirely speculative projected business losses of two entities that have never even been in the business of slaughtering horses and selling the meat before, (2) the fact that VM has never had a valid wastewater discharge permit during the entire pendency of this action, (3) the fact that a New Mexico state court has ruled that VM would be in violation of multiple state laws if it operated its facility, and (4) an unequivocal statement by the United States Food and Drug Administration ("FDA") that "sending [pharmaceutically] treated horses to slaughter for human consumption is illegal," *see* Food and Drug Administration, Establishment Inspection Report, (Apr. 3, 2012) at 11 ("FDA Report"), attached hereto as Exhibit 1.[4] Neither VM nor RT has provided any record of profits, overhead, or other issues affecting their hypothetical businesses, and therefore the

---

[4] Through a Freedom of Information Act request, Plaintiffs received an Establishment Inspection Report that the FDA prepared concerning the inspection of a facility that was sending horses treated with veterinary drugs to slaughter. As discussed below, the report contains the FDA's determination that, among other things, "sending treated horses to slaughter for human consumption is illegal." FDA Report at 11.

parties must engage in discovery in order to flesh out the claims the companies are making with respect to the bonds.

**1.      RT's and VM's Purported Damages Are Speculative.**

Plaintiffs must be afforded discovery to test the validity of VM's and RT's asserted damages.  VM has provided only a self-serving affidavit to support its damages claim of $435,000 per month.  VM simply asserted for the first time at the bond hearing, and without any documentary support, that it intended to slaughter 121 horses per day and that it would reap revenues of $350 per horse.  De Los Santos Affidavit, ECF No. 56, Att. 2, ¶ 4.  It also asserted an unsupported net profit of $180-200 per horse, for an operation that VM has never engaged in, a type of business that has not occurred in New Mexico in recent history, and for which VM has provided no established basis for estimating profits and losses.  The bond amount set at that early stage in the case was nothing more than an untested guess, with the Court relying on unchallenged projections in setting the bond amount, even though it had evidence that VM had previously and repeatedly stated its intention to slaughter only 50 to 100 horses per day.  *See* Motion to Modify at 9.  Thus even the most basic assumptions (not to mention the finer details) about these operations must be examined before bond funds can appropriately be released.

Similarly, the only evidence that RT offers as proof of its $60,000 in damages for the one-month period covered by the bond is a declaration from the company president, who simply asserts losses and attributes them to the injunction, without *any* substantiating records, evidence, or explanation.  *See* Decl. of Keaton Walker, July 19, 2013, ECF No. 48, Ex. 1, at ¶ 17 ("RT . . . is spending approximately $60,000 a month in overhead expenses.").

When (if ever) VM and RT are entitled to a hearing on their alleged damages, a more cogent evidentiary analysis must be undertaken by the Court, and Plaintiffs must have the opportunity to challenge VM's and RT's asserted damages.  Plaintiffs need to take discovery to determine issues such as the actual operating capabilities of both facilities, whether VM and RT actually had entered into any contracts, and where they obtained figures for market value, profits, and losses of their planned horse slaughter operations.

> ### 2.     VM's and RT's Purported Damages Were Not Caused by the Injunction.

In addition to these basic and unanswered questions of market value, overhead, and capacity, Plaintiffs will also need to take discovery and present evidence to further illuminate whether, in fact, VM and RT would have been able to begin operations *at all* during the time covered by the injunction bonds.

With respect to VM, there is evidence that VM would not have been able to operate at all. At no time since 2010 has VM had a valid wastewater discharge permit, which New Mexico requires for it to discharge liquid waste.  *See* Hearing Officer's Report, *In Re Application of Valley Meat Company for Ground Water Discharge Permit Renewal, DP-236*, No. GWB 13-05(P)        at        36-37        (Jan.        7,        2014),        *available        at* http://equinewelfarealliance.org/uploads/NM_Hearing_Officer_s_Report.pdf.   Without such a permit, VM cannot legally operate a slaughterhouse.  Because VM has made claims to the contrary, Plaintiffs will need to depose its principals on this issue.  *See, e.g.*, Def. VM's Resp. to Mot. to Modify TRO, August 21, 2013, ECF No. 121 (asserting that VM "does not require a groundwater discharge permit to operate").  Additionally, a state court has ruled that VM's operation would be in violation of other New Mexico laws and that its operation would be

further barred on those grounds. *State of New Mexico v. Valley Meat Co., L.L.C.*, No. 101-2013-03197 (N.M. Dist. Ct., 1st Judicial Dist. Jan. 17, 2014) (order granting preliminary injunction). That court has expressly prohibited VM from "slaughtering horses for human consumption, . . . manufacturing, selling or distributing horse meat products for human consumption," and "discharging wastewater in any manner and under any theory. . . ." *Id*. at 11 (finding that if VM commenced operations it would be in violation of the New Mexico Food Act, Water Quality Act, and Unfair Practices Act, and common law public nuisance).

Consequently, VM would not have been able to able to operate its horse slaughter operation, regardless of whether an injunction had been issued by this Court. If VM claims it would still have proceeded in violation of state law, Plaintiffs must have the opportunity to take discovery from state officials and VM regarding the economic consequences of such action, since those consequences will directly impact VM's claimed damages. Only after that factual development has been completed can this Court adequately determine if this Court's injunction could possibly have caused any damages to VM.

Moreover, the FDA has expressly determined that the slaughter for human consumption of any horses treated with substances that are unapproved for use in food animals is illegal. FDA Report at 11 (stating that "sending treated horses to slaughter for human consumption is illegal"). Such unapproved substances include the widely used veterinary drugs Phenylbutazone and Clenbuterol, which are commonly used in racehorses, *see id.* at 10, as well as in other horses in this country who are not raised for food but are sent to slaughter when they are no longer useful to their owners, *see* Administrative Record at 94-147, 4034-47. The FDA has further made clear that if an animal comes from an industry where treatment with unapproved substances is

prevalent, then the animal cannot be sent to slaughter without knowledge that the animal has not been treated with such substances.  *See id.* at 11 (noting discussions with horse dealer that "if he knows that . . . horses are former racehorses and that racehorses are commonly treated with Clenburerol and Phenylbutazone, he is knowingly sending potentially treated horses to slaughter . . . [, which] is illegal").  In addition, the FDA routinely cites producers and dealers of food animals for selling an animal for slaughter without "maintain[ing] complete treatment records," which is also illegal.  *See, e.g.*, U.S. Food and Drug Administration Warning Letter, Three L Farm 12/19/13, No. NYK-2014-14, *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2013/ucm379652.htm.

Accordingly, because the vast majority of horses sent to slaughter would have been former race, leisure, or work horses and are highly likely to have been treated with unapproved substances, *see* Administrative Record at 125-47, 4034-47, and almost certainly are not maintained with complete treatment records, neither VM nor RT would have lawfully been able to slaughter and sell the meat from any horses unless they could affirmatively demonstrate that such horses were *not* treated with unapproved substances.  Plaintiffs must be entitled to take discovery to ascertain whether in fact VM and RT would have been able to make such demonstrations with respect to any horses that would have been slaughtered during the bond period.  In light of the FDA's determination, whether VM and RT would be able to make such demonstrations would have a direct bearing on whether they lawfully would have been able to sell any horsemeat at all and thus, again, whether it was the Court's TRO – or something else – that caused their damages.

Finally, while both VM and RT have stated that they intended to export horse meat outside of the United States,[5] American horse meat is currently *ineligible for export* to the European Union and other foreign countries, and was ineligible for export to the European Union throughout during the bond period.  *See, e.g.*, Export Requirements for the European Union, EU-157 (Feb 28, 2014), *available at* http://www.fsis.usda.gov/wps/portal/fsis/topics/international-affairs/exporting-products/export-library-requirements-by-country/European-Union ("[E]xport certification cannot be issued for equine products intended for export to the European Union."). In light of this, Plaintiffs need discovery to test whether VM and RT had concrete plans to export the horse meat to eligible countries during the period covered by the bonds, and if not, how they planned to overcome this clear hurdle.

Most likely none of the financial losses claimed by VM and RT were caused by this Court's injunction, because the facilities either would not have been able to start up at all due to other factors, or because there was no real market available for the horse meat.  Thus, if this Court decides to consider the Motions at this time, Plaintiffs must be given the opportunity to engage in discovery and present evidence to the Court at a hearing that would allow Plaintiffs to probe these issues to determine what damages, if any, are appropriate.

### 3.  Any Purported Damages Must Be Reduced for RT's and VM's Failure to Mitigate.

Furthermore, Plaintiffs are entitled to discovery on whether RT and VM took steps to mitigate their alleged damages.  *See Nokia Corp*., 645 F.3d at 559 (there is "[g]ood reason[ ] to

---

[5] *See* Bond Conference Minutes at 16 ("Valley Meat has Direct agreements with exporting companies."); Decl. of Keaton Walker, July 19, 2013, ECF No. 48, Ex. 1, ¶ 4 ("Responsible Transportation plans to sell the processed meat . . . outside the United States for human consumption.").

*deny recovery* of all or a portion of the alleged damages . . . [if] a party failed to mitigate them");

*Coyne-Delany Co. Inc v. Capital Dev. Bd. of Ill.*, 717 F.2d 385, 392 (7th Cir. 1983) ("A good

reason for not awarding such damages would be that the defendant had failed to mitigate

damages."); *Intercapital Debt Trading Ltd. V. Cantor Fitzgerald Inc.,* 1996 WL 167820, at *2

(S.D.N.Y. 1996) (unreported) (same) (quoting *Coyne-Delany*, 717 F.2d at 392).

      Given the uncertain prospect of beginning horse slaughter operations based on a variety

of factors, including the federal government's equivocation on the issue, RT and VM each had

ample notice and a duty to mitigate any potential damages that might arise from legal barriers to

their operation.  Yet, neither company included the mitigation consideration in their demands for

damages and a bond.  RT demonstrated its ability to mitigate its losses by preparing to slaughter

cows instead of horses while this Court's injunction was in effect.  RT's president, Keaton

Walker, announced soon after the injunction went into effect that he intended to cut his losses by

switching to the slaughter of cows, and explained that the reason for the switch to cattle was to

"get back to work."[6]  Subsequently, RT withdrew its application for federal horse slaughter

inspection and applied to become an approved cow slaughter operation.  *See* Application for

Federal Inspection, attached hereto as Exhibit 2 ("The company has requested the original

conditional grant award for equine slaughter to be amended by removing equine slaughter and

awarding a conditional grant for bovine slaughter.").  Plaintiffs must be allowed to take

---

[6] AP NewsBreak, *Iowa Plant Drops Horse-Slaughter Plan*, KTAR (Aug. 13, 2013, 2:53 p.m.),
*available at* http://ktar.com/23/1551455/APNewsBreak-Iowa-plant-drops-horseslaughter-plan
("Walker said the company decided to reapply for a federal permit, as a beef-only operation, the
day after U.S. District Judge Christina Armijo issued the temporary restraining order.  Walker
said his company, with 18 employees in southeast Iowa, should be able to switch within a
month.").

discovery to determine whether RT acted reasonably and expeditiously in its mitigation efforts, whether it did in fact resume cattle slaughter activities (or undertake other slaughter activities), and if so, how much of its purported losses were offset by such operations.

Similarly, VM could have processed cattle while this Court's injunction was in effect, as it did before it sought to enter the horse slaughter market, and it could have engaged in other business activities which would have reduced its purported (and insupportable) damages.  *See* Grant Schulte & Jeri Clausing, *APNewsBreak: Iowa Plant Drops Horse Slaughter Plan*, ABC News (Aug. 13, 2013), http://abcnews.go.com/US/wireStory/apnewsbreak-iowa-plant-drops-horse-slaughter-plan-19950222 (noting that VM has been "pushing . . . to convert its cattle plant into a horse slaughterhouse").  However, to Plaintiffs' knowledge, VM made no attempt to mitigate its damages.  Plaintiffs must be allowed to ascertain whether VM did undertake any mitigation measures and, if not, whether that failure requires a reduction in, or rejection of, any damages the Court might consider in assessing the bond.  This evidence will be important for the Court to consider in evaluating any bond amount.  *See Nokia Corp.*, 645 F.3d at 559.

There is significant, and unknown, information regarding both RT's and VM's mitigation efforts.  Discovery and an evidentiary hearing are necessary to shed light on this issue.

## III.   <u>CONCLUSION</u>

For the reasons set forth herein, the Court should deny Responsible Transportation's and Valley Meat's separate Motions to collect on the injunction bonds.  Should the Court decide to proceed with the Motions, Plaintiffs request the opportunity to engage in discovery and an evidentiary hearing on the matter before they are deprived of their significant property interest in the bond.

Respectfully submitted this 14th day of March 2014.

/s/ *Bruce A. Wagman*
BRUCE A. WAGMAN
(Admitted *Pro Hac Vice*)
ROCKY N. UNRUH (NM Bar #3626)
SCHIFF HARDIN LLP
One Market, Spear Tower, 32nd Fl.
San Francisco, CA 94105
Telephone: (415) 901-8700
Facsimile:  (415) 901-8701
bwagman@schiffhardin.com
runruh@schiffhardin.com

*Attorneys for Plaintiffs*

BRIAN EGOLF
EGOLF + FERLIC + DAY, LLC
128 Grant Avenue
Santa Fe, NM 87501
Telephone: (505) 986-9641
brian@egolflaw.com

*Attorneys for Plaintiff Foundation to Protect New Mexico*
*Wildlife*

GARY K. KING
NEW MEXICO ATTORNEY GENERAL

By: /s/ *Ari Biernoff*
Ari Biernoff
Assistant Attorney General
408 Galisteo Street
Santa Fe, NM 87501
Telephone: (505) 827-6086
Facsimile: (505) 827-6036
abiernoff@nmag.gov

*Attorney for Plaintiff-Intervenor State of New Mexico*

Of counsel:  R. David Pederson

- 18 -

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, I filed through the United States District Court ECF System the foregoing document to be served by CM/ECF electronic filing on all counsel of record.

/s/ Bruce A. Wagman
BRUCE A. WAGMAN (Admitted *Pro Hac Vice*)
SCHIFF HARDIN LLP